**TEKER CIVILLE TORRES & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891/472-8868
FACSIMILE: (671) 472-2601/477-2511

*Attorneys for Defendants
Michael Hahm, Brian Suhr and
Sang Yeon Hahn*

FILED
DISTRICT COURT OF GUAM
MAY - 2 2003
MARY L. M. MORAN
CLERK OF COURT

(20)

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF GUAM

| | | |
|---|---|---|
| JAMES B. McDONALD, JR., | ) | CIVIL ACTION NO. 02-00031 |
| Plaintiff, | ) | |
| vs. | ) | **DECLARATION OF BRIAN Y. SUHR IN SUPPORT OF MOTION TO DISMISS** |
| SOUTH PACIFIC PETROLEUM CORPORATION, a Guam Corporation, MICHAEL HAHM, BRIAN SUHR AND SANG YEON HAHN, | ) | |
| Defendants. | ) | |

**ORIGINAL**

I, BRIAN Y. SUHR, hereby declare as follows:

1. I am the President/CEO of South Pacific Petroleum Corporation.

2. This Declaration is based upon matters within my knowledge, and if called as a witness at a hearing hereon I would testify as set forth in this Declaration.

## HANOM INVESTMENT, INC.

3. I am the president of Hanom Investment Inc. ("Hanom"), a Guam corporation which I founded in 1995. Hanom is involved in real estate development and financing, and consulting relating to those activities. I own more than 98% of the shares of stock of Hanom.

4. The other two incorporators of Hanom were Sang Kyo Lee and Yoon Ho Kim.

5. Michael Hahm, a co-defendant in the above action, was employed for about two and one-half years by Hanom from early 1996 to September, 1998. In 1998 he resigned from his job with Hanom and moved to Los Angeles.

6. Sang Yeon Hahn, who is also a co-defendant in the above action, has never worked for Hanom or held any stock or any position in Hanom.

7. The plaintiff, James McDonald has never, at any time, been an employee of Hanom. He has never received a paycheck from Hanom, and he has never been subject to Hanom's control and direction.

8. Hanom has never paid any bills of SPPC nor has it ever paid any of SPPC's payroll and has never exercised control over SPPC in any manner. Hanom did, however, allow SPPC to share Hanom's office space from late June 2000 to December 1, 2000 as an accommodation during the closing period.

## SOUTH PACIFIC PETROLEUM COMPANY

9. South Pacific Petroleum Corporation ("SPPC") is a Guam corporation incorporated on June 29, 2000. The incorporators of SPPC were Mr. Hahn, myself, Paul Kim and Mr. Hahm.

10. The controlling shareholder of SPPC is Mr. Hahn (85%). The other shareholders are Paul Kim (5%), Brian Suhr (10%) and Michael Hahm (5%).

1

11. SPPC was formed specifically for the purpose of buying the Guam assets of ExxonMobil Corporation when that company was forced to divest itself of certain assets as part of the merger between Exxon and Mobil.

12. SPPC has never owned any stock in Hanom and Hanom has never owned any stock in SPPC.

13. When SPPC was initially formed it shared an office with Hanom in the Julale Shopping Center. The reason for this was that SPPC could not take possession of the Exxon assets, including the office, until after the closing in December.

14. My secretary at Hanom, Janette Moreno, was hired by SPPC in early July, as soon as the company started operating. During the closing period (June to midnight, November 30, 2000), she was the only employee of SPPC. During the closing period, Ms. Moreno also worked at wrapping up things she had been working on at Hanom.

15. When SPPC was formed in June, it hired Michael Hahm and me as consultants. McDonald was hired by SPPC as a consultant in early July. It was SPPC's intention to convert the consulting positions to full time employment positions once the deal with ExxonMobil closed (which is in fact what happened in December, 2000).

## HIRING OF JAMES McDONALD

16. In March, 2000, I learned that Exxon was trying to sell its Guam assets. I was also informed that the bidding process was already well under way, and that the top bidder for the Exxon assets was looking for prospective joint venture partners to help purchase the assets. I learned that the top bidder was a joint venture between the FPX, LLC and David Pangelinan ("FPX JV"), which was represented by James McDonald. I was initially interested in having Hanom participate directly. Given the amount of money needed to buy the assets, I quickly realized this was not possible. I then decided to find an investor who might be interested in a joint venture with Hanom, or who would be willing to use Hanom as a broker. I contacted Michael Hahm and he put me in contact with Sang Yeon Hahn, a wealthy businessman who owned a number of businesses.

17. In March, 2000 I contacted James McDonald at his home in California to find out what type of help the FPX JV was looking for. I learned from McDonald, who was representing the

1 | FPX JV, that it needed financing. Mr. McDonald faxed me some preliminary financial projections and gave me a brief history of the Exxon asset divestment. Mr. McDonald offered to meet with Mr. Hahn.

18. In March of 2000, Mr. McDonald drove to L.A. to meet with Mr. Hahn, Mr. Hahm, Paul Kim and one of Mr. Hahn's son, who represented Calihahn's Co. LLP (one of Mr. Hahn's companies), to give a presentation on the deal. McDonald was acting throughout this time solely on behalf of the FPX JV.

