**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Defendant*
*South Pacific Petroleum Corporation*



**FILED**
DISTRICT COURT OF GUAM

MAY - 6 2005

**MARY L.M. MORAN**
**CLERK OF COURT**



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| JAMES B. McDONALD, JR., | ) CIVIL ACTION NO. 02-00031 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES IN SUPPORT OF** |
| SOUTH PACIFIC PETROLEUM | ) **MOTION FOR SUMMARY** |
| CORPORATION, a Guam Corporation, | ) **JUDGMENT** |
| | ) |
| Defendant. | ) |
| | ) |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.   Plaintiff Has Failed To Exhaust Administrative Remedies
        With Respect To Americans With Disabilities Act Claims
        And These Claims Should, Therefore, Be Dismissed For Lack
        Of Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.   Plaintiff Is Not "Disabled" Under The Americans With
        Disabilities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.   The Hostile Work Environment Claims Do Not Fall Within the
        Period and Should Be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   E.   There Was No Discrimination Under Either Title VII And the ADA . . . . . . . . . . . . 14

   F.   McDonald Cannot Establish A Hostile Work Environment . . . . . . . . . . . . . . . . . . 16

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## Cases

*Bergene v. Salt River Project Agricultural Improvement & Power District,*
272 F.3d 1136 (9th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brown v. City of Tucson,* 336 F.3d 1181 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,*
818 F.2d 1466 (9th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . . . . . . . . . . 6, 7

*Churchill v. Star Enterprises,* 183 F.3d 184 (3d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Cordova v. State Farm Ins.,* 124 F.3d 1145 (9th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*Costa v. Desert Palace Inn,* 539 U.S. 123 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Davis v. Alhambra Nat. Water Co., Inc.,* No. C-97-3290-VRW,
1999 WL 33435, *2 (N.D. Cal. Jan. 20, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498 (1980) . . . . . . . . . . . . . . . . . . 12

*E.E.O.C. v. United Parcel Service, Inc.,* 306 F.3d 794 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . 18

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253,
88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fox v. General Motors Corp.,* 247 F.3d 169 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Francis v. City of Meridien,* 129 F.3d 281 (2nd Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 15-16

*Goodman v. L.A. Weight Loss Centers, Inc.,* No. Civ.A. 04-CV-3471,
2005 WL 241180 (E.D. Pa.. Feb. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gordon v. E.I. Hamm & Associates, Inc.,* 100 F.3d 907 (11th Cir. 1996) . . . . . . . . . . . . . . . . 11

*Gregory v. Widnall,* 153 F.3d 1071 (9th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253 (10th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . 8

*Hagans v. Andrus,* 651 F.2d 622 (9th Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hernandez v. Hughes Missile Systems Co.,* 362 F.3d 564 (9th Cir. 2004) . . . . . . . . . . . . . . . . . 9

*Hoesterey v. City of Cathedral City,* 945 F.2d 317 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . 12

*Johnson v. xpedx*, No. CIV. 03-2630PAMRLE),
2004 WL 2453051, *3 (D.Minn. Oct. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kennedy v. Applause, Inc.*, 90 F.3d 1477 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Leong v. Potter*, 347 F.3d 1117 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lindahl v. Air France*, 930 F.2d 1434 (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*London v. Coopers & Lybrand,* 644 F.2d 811 (9th Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lyons v. England,* 307 F.3d 1092 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792,
93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McGinest v. GTE Service Corp.,* 360 F.3d 1103 (9th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . 15

*Meritor Savings Bank v. Vinson,* 477 U.S. 57,
106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269 (11th Cir.2002) . . . . . . . . . . . . . . . . . . . . 17

*National R.R. Passenger Corp. v. Morgan,*
536 U.S. 101, 826, 122 S.Ct. 2061 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Porter  v. California Department of Corrections,*
383 F.3d 1018 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . 9

*Roberts v. Dimension Aviation*, 319 F.Supp.2d 985 (D. Ariz. 2004) . . . . . . . . . . . . . . . . . . . . 18

*Sotolong v. New York City Transit Authority,*
63 F.Supp.2d 353 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Stedman v. Bizmart, Inc.,* 219 F.Supp.2d 1212 (N.D.Ala. 2002) . . . . . . . . . . . . . . . . . . . . . . . 17

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139 (1999) . . . . . . . . . . . . . . . . . . 10

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
310 F.3d 1188 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,*
809 F.2d 626 (9th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Thompson v. Holy Family Hosp.*, 121 F.3d 537 (9th Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 780 (9th Cir. 2001),
    *opinion clarified,* 292 F.3d 1045 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Union Sch. Dist. v. Smith,* 15 F.3d 1519 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 15

*Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . 7

*Wallin v. THC Chicago, Inc.*, No. 99 C 3173,
    2004 WL 2535283 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wallis v. J.R. Simplot Co.,* 26 F.3d 885 (9th Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wei v. Chicago State University*, No. 01 C 7509,
    2003 WL 22048081, *11 (N.D.Ill. Aug. 29, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*White v. City of San Diego,* 605 F.2d 455 (9th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wilkerson v. Grinnell Corp.*, 270 F.3d 1314 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Zarek v. Argonne Nat. Laboratory*, No. 97 C 6964,
    1998 WL 547288, *3 (N.D.Ill. Aug. 27,1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Statutes