19. After the presentation, Calihahn's Co. LLP informed me that they were interested in the deal and asked Hanom to begin information gathering on the project. Hanom was then introduced to the FPX principals by Mr. McDonald, and I discussed with them the formation of a joint venture relationship between Hanom/Calihahn and the FPX JV.

20. Hanom/Calihan and the FPX JV discussed some potential joint venture structure in jointly pursuing the Exxon asset purchase and arrived at an informal intent to form a joint venture if our discussions with Exxon were successful.

21. In March, 2000, I participated in a conference call with a representative of FPX, Michael Hahm and Dave Kingston, the chief negotiator for Exxon. The purpose of the call was to understand the current status of the negotiations between FPX and Exxon, to tell them about our proposed joint venture and to give Exxon assurances that a joint venture between FPX and Hanom/Calihahn could fund the asset purchase.

22. During the telephone conference, it became clear that Exxon was very skeptical about FPX's ability to close the deal. Exxon said that it was tired of dealing with FPX, that it had been dealing with them for more than six months and that it was time for FPX to either pay up or walk away. Exxon then demanded that FPX deposit $23 million within the next 48 hours, or Exxon would look for another buyer. At that point, I decided that the present discussions between FPX and Exxon would never be successful. I politely told Exxon and FPX that we were not prepared to commit to a deal and Michael Hahm and I excused ourselves from the discussions.

3

23. After the telephone conference, I told FPX and Mr. McDonald that Hanom/Calihan would never do business under these unreasonable terms and that we needed to have time to conduct our due diligence inquiry.

24. Within the next few days, the FPX JV and Hanom/Calihahn signed a termination letter cancelling our intent to form a joint venture. I immediately informed Mr. McDonald that the joint venture intent between FPX and Hanom/Calihahn was terminated and thanked him for his efforts to tie FPX and Hanom/Calihan together. My communication with Mr. McDonald terminated at this point until a few months later in June 2000.

25. FPX did not come up with the money and Exxon went to other bidders on its short list. Exxon was not able to reach an agreement with any of the other bidders and intended to re-bid the assets. In mid-May, 2000 When I learned of this, I contacted Exxon and expressed Hanom/Calihahn's continued interest to buy the assets. This time Exxon was much more interested. It sent me a bid package and we began talking in earnest. Hanom/Calihahn hired Larry Hilton of Stillwater Associates to assist us in formulating our purchase bid for the Exxon assets. McDonald had no involvement with us at that time and provided us with no assistance.

26. After Hanom/Calihahn made its purchase bid and well into our second-round bidding discussions with Exxon, in June, 2000 I telephoned Mr. McDonald and asked him if he would be willing to join the Hanom/Calihan team in pursuing the Exxon assets. He said that he was representing another bidder (an investment banking firm based in California, separate from FPX) and that he would stick with his client. I told him that I admired his loyalty and I asked him if he would be interested in working for Hanom/Calihahn if it was the successful buyer. McDonald said he would not participate with Hanom/Calihahn because he represented an entity competing for the same assets, but he asked me to give me a call if we were successful.

27. Mr. Hahm, myself and Patrick Civille of Teker & Civille Law Firm went to Singapore and negotiated the purchase agreement with Exxon. During the negotiations, Mr. McDonald never participated in our discussions. It was known by all involved, including the members of the Exxon negotiation team, that Mr. McDonald was representing a competing bidder during our negotiations. The negotiations between Hanom/Calihahn was successful and the principals of Hanom/Calihahn,

4

1  Mr. Hahn, Mr. Hahm, Paul Kim and I formed SPPC. Then on June 29, 2000, SPPC signed a
2  purchase agreement contract for the Exxon assets. That same night, I called McDonald and told him
3  that SPPC had a signed contract and I asked him if he wanted to work for SPPC. McDonald said
4  that he was prepared to start immediately.

5      28.     SPPC paid for a ticket to fly McDonald to Guam.

6      29.     Mr. McDonald was retained in early July, 2000 as a consultant. There was no written
7  contract. He was initially retained as a consultant at the rate of $7,500 per month. On December 1,
8  2000 he was hired as a full time SPPC "at will" employee at a salary of $110,000 per year with full
9  company benefits, in the position of General Manager.

10     30.     At the time he was hired, Mr. Hahn indicated to McDonald that it was SPPC's
11 intention to make him a non-voting member of the Board of Directors, (this did not require the
12 company to issue him a qualifying share of stock). McDonald participated in most Board of
13 Directors discussions, but recused himself whenever a Board of Directors voted.

14     31.     At no time was Mr. McDonald ever promised or guaranteed a 5% shareholding
15 interest in SPPC.

16     32.     During his tenure at SPPC, McDonald only worked for SPPC, a Guam corporation.
17 He did not work for Hanom, he did not work for me, he did not work for MR. Hahm or Mr. Hahn.
18 SPPC was at all time operated and managed through its Board of Directors which meets on a regular
19 basis and conducts itself in the manner of a corporation.

20     **COMPANY VEHICLE**

21     33.     McDonald was provided a company vehicle, which SPPC had purchased from me for
22 fair market value in a transaction approved by SPPC's Board of Directors.

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

## NO HARASSMENT

34.     I have read in the complaint and in his declaration Mr. McDonald's allegations that he was harassed due to his weight, and race and ethnic background. These allegations are despicable and completely and utterly false.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2003, in Hagåtña, Guam.

BRIAN Y. SUHR