Title VII of the Civil Rights Act of 1964,
    42 U.S.C. § 2000e-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    42 U.S.C. § 2000e-5(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    42 U.S.C. § 2000e-5(b), (e), (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    42 U.S.C. § 2000ee-5(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12117
    42 U.S.C. § 12102(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    42 U.S.C. § 12102(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 10
    42 U.S.C. § 12102(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18
    42 U.S.C. § 12111(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    42 U.S.C. § 12112(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    42 U.S.C. § 12117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    42 U.S.C. § 12117(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## Rules

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I. FACTUAL BACKGROUND

Plaintiff, James B. McDonald ("McDonald"), is a Chamorro male. *See* Transcript of Deposition of J. McDonald ("McD Depo."), 11:6-10, Civille Decl. **Ex. A**. Chamorros are the indigenous people of Guam. He is 5'7" tall and weighs 280 pounds. *Id.*, 12:2-9. Defendant, South Pacific Petroleum corporation ("SPPC"), is a Guam corporation which operates gasoline service stations, convenience stores ("c-stores"), fuel terminal facilities and liquid propane gas ("LPG") facilities in Guam. *See* Declaration of Brian Suhr ("Suhr Decl.") ¶3, filed herewith.

In 2000, as part of the merger between Exxon and Mobil Oil, Exxon was required to divest itself of its assets on Guam. *Ibid.* SPPC was formed for the purpose of buying the Exxon assets. *Ibid.* The investors and incorporators of SPPC were four men of Korean or Korean-American heritage. *Ibid.* In order to be able to market its products under major brand names, SPPC entered into an agreement with TMC Franchise Corporation, a division of Tosco, Inc., whereby SPPC was licensed to sell 76 brand gasoline, and it was granted a franchise to operate Circle K convenience stores at its service station locations. Civille Decl. **Ex. B**.

McDonald was aggressively recruited by SPPC to be the company's vice-president and general manager. Suhr Decl. ¶¶ 8-10. This was the number three position in the company, and the highest position held by a non-investor. McDonald had many years experience in the petroleum industry, and had previously held executive level positions with Exxon and Mobil on Guam. Additionally, McDonald was highly recommended by SPPC's president's step-father, who was a professor at the University of Guam. *Id.* 12. McDonald was hired by oral agreement as at will employee. *See* SPPC Confidentiality Agreement ¶ 7, attached as **Ex. C** to Decl. of Patrick Civille ("Civille Decl") filed herewith. McDonald was initially hired as a consultant for five months, until the closing of the Exxon/ SPPC sale, at a salary of $7,500 per month. Upon closing of the sale he became the vice-president/general manager at a base salary of $144,000 per year. McD Depo. 75:1-15; Civille Decl. Ex. A. McDonald reported directly to executive vice-president, Michael Hahm ("Hahm") on most matters, and to the president, Brian Suhr ("Suhr") on other matters. Hahm Decl.¶ 2. Problems in the employment relationship developed in early 2001, during the period in

1

which SPPC was converting Exxon's service stations and c-stores to SPPC operated 76 stations and Circle K stores. SPPC was under a tremendous amount of pressure to complete the conversion in a timely manner. McDonald had oversight responsibilities for the entire SPPC operations. Many tasks assigned to him did not get accomplished in a timely manner, and Suhr and Hahm determined that critical decisions and paperwork were getting logjammed on McDonald's desk. Hahm Decl. ¶¶ 5-6, Suhr Decl. ¶¶ 17-19. The failure of McDonald to timely respond to queries from subordinates and his failure to insure that assigned tasks were completed on time became a source of tremendous frustration. Suhr and Hahm discussed this problem with MacDonald, but it was never fully rectified. Hahm Decl. ¶ 6.

A much more costly problem arose in early 2001. Suhr gave McDonald instructions to check he leases on SPPC's various service stations to determine when the option dates to extend the leases fell due. These were originally Exxon leases and Exxon had included in the leases options to extend the leases at favorable lease rates. Suhr Decl. ¶¶ 20-22. McDonald resisted Suhr's instructions, and claimed that the law firm which had represented Exxon, and which was doing work also for SPPC, had a tickle system and would let SPPC know when it had to renew leases. *Ibid.* Suhr insisted that McDonald perform and independent review of the leases and double check the extension dates. *Ibid.* McDonald reluctantly agreed, but then failed to take any action. About two months later SPPC was advised that the option period on the leases on its Agat service station had passed without being exercised. *Ibid.* As a result, SPPC nearly lost the leases to Shell Guam. In the end, SPPC was able to renew the leases, but only by agreeing to an increase in payments from about $700 a month to almost $7,000 per month. Hahm Decl ¶ 7. McDonald admitted that he had "dropped the ball" on this matter. This mistake cost SPPC more than $75,000 per year, and will cost the company more than $650,000 over the life of the leases. *Id.*

A further problem developed regarding McDonald's reassignment of workers. As general manager, McDonald had broad discretion where to assign workers. Hahm Decl. ¶ 9. Because McDonald had more experience in the petroleum business that Suhr or Hahm, they tended to defer to McDonald's decisions on employee placement. *Ibid.* Although SPPC was a new company, it

2

needed to hire very few people since it was contractually obligated to keep all Exxon employees for a period of 12 months following the closing (unless discharged for cause). Suhr Decl. ¶ 44. As a result, SPPC inherited a fairly well seasoned work force. *Ibid.* McDonald insisted on moving key managers to different positions. Among others, he moved Glen Leon Guerrero from the position of terminal manager (which he had been holding under Exxon) to the retail manager' position. Leon Guerrero did not have a strong c-store background and did not perform well in this position. Circle K became dissatisfied with this transfer and concerned that Mr. Leon Guerrero would not be an effective manager of c-store operations.

A very serious problem with respect to McDonald arose in late spring 2001. Circle K had sent an expert, Klaus Kokott, to Guam for six months to oversee the c-store conversion. Under our franchise agreement with Circle K we were required to set up and operate the c-stores strictly according to Circle K guidelines. McDonald had apparently set up c-stores for Exxon about 10 years earlier on Guam and he had very strong opinions about how a c-store should be set up and operated. It quickly became apparent that McDonald's views on c-stores were quite different from Circle K's views. Both Suhr and Hahm had meetings with McDonald in which they stressed the need to do things the Circle K way – that it was SPPC's duty as franchisees to follow Circle K. McDonald was highly resistant to this; he genuinely believed he knew what was best and he wanted to do things his way. Hahm ¶ 10.

In late spring or early summer 2001, John Patton, a vice president for Circle K International, who was in charge of coordinating the conversion on Circle K's behalf, complained to Suhr and to me that the conversion on the c-stores was behind schedule and that there was a real risk the stores would not be ready by the conversion deadline. Id. ¶ 11. Patton expressed his concern that McDonald was not supporting Klaus Kokott's work, and that McDonald was in some instances countermanding Kokott's instructions. *Ibid.* Patton reminded SPPC that the stores had to be set up and operated according to Circle K standards, and he added that this would ensure the value SPPC was paying to achieve. Patton made it quite clear that Circle K expected SPPC to comply with its contractual obligations as a franchisee. *Ibid.*

Suhr and Hahm again talked to McDonald and told him that Kokott had to be supported. McDonald continued to insist that Circle K was not making the best decisions, but he did not appear to be interfering with Kokott and the store conversion was completed on schedule.

SPPC management believed that McDonald had finally come to the realization that the c-stores were a franchise operation and that neither he nor SPPC would have as much autonomy as McDonald had in his days with Exxon. Unfortunately, this was an incorrect assumption. About a week before the grand opening of the Circle K stores on Guam, Kokott went to Saipan for a one or two-day trip. While he was gone, McDonald approached Hahm and told him not to worry, that Kokott was leaving soon and that he (McDonald) "would change everything and make it right once Kokott leaves." This was very disturbing and it indicated how out of step McDonald had become with the wishes of the Board.

Hahm discussed McDonald's comments with Suhr and the rest of the Board. There was a unanimous agreement that, when all factors of McDonald's performance were considered, and especially given his inability to grasp the Board's very strong need and desire to have a good relationship with Circle K and do things in the manner Circle K required, that McDonald should be terminated from his position as vice-president and general manager. Hahm Decl. ¶ 14. Suhr was authorized to deliver the news to McDonald and to offer him a six-month severance package couched in terms of a consulting contract. *Ibid.* The consulting contract was intended as a face saving measure to cushion McDonald from the embarrassment of being publicly terminated.

SPPC and McDonald agreed that McDonald would serve as a consultant to the company for 6 months following his termination. Consultant Agreement attached as **Ex. D**, Civille Decl. This agreement was strictly intended by SPPC to be face saving arrangement for McDonald, and it required no duties by McDonald. Hahm Decl. ¶ 14.

McDonald was terminated on October 21, 2001. On April 19, 2002 McDonald filed a charge of discrimination with EEOC alleging only that he had been discriminated on as result of national origin, and describing the offensive conduct to have been "In August and September 2001, I was subjected to ethnically derogatory remarks by Michael Hahm (Korean), executive Vice President.

Hahm told me that he was uncomfortable with the local people (Chamorros) and that their work was not as good as the people from the US mainland." *See* EEOC Charge, **Ex. E** Civille Decl.

After receiving a right to sue letter, McDonald initiated action in this Court. McDonald asserts four causes of action against SPPC[1]. "Claim One", *see* Amended Complaint, ¶¶ XV-XXVI, was brought under section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and based on McDonald's allegation that during the course of his employment he was discriminated against by the Defendants "with respect to the terms, conditions, and privileges of employment because of [his] race, color and ethnic origin. . . ." Amended Complaint, ¶ XVI. "Claim Two, Amended Complaint, ¶¶ XXVII-XXVIII, was also brought under Title VII and contained allegations that McDonald was "subjected . . . to differential terms and conditions of employment because of his race, color and ethnic origin . . . . [that] included harassment based on Plaintiff's race, color and ethnic origin . . . . in violation of Title VII." Amended Complaint, ¶ XXVIII.

The remaining two claims were based on alleged violations of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-12117. In "Claim Three", Amended Complaint, ¶¶ XXIX-XXXI, McDonald alleged that he was "overweight during the course of his employment, [and] was informed that he would be fired if he did not meet defendants' South Pacific Petroleum Corporation, Hahn's, Suhr's and Hahm's weight qualifications." Amended Complaint, ¶ XXX. He alleged that "Defendants South Pacific Petroleum Corporation and Hahn have a policy of not employing anyone who appears overweight . . . . [and that] [t]his policy discriminates against and has a disparate impact on Pacific Islanders in that these individuals are associated by defendants and all of them as being fat, lazy, inefficient and expensive to employ." *Ibid.* McDonald alleged that this disparate impact "constitutes discrimination based disability [sic] in violation of 42 USCA § 12101 et seq.," Amended Complaint, ¶ XXXI, and that he, McDonald, could "perform the management functions for defendant South Pacific Petroleum Corporation but has been denied the

---

[1]McDonald also filed claims against individual defendants Brian Suhr, Chairman Hahn and Michael Hahm. Those charges were dismissed by Order of the Court on May 21, 2003.

opportunity of employment, all as a result of discrimination based on disability." *Ibid.* He further alleges that SPPC employs over two hundred persons in Guam "with none being Pacific Islander in similar levels of management where plaintiff was performing." *Ibid.* In his final claim, "Claim Four," Amended Complaint, ¶¶ XXXII-XXXVII, McDonald alleges that during the course of his employment he "was continuously harassed about his weight, and threatened by Defendants in front of other employees, friends and family, that if he did not lose weight, he would be enrolled in a fat camp or discharged." Amended Complaint, ¶ XXXIII. He alleges that this "harassment occurred in violation of 42 USCA §§ 12101 et seq." Amended Complaint, ¶ XXXIV.

## II. ARGUMENT

### A. Summary Judgment Standard.

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN11] *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by " 'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir.1987).

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *See Celotex,* 477 U.S. at 322-23, 106 S.Ct. 2548; *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348; *Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002).

## B. Plaintiff Has Failed To Exhaust Administrative Remedies With Respect To Americans With Disabilities Act Claims And These Claims Should, Therefore, Be Dismissed For Lack Of Subject Matter Jurisdiction.

In Claims III and IV of his Amended Complaint, McDonald asserts claims for disability discrimination under Title I of the ADA. These claims should be dismissed because he has failed to exhaust his administrative remedies.

The ADA incorporates by reference the two-step administrative and judicial enforcement scheme of Title VII of the 1964 Civil Rights Act. *See* 42 U.S.C. § 12117(a). Thus, before a plaintiff may file a civil action under Title I of the ADA, he must exhaust administrative remedies, which include filing a charge of discrimination with the EEOC within 180 days after the alleged violations occurred and filing suit within 90 days after receiving a right-to-sue letter from the EEOC. *See* 42 U.S.C. § 2000e-5(b), (e), (f); 42 U.S.C. § 12117(a) (Title I incorporation of § 2000e-5 by reference); *Davis v. Alhambra Nat. Water Co., Inc.*, No. C-97-3290-VRW, 1999 WL 33435, *2 (N.D. Cal. Jan. 20, 1999) ( "The filing of an EEOC charge is a prerequisite to bringing a civil action under the ADA.

*See* 42 USC § 12117, incorporating exhaustion requirement codified at 42 USC § 2000e-5 into the ADA"). The scope of a civil action alleging disability discrimination is limited by the charge filed with the EEOC."). Under the ADA, a plaintiff must exhaust his administrative remedies before filing a civil action in a federal court. See 42 U.S.C. § 12117; *see also Churchill v. Star Enterprises,* 183 F.3d 184, 190 (3d Cir.1999).

In his EEOC charge, McDonald did not check the box for disability discrimination and in his factual statement to the EEOC, he referred only to race or national origin discrimination. Although a failure to mark the box for disability discrimination "is not dispositive . . . it certainly creates a presumption that [he] was not asserting claims represented by boxes not checked." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1260 (10th Cir.1998) (internal citations omitted). In *Grunnell*, the court held that the "presumption was not rebutted by the text of her claim because the prose she used to describe her claim did not clearly set forth a sexual discrimination claim," *ibid.*, but held that a later supplement to the plaintiff's EEOC charge did complain about harassment. *Ibid.* As in *Grunnell*, McDonald did not check the disability box in his EEOC complaint and the text of his claim does not rebut this presumption. *See also, Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003),("[c]onstruing his EEOC charge with the utmost liberality, we conclude that it does not satisfy the exhaustion requirement."), ("A decision that an EEOC complaint with no mention whatsoever of disability is "like or reasonably related to" Leong's disability claim would reduce the exhaustion requirement to formality.). *In accord, Sotolong v. New York City Transit Authority*, 63 F.Supp.2d 353 (S.D.N.Y. 1999).

Because McDonald has failed to exhaust his administrative remedies with respect to his ADA claims, this Court lacks subject matter jurisdiction over these claims and they should, therefore, be dismissed.

**C.     Plaintiff Is Not "Disabled" Under The Americans With Disabilities Act.**

In order for McDonald to establish a *prima facie* case under the Americans with Disabilities Act he must show that he was "disabled" or was regarded as disabled. In both cases, McDonald would have to establish that he suffered from a physical or mental impairment that substantially

8

limits one or more of the major life activities or was regarded as suffering from such an impairment. McDonald does not make such allegations in his amended complaint, and there is no evidence whatsoever to suggest that McDonald suffered such impairment or that SPPC thought he suffered such impairment; his claims under the ADA should, therefore, be dismissed.

> The Americans with Disabilities Act directs that

>> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "disability" is defined, with respect to an individual, as:

> (A) a physical or mental impairment that substantially limits one or more
> of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

"In order to prevail on an employment termination claim under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA, (2) that he is qualified, that is, with or without reasonable accommodation (which he or she must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). A plaintiff "bears the burden of proving, by a preponderance of the evidence, that his disability 'actually played a role in [the employer's decision making] process and had a determinative influence on the outcome.'" *Hernandez v. Hughes Missile Systems, Co.*, 362 F.3d 564, 568 (9th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 141 (2000)).

"A plaintiff in an ADA case bears the burden of proving disability within the meaning of the ADA." *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 780, 794 (9th Cir. 2001), *opinion*

9

*clarified*, 292 F.3d 1045 (9th cir. 2002). To have a disability, the plaintiff must have "a physical or mental impairment that substantially limits one or more of the major life activities." 41 U.S.C. § 12102(2)(A).

For obesity to be a disability under the ADA it must be morbid obesity related to a physiological impairment. Even when the claim is based on a perception that a person is morbidly obese the plaintiff must show that the employer believed that the plaintiff suffered from a physiological disorder substantially limiting his major life activities. *Francis v. City of Meridien*, 129 F.3d 281, 286 (2nd Cir.1997); *Zarek v. Argonne Nat. Laboratory*, No. 97 C 6964, 1998 WL 547288, *3 (N.D.Ill.) (N.D.Ill. Aug. 27,1998).

In *Goodman v. L.A. Weight Loss Centers, Inc.*, No. Civ.A. 04-CV-3471, 2005 WL 241180 (E.D. Pa. Feb, 1, 2005), the plaintiff's application for employment with the defendant was rejected in part because of concerns about the plaintiff's weight. Plaintiff sued, alleging that the sole basis for the denial of employment was the defendant's perception that his morbid obesity constituted a disability. 2005 WL 241180 at *1. The court noted, citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139 (1999), that

> In order to be "regarded as" having a disability under the ADA, Plaintiff must show that he (1) has a physical or mental impairment that does not substantially limit major life activities, but is treated by a covered entity as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or, (3) has no such impairment, but is treated by the covered entity as having a substantially limiting impairment

2005 WL 241180 at *2.

As stated by the Ninth Circuit in *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789 (9th Cir. 2001),

> An individual is protected by the ADA if he or she is "regarded as having," 42 U.S.C. § 12102(2)(C), a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A). McClatchy must have believed that Thornton either had a substantially limiting impairment that she did not have, or that she had a substantially limiting impairment which, in fact, was not so limiting. Sutton, 527 U.S. at 489, 119 S.Ct. 2139. As with real impairments, "a perceived impairment must be substantially limiting and significant." Thompson, 121 F.3d at 541 (internal quotation marks omitted).

261 F.3d at 789.

There is no evidence that SPPC or its agents regarded McDonald as having a substantially limiting impairment. It is clear, for example, that McDonald remained in his position after the allegedly discriminatory remarks, a fact showing SPPC did not consider McDonald's weight as limiting his ability to work or, for that matter, to engage in any major life activity. *See Gordon v. E.I. Hamm & Associates, Inc.*, 100 F.3d 907, 913 (11th Cir. 1996) (plaintiff, following chemotherapy, continued to perform same or similar work). In fact, the evidence is to the contrary.

## D. The Hostile Work Environment Claims Do Not Fall Within the Period and Should Be Dismissed.

Title 42 U.S.C. § 2000e-5(e)(1), directs that "a charge under this section shall be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter. . . ."[2] Section 2000e-5(e)(1) "is a charge filing provision that specifies with precision the prerequisites that a plaintiff must satisfy before filing suit," *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 826, 122 S.Ct. 2061, 2070 (2002), and "[a]n individual must file a charge within the statutory time period and serve notice upon the person against whom the charge is made." *Ibid.* In *Morgan*, the Supreme court pointed out that:

> For our purposes, the critical sentence of the charge filing provision is: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." § 2000e-5(e)(1) (emphasis added). The operative terms are "shall," "after ... occurred," and "unlawful employment practice." "[S]hall" makes the act of filing a charge within the specified time period mandatory. *See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("[T]he mandatory 'shall,' ... normally creates an obligation impervious to judicial discretion"). "[O]ccurred" means that the practice took place or happened in the past. [FN5] The requirement, therefore, that the charge be filed "after" the practice "occurred" tells us

---

[2]     Section 2000e-5(e)(1) also establishes a three hundred day filing period in a case where "the person aggrieved has initially instituted proceedings with a State of local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof," or a thirty day filing period running from the receipt of notice that the State or local agency has terminated proceedings, whichever occurs earlier. 42 U.S.C. § 2000ee-5(e)(1). McDonald did institute proceedings before a State or local agency in this case. Furthermore, Guam is not a "deferral state", *see* 29 C.F.R. § 1601.74 (listing designated FEP agencies); § 1601.80 (listing certified designated FEP agencies), and "[f]or a charge to be timely in a non-deferral state . . . it must be filed within 180 days of the last discriminatory act." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).

11

that a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC.

536 U.S. at 109-110, 122 S.Ct. at 2070.

In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498 (1980), the plaintiff alleged that his employer, a college, violated Title VII when it denied him tenure and terminated his employment on the basis of his race. *See id.* at 254. Specifically, Ricks argued that his eventual termination, a year after he was denied tenure, was part of a continuing violation that began with the college's decision to deny him tenure. *See Id.* Under the college's policy, junior faculty who are denied tenure are offered a "terminal" contract to teach one additional year. When that contract expires, so too does the employment relationship. The Court recognized that the statute of limitations commenced when Ricks was notified that he would not receive tenure, and then stated, "[i]t is simply insufficient for Ricks to allege that his termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.'" *See id.* at 252-53.

Thus, the period in which a claim for wrongful discharge may be brought begins to run once the employee is notified of her termination. In *Hoesterey v. City of Cathedral City,* 945 F.2d 317, 319 (9th Cir.1991), the Ninth Circuit, discussing *Ricks*, noted that "Ricks, on learning of the denial of tenure, would have notice of all allegedly wrongful acts that he later sought to challenge, [and] the statute of limitations must be deemed to commence at that time." 945 F.2d at 319. The court noted that "the termination of Ricks' employment was not an independent discriminatory act, but merely the 'delayed, but inevitable, consequence of the denial of tenure.'" *Id.*; *see also London v. Coopers & Lybrand,* 644 F.2d 811, 816 (9th Cir.1981) ("Absent special circumstances, a single act by an employer adverse to an employee's interests, such as a discharge, layoff, or failure to transfer or promote, begins the running of the statute of limitations and the natural effects of the allegedly discriminatory act are not regarded as 'continuing.' ").

In *Porter v. California Department of Corrections,* 383 F.3d 1018 (9th Cir. 2004, the Ninth Circuit refused to include discrete acts occurring within the limitations period as part of the same

12

unlawful employment practices reflected by non-discrete acts occurring outside of the limitations period. The court stated that:

> As the Supreme Court emphasized, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113, 222 S.Ct. 2061 [*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 122 S.Ct. 2061(2002)]; *see also Cherosky v. Henderson*, 330 F.3d 1243, 1245-47 (9th Cir. 2003) (declining to treat a series of related employment decisions as a pattern or practice, but finding that each decision was a discrete act). Consequently, we refuse to mix recent discrete acts like tinder with the planks of ancient sexual advances and then, regardless of whatever it was that set the spark in the furnace, call the fire that ignites therefrom a hostile environment. If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts.

383 F.3d at 1027.

Thus, discrete acts falling within the limitations period could not be used to satisfy the requirement that at least one act contributing the hostile work environment come within the limitations period. *See* 383F.3d at 1028 ("When the ashes are sifted, the bulk of the conduct attributed by Porter to the CDC and its agents falls into the category of discrete acts: for instance, refusing to grant Porter's requests for vacation or holidays, requiring Porter to be tested for tuberculosis by her own physician, threatening disciplinary action while she was on medical leave, leaving a negative performance evaluation in her personnel file, and instructing her to enter the work site through the back gate.").

In *Wallin v. THC Chicago, Inc.*, No. 99 C 3173, 2004 WL 2535283 (N.D. Ill. 2004), the court found the hostile work environment claim based on sex to be untimely, refusing to consider the firing of the plaintiff as an act creating a hostile work environment:

> As for her hostile environment clam based on sex, this too is time-barred because it is based on two comments made by Tse (that she was "pretty" and that he expected her to act "like his little sister"). These comments occurred well outside the period, and plaintiff cannot link them to any other sexually harassing comment within the period. Plaintiff argues that Tse said she was not a moral person but this comment is not tied to her sex. She also ties to point to the fact that she was fired. But her firing was not an act creating a hostile environment but was (allegedly) an example of disparate treatment between her and the male doctor. It therefore is not part of the same hostile environment claim. For these reasons, plaintiff's termination cannot be used as the hook to draw in the untimely acts.

2004 WL 2535283, at *7.

**E. There Was No Discrimination Under Either Title VII And the ADA.**

Under the familiar framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), "a plaintiff may prove his case through circumstantial evidence by showing that (1) he belongs to a statutorily protected class, (2) he applied for and was qualified for an available position, (3) he was rejected despite his qualifications, and (4) after the rejection, the position remained available and the employer continued to review applicants possessing comparable qualifications." *Lyons v. England,* 307 F.3d 1092, 1112 (9th Cir. 2002); *see also Bergene v. Salt River Project Agricultural Improvement & Power District,* 272 F.3d 1136 (9th Cir.2001) ("To state a prima facie case of discrimination, a plaintiff must show (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably."). On a summary judgment motion, "the 'requisite degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Lyons, supra.*

A presumption that the employer unlawfully discriminated against the employee arises if the *prima facie* case is established. *See ibid.* "The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's rejection." *Ibid.*

Finally, if the employer sustains its burden, the plaintiff must then show that "the proffered nondiscriminatory reason is merely a pretext for discrimination." *Ibid.* Pretext can be proven either '(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Ibid.*

The Ninth Circuit recognizes a need for a flexible approach to the *McDonnell Douglas* framework. *See Hagans v. Andrus,* 651 F.2d 622, 625 (9th Cir.1981) (citing *White v. City of San Diego,* 605 F.2d 455, 458 (9th Cir.1979), for the proposition that "a proper prima facie case identifies sex as the likely reason for the denial of a job opportunity"); *see also Lyons,* 307 F.3d at 1114 ("[t]he Supreme Court has cautioned that the prima facie case method established in

14

McDonnell Douglas was 'never intended to be rigid, mechanized, or ritualistic.' ") (citation omitted). Also, while the

> McDonnell Douglas burden shifting framework is a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial," "nothing compels the parties to invoke the McDonnell Douglas presumption." Rather, when responding to a summary judgment motion the plaintiff is presented with a choice regarding how to establish his or her case. [The plaintiff] may proceed by using the McDonnell Douglas framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the defendant].

*McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1122 (9th Cir.2004). Under either approach, the plaintiff "must produce some evidence suggesting [the defendant's] failure to promote ... was due in part or whole to discriminatory intent, and so must counter [the defendant's] explanation that a [legitimate reason] accounted for its failure to promote[.]" *Id.* at 1123.

The Ninth Circuit has held, consistently with *Costa v. Desert Palace Inn,* 539 U.S. 123 (2003), that to establish a *prima facie* case, a plaintiff "must offer evidence that 'give[s] rise to an inference of unlawful discrimination,' either through the framework set forth in *McDonnell Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent." *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (citing, *inter alia,* in footnote, *Cordova v. State Farm Ins.,* 124 F.3d 1145, 1148 (9th Cir.1997)). The Ninth Circuit has stated that "derogatory comments can create an inference of discrimination." *Cordova,* 124 F.3d at 1149.

"A close review of our decisions reveals that in this circuit a plaintiff who offers substantial evidence that the employer's proffered reasons were not reliable, *see, e.g., Lindahl v. Air France,* 930 F.2d 1434, 1438-39 (9th Cir.1991), or direct evidence of discrimination, *see e.g., Cordova v. State Farm Ins.,* 124 F.3d 1145, 1150 (9th Cir.1997), has made a sufficient showing to create triable issues with respect to the employer's motivation." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1219 (9th Cir. 1998).

"'The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas,* or by more direct evidence of discriminatory intent.' *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994) (citations omitted). 'The requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and

15

does not even need to rise to the level of a preponderance of the evidence.' *Id.* at 889." *Godwin v.*

*Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

> When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. As we said in Lindahl, it need be "very little." *Lindahl*, 930 F.2d at 1438 (direct evidence of sexual stereotyping where employer believed that the female candidates get "nervous" and "easily upset"); *see also Cordova*, 124 F.3d at 1150 (direct evidence of race discrimination where employer referred to a Mexican-American employee as a "dumb Mexican."); Sischo-Nownejad, 934 F.2d at 1111 (direct evidence of sex stereotyping where employee referred to female plaintiff as "an old warhorse" and to her students as "little old ladies"). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." Davis v. Chevron, U.S.A., Inc., 14 F.3d 1082, 1085 (5th Cir.1994) (alterations in original, quotations and citations omitted).
>
> As did the plaintiffs in *Cordova* and *Lindahl*, Godwin produced evidence of direct discrimination. *See Cordova*, 124 F.3d at 1150; Lindahl, 930 F.2d at 1438. She presented a statement made by Ruschman to Hunt Wesson's national sales manager, Bernie Stipetic, that Guthier "did not want to deal with another female after having dealt with ... Louise De PreFontaine." This comment directly suggests the existence of bias and no inference is necessary to find discriminatory animus. *See Cordova*, 124 F.3d at 1149; *Davis*, 14 F.3d at 1085.

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

## F.     McDonald Cannot Establish A Hostile Work Environment.

In order to prevail on a racially hostile work environment claim, Plaintiff must establish that

(a) he belongs to a protected group, (b) he was subjected to unwelcome harassment based upon a

protected characteristic, (c) the harassment was sufficiently severe or pervasive to alter the

conditions of employment and create an abusive working environment, and (d) the employer knew

or should have known of the alleged harassment and failed to take adequate remedial action. *See*

*Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gregory*

*v. Widnall*, 153 F.3d 1071, 1074 (9th Cir.1998)).

To establish a hostile work environment claim, the plaintiff must show, among other

elements, that the challenged conduct "was sufficiently severe or pervasive to alter the conditions

of plaintiff's employment and create an abusive workplace environment." *Vasquez v. County of Los*

*Angeles*, 349 F.3d 634, 642 (9th Cir. 2004). In determining whether conduct was sufficiently severe

or pervasive to violate Title VII, courts look at

> "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

16

whether it unreasonably interferes with an employee's work performance." [*Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)] In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive." [*Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)]

*Vasquez*, 349 F.3d at 642 (citations in footnotes inserted in text).

Isolated remarks are not sufficient to sustain a hostile environment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (observing that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"). Furthermore, the language or acts complained of must be related to the protected characteristic.[3]

The Ninth Circuit has yet to decide whether a hostile work environment claim is available under the ADA. If it is, the plaintiff must still satisfy the requirement that he is disabled under the ADA. In *Fox v. General Motors Corp*, 247 F.3d 169 (4th Cir. 2001), the Fourth Circuit held that "the ADA, like Title VII, creates a cause of action for hostile work environment harassment." 247 F.3d a 176. The court then articulated the elements a plaintiff must prove to establish a claim for hostile work environment under the ADA:

> Appropriately modifying the parallel Title VII methodology, an ADA plaintiff must prove the following to establish a hostile work environment claim: (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.

247 F.3d at 177.

---

[3] *See Miller v. Kenworth of Dothan, Inc.* 277 F.3d 1269, 1275 (11th Cir.2002) ("This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) <u>that the harassment must have been based on a protected characteristic of the employee, such as national origin;</u> (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.") (emphasis added); *Johnson v. xpedx*, No. CIV. 03-2630PAMRLE), 2004 WL 2453051, *3 (D.Minn. Oct 24, 2004) (language complained about must be related to protected characteristic); *Wei v. Chicago State University*, No. 01 C 7509, 2003 WL 22048081, *11 (N.D.Ill. Aug 29, 2003) ( "Beyond a finding of objectively hostile work conditions, the complained of actions must relate to and be offensive because of a protected characteristic--Wei's national origin or sex."); *Stedman v. Bizmart, Inc.,* 219 F.Supp.2d 1212, 1223 (N.D.Ala. 2002) ( "Although the court examines the statements and conduct complained of collectively in determining whether they were sufficiently pervasive or severe to constitute disability harassment, the statements or conduct must be related to plaintiff's disability or perceived disability.")

In order to establish a claim that an individual "is regarded has having,' 42 U.S.C. § 12102(2)(C), a "physical or mental impairment that substantially limits one or more of the major life activities of such individual, 42 U.S.C. § 12102(2)(A), the defendant must have believed that the individual "either had a substantially limiting impairment that she did not have, or that she had a substantially limiting impairment which, in fact, was not so limiting." *Thorton*, 247 F.3d at 798. "As with real impairments, 'a perceived impairment must be substantially limiting and significant.'" *Thornton*, 247 F.3d at 798 (quoting *Thompson v. Holy Family Hospital*, 121 F.3d 537, 541 (9th Cir. 1997); *see also E.E.O.C. v. United Parcel Services, Inc*, 306 F.3d 794 (9th Cir. 2002) ("However, "[a]s with real impairments . . . a perceived impairment must be substantially limiting and significant'") (quoting *Thompson*).

In *Roberts v. Dimension Aviation*, 319 F.Supp.2d 985 (D. Ariz. 2004), the court noted while the Ninth Circuit has not yet held that a hostile work environment/harassment claim is actionable under the ADA, *see* 319 F.Supp.2d at 988 (citing in footnote *Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003), as noting that "[o]ur court has not yet held that such a claim exists, let alone what its source in the statute might be. We decline to do so here"),

> several other circuits have recognized such a cause of action because of the similarity between the language of the ADA and Title VII. Each prohibits discrimination with regard to "other terms, conditions, and privileges of employment" and courts have concluded that because such language is the basis for a hostile work environment claim under Title VII, the same must be true under the ADA.

319 F.Supp.2d at 988.

The conduct McDonald complains of simply does not support a hostile work environment claim under either Title VII or the ADA.

The alleged statements do not relate to national origin. The supposedly offensive statements fell into two categories. (1) McDonald claims that Hahm commented that he (Hahm) felt a greatest sense of belonging in Korea. There is nothing actionable about this type of comment. It is not directed at any racial group and it suggests no derogatory connotation toward any group. (2) Hahm is purported to have said on several occasions that he didn't want to hire locally, and that he could hire workers who were better and cheaper on the U.S. mainland. Even assuming Hahm made these

type of comments, which he denies, see Hahm Decl ¶ 17 ("we might not be able to find a qualified worker on island, and if we didn't we would have to recruit off island."), the comments were not directed any particular racial or ethnic group. Even McDonald admits that discussions about where to find the best workers at the lowest cost are appropriate topics of conversation for an employer. McDonald tries very hard to equate the words "local' or "locally" with "Chamorro", ignoring that local can just as easily refer to any person who resides on Guam as opposed to a person who must be hired from off island. For example, the hiring of Fleming, who had been living on Guam for about 9 years, is an example of hiring locally – unless one buys into McDonald's xenophobic notion that only Chamorros can qualify as locals. In this case the conduct alleged by McDonald was neither sufficiently severe or pervasive to constitute a hostile work environment under either Title VII and the ADA.

### III. CONCLUSION

For the reasons set forth herein, SPPC prays that the Court grant summary judgment in its favor on all counts of the complaint.


Respectfully submitted this 6th day of May, 2005.


CIVILLE & TANG, PLLC


By: _____
G. PATRICK CIVILLE
*Attorneys for Defendant*
*South Pacific Petroleum Corporation*