CIVILLE & TANG, PLLC
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÁTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Defendant*
*South Pacific Petroleum Corporation*



DISTRICT COURT OF GUAM

MAY - 6 2005

**MARY L.M. MORAN**
**CLERK OF COURT**



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM

| | | |
|---|---|---|
| JAMES B. McDONALD, JR., | ) | CIVIL ACTION NO. 02-00031 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF G. PATRICK** |
| vs. | ) | **CIVILLE IN SUPPORT OF** |
| | ) | **MOTION FOR SUMMARY** |
| SOUTH PACIFIC PETROLEUM | ) | **JUDGMENT** |
| CORPORATION, a Guam Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, G. PATRICK CIVILLE, hereby declare under penalty of perjury as follows:

1.     I am a member of the bar of Guam and of the law firm of Civille & Tang, counsel

for South Pacific Petroleum Corporation ("SPPC"). I submit this declaration in support of

SPPC's Motion for Summary Judgment. I have personal knowledge of the facts stated herein

and, if called as a witness, could and would testify competently thereto.

2.     Attached hereto as Exhibit A are true and accurate copies of certain pages of the

transcript of the deposition of James B. McDonald taken March 25, 2004.

ORIGINAL

3. Attached hereto as Exhibit B is a true and accurate copy of the Circle K Multiple Unit Development and Operating Agreement between TMC Franchise Corporation and SPPC dated March 26, 2001.

4. Attached hereto as Exhibit C is a true and accurate copy of the Confidentiality Agreement executed by Mr. McDonald on August 15, 2001.

5. Attached hereto as Exhibit D is a true and accurate copy of the Consultant Agreement between SPPC and Mr. McDonald dated October 26, 2001.

6. Attached hereto as Exhibit E is a true and accurate copy of the EEOC Charge dated April 19, 2002.

7. Attached hereto as Exhibit F is a true and accurate copy of SPPC's Affirmative Action Information Sheet.

8. Attached hereto as Exhibit G is a true and accurate copy of a pay schedule.

9. Attached hereto as Exhibit H is a true and accurate copy of SPPC's Policy and Procedures for its Affirmative Action/Equal Employment Opportunity.

I declare under penalty of perjury under the laws of Guam and the United States of America Section that the foregoing is true and correct.

Executed on May 6, 2005, in Hagåtña, Guam.

G. PATRICK CIVILLE

2

# EXHIBIT A

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| JAMES B. McDonald, JR., | CIVIL ACTION NO. 02-00031 |
| Plaintiff, | |
| vs. | DEPOSITION OF<br>JAMES B. McDonald, JR.<br>MARCH 25, 2004 |
| SOUTH PACIFIC PETROLEUM<br>CORPORATION, a Guam corporation,<br>MICHAEL HAHM, BRIAN SUHR<br>AND SANG YEON HAHN, | **ORIGINAL** |
| Defendants. | |

_____

      The deposition of James B. McDonald, Jr., called by the Defendants, for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure, taken at the law offices of Teker Civille Torres & Tang, PLLC, Suite 200, 330 Hernan Cortez Avenue, Hågatña, Guam, on the 25th day of March, 2004, at the hour of 9:30 a.m.

      That at said time and place there transpired the following:

## A P P E A R A N C E S :

For the Plaintiff:      GORMAN & GAVRAS
                     By:  Timothy Farrell, Esq. (A.M.)
                         William Gavras, Esq. (P.M.)

For the Defendant:    TEKER CIVILLE TORRES & TANG, PLLC
                     By: G. Patrick Civille, Esq.

Also Present:          Michael Hahm

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727
Fax: (671) 632-5363
E-mail: flores@ite.net

BY MR. CIVILLE: (Continuing)

    Q.   So she just hasn't had any success in finding full-time employment; is that correct?

    A.   Yes, she has not had success in finding full-time employment.

    Q.   You've indicated, I think indirectly, that you are Chamorro by, by heritage?

    A.   Yes, I am.

    Q.   And do you consider that a race or national origin?

    A.   Yes; I mean, the people of Guam are Chamorro.

    Q.   I just want to make sure I'm clear on, on what type of discrimination you're claiming.  Are you claiming that you were discriminated against because you are a Chamorro?

    A.   Yes, I am.

    Q.   That's part of your claim; we'll get to the other parts of it.

        All right.  And do you consider that a racial discrimination, or a discrimination based on national origin?

    A.   It's based on national origin.  Can you please define for me what you mean -- how you differ the terms "national origin" and "race"?

    Q.   Well, no, I can't.  And I just don't know --

    A.   I mean, why is there a difference?

    Q.   I can't.  And my question is, is there a difference in your mind between those two?

James B. McDonald, Jr.: March 25, 2004

1      A.   No, there's not.

2      Q.   Okay, fair enough.  How tall are you?

3      A.   I'm 5'7".

4      Q.   And how much do you weigh as we sit here today?

5      A.   Two hundred and eighty pounds.

6      Q.   You don't look like it.  At the time of the

7  discrimination you've alleged in your complaint, how much did

8  you weigh?

9      A.   I weighed about the same.

10      Q.   Over the past -- let's see, this would have been

11  back in -- when you were hired on, it would be back in 2000.

12  So between January, 2000 and today, has your weight

13  fluctuated appreciably?

14      A.   Um, within five or ten pounds.

15      Q.   So you look, today, pretty much the way you looked

16  in January of 2000?

17      A.   I think so.

18      Q.   Have you ever been diagnosed as having any physical

19  or mental disability?

20      A.   I've never been diagnosed with any mental

21  disability.  I've never had any physical disability.  I have

22  had knee surgery.  That's not a disability.

23      Q.   Have you ever been diagnosed by a doctor as having

24  any sort of physical impairment due to your weight?

25      A.   No, I've never been diagnosed as having any

James B. McDonald, Jr.: March 25, 2004

1      A.    I said $13,000 a month.

2      Q.    And he grabbed his heart.

3      A.    He said I thought you said it was $10,000 a month.

4      Q.    All right; okay.  And?

5      A.    And we settled on a figure of $12,000 a month.

6      Q.    All right.  And, I mean this was a negotiated deal;

7    right?

8      A.    Absolutely.

9      Q.    You wanted the best you could get, and you

10   understood Michael, of course, wanted to get you at the best

11   price he could get you at and those were different figures;

12   is that right?

13     A.    No -- I'm a big boy; I can negotiate.

14     Q.    All right.  And you successfully did?

15     A.    I started working.

16     Q.    Okay.  And this conversation with Michael Hahm, was

17   it a pretty cordial conversation?

18     A.    Yes, it was.

19     Q.    How long did it take you guys to reach -- the two

20   of you to reach an agreement?

21     A.    About an hour.

22     Q.    And then did you have a follow-up meeting with the

23   Chairman and Brian?

24     A.    No.  When we were done, I was excused and the

25   Chairman and Brian came back in.  They talked for about half

James B. McDonald, Jr.: March 25, 2004

1       A.   Actually, it was a discussion between Brian Suhr

2   and Michael Hahm when they were talking -- you know, once

3   Mr. Hahn and Brian Suhr returned -- excuse me -- when they

4   called me back into the conference room.

5       Q.   This is back in July now?

6       A.   On July 6; yes.

7       Q.   Okay.  And they called you back into the conference

8   room; and what happened?

9       A.   Well, the discussion was that there had to be a

10  presentation before the people of Guam that the new owners

11  weren't just Koreans coming in, that this was a local company

12  and it was going to show local participation.

13      Q.   Is that the word they used, "local"?

14      A.   Yes.

15      Q.   Did they use the word "Chamorro"?

16      A.   They used "local."  It is my understanding that

17  they meant Chamorro.

18      Q.   Why do you think that?

19      A.   Because Brian maintained residence here, but I

20  don't think the Chamorro would consider him local.

21      Q.   When you say "maintained residence here," you mean

22  he lives here?

23      A.   Yes.

24      Q.   Lived here a long time?

25      A.   Yes.

James B. McDonald, Jr.: March 25, 2004

1      Q.   But that wouldn't count as being local?

2      A.   That's the way they felt; that's the way it came

3   across to me.  It came a little bit more when there's a

4   picture taken the next day.  The newspaper had written an

5   article that they felt--I don't remember all the

6   details--they had felt did not refer to them in the light

7   they wanted to be referred to, SPPC.  And they were calling

8   the reporter and the PDN that they wanted some corrections

9   made.  And so on the 7th of July, there was a picture taken

10  and it was at that point where Michael said, "we need to have

11  Jim in the picture because it can't be all yellow, we need a

12  brown face."

13     Q.   And who was present when he made that comment?

14     A.   It was the three of us, the photographer and the

15  reporter.

16     Q.   Do you remember who the reporter was?

17     A.   I don't remember her name.  I'm not sure if they

18  heard it but that's what they were discussing, that they want

19  to make sure.

20     Q.   How did you respond to that?

21     A.   Well, I mean I was gonna be part of the deal, part

22  of the team.

23     Q.   Were you offended by that comment?

24     A.   No; I thought that confirmed my status in the

25  company.

James B. McDonald, Jr.: March 25, 2004

1    Q.   And you said the next day there was a photo shoot

2    and Brian made that comment, "we need Jim in the picture."

3    A.   Because at this point we were quite friendly.   I

4    had a funny haircut according to Michael, and he says -- you

5    know, "you've got to change your hair, you're going to be in

6    this picture."  And Brian goes, "yeah, we need a brown face,

7    there's too much yellow."  And this is -- this is -- you

8    know, kind of a camaraderie.

9    Q.   And you were not offended by that comment?

10   A.   No; I thought I had funny hair myself.

11   Q.   And you weren't offended by Brian's comment?  I

12   mean, did it in fact make good sense to you?

13   A.   It made good sense because we were trying to get us

14   approved by the government of Guam, which for the most part

15   is notoriously atavistic.

16   Q.   I'm sorry?

17   A.   You know, they're nationalists, they're natives,

18   they're pro-national, nation of origin people.

19   Q.   Okay.  In other words --

20   A.   Pro-Chamorro.

21   Q.   Pro-Chamorro; okay.

22        Now, have you ever fired -- hired or fired anyone

23   in your other jobs with Exxon or Mobil or La Chiquita?

24   A.   Yes.

25   Q.   Okay.  You're generally familiar with the concept

James B. McDonald, Jr.: March 25, 2004

1    of an at-will employee?

2        A.    Yes, I am.

3        Q.    And it basically means that you can -- an employer

4    is free to fire an employee with or without cause.  In other

5    words, you can't do it for a discriminatory reason, but other

6    than that, the employer doesn't need a cause to terminate an

7    employee relationship; is that your understanding?

8        A.    Yes, it is.

9        Q.    And conversely, what it means is the employee

10   doesn't really have any right or expectation to continued

11   employment, other than at the pleasure of the employer; is

12   that your understanding?

13       A.    Are you trying to define at-will employment or my

14   employment circumstance?

15       Q.    No, just generally at-will.

16       A.    At-will; yes, that's my understanding.

17       Q.    Okay.  Were you an at-will employee for Mobil when

18   you were there; did you have a written contract with Mobil?

19       A.    Yes, I did.

20       Q.    Did you have a written contract with Exxon?

21       A.    No, I did not.

22       Q.    Were you an at-will employee for Exxon; do you

23   know?

24       A.    Yes, I was.

25       Q.    And you did not have a written contract with SPPC

James B. McDonald, Jr.: March 25, 2004

1      A.    I took him at his word.

2      Q.    All right.

3      A.    That he didn't say things lightly.

4      Q.    Now you didn't take that to mean, though, that if

5  he became dissatisfied with you, that you were nevertheless

6  promised employment; did you?

7      A.    I think any reasonable person would say that I took

8  that, that as long as I performed and the company did well,

9  that I would have employment.

10      Q.    And that conversely, if the company felt that your

11  performance was, was not what it wanted, that you weren't

12  guaranteed employment; would that be fair?

13      A.    That would be fair.

14      Q.    And at Exxon, if I understood your testimony this

15  morning correctly, you felt that you had done a good job

16  throughout your career at Exxon?

17      A.    Yes.

18      Q.    But a boss came in that you didn't get along with

19  essentially?

20      A.    Yes.

21      Q.    You didn't see "eye to eye with" were your words;

22  correct?

23      A.    Yes.

24      Q.    And in that context, you left the company?

25      A.    Yes.

James B. McDonald, Jr.: March 25, 2004

1       Q.    And it's been your experience in your observation
2    of the business world that that's another reason why
3    employment relationships sometimes end, that an employee
4    simply doesn't see eye to eye with his boss; is that correct?
5       A.    It can happen.
6       Q.    And that doesn't necessarily mean that the employee
7    did anything wrong, or wasn't doing his job.  But the boss
8    wants it one way and you feel very strongly it should be
9    another way, then it's usually the employee that has to go;
10   is that right?  Or you suck it up.
11      A.    It's one or the other.
12      Q.    One of your responsibilities at some point early on
13   with SPPC was monitoring the leases on gas stations; is that
14   correct?
15      A.    Yes.
16      Q.    All right.  And do you recall that a conflict
17   developed between you and Brian Suhr over the monitoring of
18   the lease for the Agat station?
19      A.    Actually, because Brian was a real estate mogul, he
20   took all of that into his hands; I had general, but he was
21   the one, he kind of arrogated that to himself, that he handle
22   the real estate himself.
23      Q.    well, let's talk about the Agat station for a
24   moment.  Not too long after SPPC took over the Exxon assets,
25   the Agat station was coming up for renewal, the lease on the

1  Agat station was coming up for renewal; was it not?

2      A.    Yes.

3      Q.    And in the lease that was existing at the time,

4  Exxon, and then SPPC as its successor, had an option to renew

5  the lease on essentially the same terms as had been ongoing;

6  correct?

7      A.    Correct.

8      Q.    And that was around 700, $750 a month, lease

9  payments?

10     A.    Something like that.

11     Q.    But in order -- the option period had -- the right

12 to that option to extend had to be exercised by a certain

13 date; correct?

14     A.    Yes.

15     Q.    And there came a point where Brian Suhr asked you

16 to follow up and check on the option date, when the option

17 had to be renewed by; is that correct?

18     A.    I think he had received notice from the landlord

19 and that's when he asked me to check.

20     Q.    All right.  And did a dispute arise between you and

21 Brian because you responded that the Carlsmith attorneys had

22 a tickler system and it wasn't necessary for you to get

23 involved in that?

24     A.    I told him, not that I didn't necessarily have to

25 get involved in it, but that Carlsmith did have a tickler

James B. McDonald, Jr.: March 25, 2004

1  system.
2      Q.  Okay.  And despite that, Brian asked you to check
3  with Carlsmith and confirm the date; correct?
4      A.  Yes.
5      Q.  All right.  And in fact, you dropped the ball on
6  that and you didn't do it --
7      A.  No, I --
8      Q.  -- is that correct?
9      A.  I did not drop the ball.
10     Q.  Was the option date missed?
11     A.  It was missed.
12     Q.  And it turned out that Carlsmith did not have it on
13 their tickler system?
14     A.  Carlsmith did not have it on their tickler system.
15     Q.  Okay.  And you had not checked with Carlsmith
16 before the option date was missed?
17     A.  I had not checked; yes.
18     Q.  And that was despite specific instructions from
19 Brian Suhr that you do check with Carlsmith?
20     A.  Brian Suhr never made any specific instructions
21 prior to him receiving notice from the landlord.
22     Q.  And what kind of notice was that?
23     A.  I'm sorry?
24     Q.  When you say "notice from the landlord," what
25 notice?

1        A.    That the option period had ended.

2        Q.    Okay.  Now you're aware of course that Brian's

3    recollection of this is that he gave you instructions to

4    contact Carlsmith long before the option period expired?

5        A.    Yeah, but that is not my recollection.

6        Q.    And as a result of the option period being missed,

7    SPPC was eventually forced to renegotiate the entire lease on

8    the Agat lot; correct?

9        A.    Yes.

10        Q.    And the rental jumped from essentially seven

11    hundred and some-odd dollars a month to almost $7,000 a

12    month; is that correct?

13        A.    I think so.

14        Q.    Okay.  And do you recall that being on a 20-year

15    lease?

16        A.    Which one?

17        Q.    The Agat, the renewal.  It was renewed for -- the

18    renewal period then became -- once it was renewed it was for

19    another 20-year period.

20        A.    The original -- what I remember, the original lease

21    was for 20 years and it ended sometime in the '90s.  There

22    was an additional extension that went into the period where

23    we're talking about.

24        Q.    Okay.

25        A.    And that was for 10 years.  And then there was

James B. McDonald, Jr.: March 25, 2004

1   weight, I remember that.
2       Q.   And who would make the comments?
3       A.   Both Brian and Michael will make comments --
4       Q.   Okay.
5       A.   -- just about my weight.
6       Q.   What would they say?
7       A.   Oh, the Chairman is going to talk to you -- you
8   know, that they may have to put you someplace secluded so you
9   can lose weight.
10      Q.   Okay.
11      A.   The Chairman wants you around a long time and he
12  wants you to be healthy.
13      Q.   All right.
14      A.   So --
15      Q.   And how did you respond when they made these
16  comments?
17      A.   Well, I am who I am.
18      Q.   Okay.  The Chairman wants you around a long time
19  and wants you to be healthy; now, that doesn't sound like a
20  mean spirited comment.
21      A.   I didn't say it was.
22      Q.   Okay.  Did you take it as mean spirited from them?
23      A.   I didn't say I did that.
24      Q.   Well, I mean, that's why -- that's why I put a
25  question mark at the end of that comment.  Did you take it as

1    being mean spirited?

2         A.   I thought it was irrelevant to the task of getting

3    a company started and keeping it going.

4         Q.   Okay.  But did you think they were being mean

5    spirited to you?

6         A.   Oh, they were -- I thought this was the kind of

7    harassment you get, just because they don't have anything

8    else to say.

9         Q.   Do you think they were picking on you because you

10   were Chamorro?

11        A.   No, this was talking about, we're talking about

12   being heavy.

13        Q.   Yeah, yeah.  So it wasn't because you're Chamorro?

14        A.   I didn't say I was Chamorro, I was just talking

15   about being heavy.  Did I say anything about Chamorro at this

16   point?

17        Q.   When they made these comments, you didn't take it

18   as, "hey, you're picking on me 'cause I'm Chamorro"?

19        A.   They were just saying, "you're overweight, the

20   Chairman is gonna have something to say about this" -- you

21   know.

22        Q.   And the Chairman was kind of a health nut; wasn't

23   he -- not a health nut; he was concerned about health.

24        A.   I was led to believe that.  I don't know.

25        Q.   And in fact, on your watch the company instituted a

1   wellness program where it offered to pay, what, 75 percent of
2   the -- the fee up at Gold's for people who wanted to go work
3   out?

4           A.      Something like that.

5           Q.      Okay.  All right.  And did you find that offensive?

6                   MR. GAVRAS: Did you find what offensive?

7           Q.      Any of that.  Did you find this idea of the
8   wellness program; was that offensive?

9           A.      No, I did not find -- I took advantage of that and
10  I did three miles a day.

11          Q.      All right.  I mean, did you need to lose weight?

12          A.      Yes, I did.

13          Q.      Do you need to lose weight?

14          A.      Yes, I do.

15          Q.      And have you been heavy for years, for many years?

16          A.      Yes, I have.

17          Q.      Did your mother used to tell you, you need to lose
18  weight?

19          A.      No, she's never told me I need to lose weight.

20          Q.      Your mom -- well, now we get -- now we get to the
21  problem.  Your wife, she's told you, you need to lose weight?

22          A.      My wife has told me I need to lose weight.

23          Q.      Okay.  She loves you, she wants you to lose weight.

24          A.      My mom loves me, too.

25          Q.      Okay.  But your wife loves you and she's a little

James B. McDonald, Jr.: March 25, 2004

1    more honest than your mom apparently and she said you need to
2    lose weight; is that right?
3         A.    My wife has told me I need to lose weight, yes.
4         Q.    And she does it out of love for you because she
5    wants you around for a long time; don't you think that's
6    really what's going on there?
7         A.    Yes, I think so.
8         Q.    Okay.  Have your children ever told you, dad, come
9    on, you need to lose a little weight?
10        A.    Um, no.
11        Q.    Has your doctor told you, you need to lose weight?
12        A.    Yes, he has.
13        Q.    All right.  And it's a health issue, isn't it?
14        A.    Yes, it is.
15        Q.    I mean you read -- I mean you see the popular
16   literature, they're linking being overweight to all sorts of
17   horrible things, including early death, heart disease; and
18   you're aware of that generally, aren't you?
19        A.    Yes, I am.
20        Q.    Okay.  So when Michael and Brian said, gees -- you
21   know, Jim, you need -- you know, the Chairman is going to get
22   on you, he wants you to lose some weight.
23        A.    It wasn't "gees, Jim"; it was "hee-hee hee-hee!
24   you still haven't lost any weight."
25        Q.    Okay; all right.

James B. McDonald, Jr.: March 25, 2004

1       A.    As they would rush to the back of the building to
2   have some smokes.

3       Q.    Okay; all right.

4             MR. GAVRAS: Excuse me.

5             MR. CIVILLE: Yeah?

6             MR. GAVRAS: I'd like to ask the court reporter a
7   question.

8             MR. CIVILLE: How did she do "hee-hee hee-hee"?

9             MR. GAVRAS:  Yeah.  How did you do "hee-hee hee-
10  hee"?  As "hee-hee hee-hee"?

11            REPORTER: Yes.

12            MR. GAVRAS: Thank you.

13  BY MR. CIVILLE: (Continuing)

14      Q.    All right, so they made some comments.  In that
15  month period, they say the Chairman is going to -- the
16  Chairman wants you around a long time, he's going to get on
17  you about losing weight; all right. And you had thought that
18  was irrelevant to your job?

19      A.    Yeah, it wasn't the most important thing for me to
20  think about.

21      Q.    From a management point of view, do you think your
22  health was a legitimate concern of the company?

23      A.    Um --

24      Q.    It's pretty simple, I mean you're a manager,
25  you're, you're -- you know, you were a big boss.  When you

James B. McDonald, Jr.: March 25, 2004

1    were a boss, weren't you concerned about the health of your

2    management team?

3         A.   Yes, but I didn't tease the fat guys.

4         Q.   Okay.

5         A.   I didn't tease the skinny people.

6         Q.   Okay.

7         A.   I didn't constantly harp on their weight or their

8    hair or their look.  I based it on the results that they

9    brought to the company.

10        Q.   And other than commenting on your weight, did Brian

11   and Michael comment on other aspects of your appearance?

12        A.   No, it was just my weight.

13        Q.   And how often would they do this?

14        A.   It happened a couple of days a week in that month

15   leading up to the board meeting.

16        Q.   And did you ever take some shots at them, did you

17   ever say, "hey, guys, when are you going to quit smoking"?

18        A.   No.

19        Q.   No; it's okay.  I mean if you wanted to, you were

20   free to do that, weren't you?

21        A.   Yeah.

22        Q.   I mean when they made these comments, I mean did

23   you feel, oh, I have to be very quiet and submissive because

24   they're my bosses?  Or was this more like, guys --

25        A.   There's important things to do.

James B. McDonald, Jr.: March 25, 2004

1   This was the point where it became more, kind of like
2   humiliation.

3       Q.   Who do you recall saying what during the dinner?
4       A.   At one point the Chairman said something about
5   sending me to the fat farm.

6       Q.   Okay.

7       A.   And this time the translation was from Mr. Lee.
8       Q.   Okay.

9       A.   I was sitting next to him and Michael was sitting
10  further up the table.  In fact, it got so bad I had to calm
11  my wife down, she was very upset.  It hit the point when,
12  after dinner they passed the dessert menu around and Lee took
13  the dessert menu out of my hands and said, "he has nothing
14  order."

15      Q.   Okay; all right.

16      A.   And the Chairman said something to that effect when
17  he saw that the menu had been taken out of my hand, sort of
18  in -- in concert with Mr. Lee.

19      Q.   All right.  So the comments were in the nature of
20  "you're fat"?  But what else, do you remember any specific
21  comments?

22      A.   "You don't look good," "you're fat," "you need to
23  go to a fat farm."

24      Q.   Anything else?

25      A.   There was no discussion of health.

James B. McDonald, Jr.: March 25, 2004

1      Q.     Is that two separate people?

2      A.     Michael Hahm and Klaus Kokott.

3      Q.     Oh -- I didn't hear the "Hahm."  Okay.

4      A.     Kokott was talking about how he had grown up in

5    Chicago, but he finally realized who he was when he went to

6    Germany or Austria--I forget which one it was-that he had

7    found home or comfort or something like that.  And Michael

8    said that he had grown up in the states, but that it wasn't

9    until he did some work in Korea that he felt, "oh, I belong

10   here."

11     Q.     Okay.

12     A.     And then a couple of weeks later, I'm talking to

13   Michael about possible changes of employees' assignments and

14   I was saying we could go out to the marketplace, move Glenn

15   Leon Guerrero to Cabras, and hire somebody from the outside

16   locally to work retail.  I had a couple of people in mind.

17   And he said that he could find better people than local

18   people cheaper and better in the states.  And that Circle K,

19   Costco Phillips-I forget what they were at that point--

20   assured him that he could find cheaper and better in the

21   states.

22     Q.     Okay.

23     A.     And then about a week or so later --

24     Q.     Now, wait, wait.  Hang on a second, hang on.  We'll

25   pause there for a second and catch up with you.

James B. McDonald, Jr.: March 25, 2004

1      A.    Agat.

2                          (Brief pause.)

3      Q.    Okay.  Two weeks later you and Michael are talking

4   personnel issues, and he said you would find better and

5   cheaper -- better, what, better trained, cheaper people in

6   the states.

7      A.    Better performing is what he means.

8      Q.    Better performing people at a cheaper rate in the

9   states, and that that's what Costco had -- had advised him.

10  Now, you're talking about management level type of people?

11     A.    Yes.

12     Q.    Well, what did you think about that comment?

13     A.    I was taken aback.

14     Q.    Did you think there was any truth in it?  I mean

15  objectively, do you think it's probably true that in the

16  states, in the mainland United States, you have a larger pool

17  of people with experience and that --

18     A.    I thought you could --

19     Q.    -- things are so crappy back there right now that

20  you could get them cheaper than you might be able to get

21  people here?

22     A.    I thought I had one, maybe two people that I

23  thought could match anybody I could find in the states.

24     Q.    And did you talk about that?

25     A.    Yes, I did.

James B. McDonald, Jr.: March 25, 2004

1       Q.    And how did he respond?

2       A.    He maintained that he could find better and cheaper

3    in the states.

4       Q.    And what happened; were those positions ever

5    filled?

6       A.    I think something happened after I left, not while

7    I was there.

8       Q.    What positions were you talking about; do you

9    recall?

10      A.    The retail manager's position.

11      Q.    Okay.

12      A.    And one of the category managers' positions.

13      Q.    Is that -- I'm not familiar with that term.

14   "Category Manager," is that just the title "Category" or is

15   there a category that --

16      A.    Category Manager is a specialist in negotiating

17   agreements with suppliers for certain products, with

18   merchandising these products within the stores, with putting

19   together promotional events and ongoing sales events on all

20   the various categories that they handle.  So that's a

21   category manager.

22      Q.    All right.

23      A.    Normally they handle --

24      Q.    What's the pay rate of that generally?

25      A.    Category Manager, somewhere in the neighborhood of

James B. McDonald, Jr.: March 25, 2004

1   50,000, 40,000.

2        Q.   Okay.  How about for a retail manager?

3        A.   Sixty, seventy thousand.

4        Q.   How would you describe your discussion with

5   Michael; you both stated your opinions?

6        A.   Mm-hmm.

7        Q.   So it was just kind of a professional discussion

8   about where to get the best workers at the best price?

9        A.   Well, I was saying that we could get the best

10  workers locally.

11       Q.   Okay.  I understand you had a difference of opinion

12  about the source, but the topic was how to get the best

13  workers at the best price; is that correct?

14       A.   Yes.

15       Q.   And would you agree that's a fair thing for

16  management people to talk about?

17       A.   Absolutely.

18       Q.   And that issue, how that issue eventually resolved

19  you don't know because you left before then?

20       A.   Yes.

21       Q.   Before those positions were filled?

22       A.   Or reassigned.

23       Q.   Okay.  Then in mid-August, you and Michael again

24  are in your office in UIU Building.  Joanne Tanaka –

25       A.   (To Mr. Gavras)  That's part of the discussion,

James B. McDonald, Jr.: March 25, 2004

```
1        A.    Once or twice a week.

2        Q.    For how long?

3        A.    Five, six weeks before; afterwards I saw him.

4    You're talking about just seeing Father Bob, because I did

5    church activities.  I mean --

6        Q.    Well, no.  I mean in the sense of how many times

7    did you consult with him about --

8        A.    I don't know--every other week or something like

9    that.

10       Q.    So you used him sort of as a therapist?

11       A.    Yes; that's what your parish priest is for.

12       Q.    Okay.  I'm out of touch with this.  Now, do you

13   have to pay him for this or this just part of the services of

14   a parish priest?

15       A.    I've never thought about paying my parish priest

16   for the advice he would give me on how to handle myself.

17       Q.    You've listed Frank Gumataotao --

18       A.    Yes.

19       Q.    -- Gary Gumataotao.  And I see that he may have

20   some knowledge on the issue of liability, that means your

21   claim that South Pacific is at fault.  Do you know what that

22   would be?

23       A.    Around the time that the overweight issue was

24   discussed, Brian Suhr and Michael Hahm told him that

25   overweight people was not going to be tolerated in the
```

James B. McDonald, Jr.: March 25, 2004

1   company.

2        Q.   When did that conversation take place?

3        A.   I think when we started this full discussion about,

4   starting March, the discussion on the purchase of the LPG

5   assets of Island Equipment.

6        Q.   And how do you know Mr. Gumataotao?

7        A.   Well, I was the one who -- in the first place, I

8   knew Mr. Gumataotao years ago when I worked for Exxon and

9   Mobil because he's been with Island Equipment that long.  I

10  had to negotiate a certain -- there were disagreements

11  between Island Equipment and Exxon.

12       Q.   Okay.

13       A.   And we had to negotiate how to overcome those

14  disagreements.  And when I was at Mobil I was asked to --

15  Mobil Singapore --

16            COURT REPORTER: You were asked to?

17       A.   I was asked to meet with Island Equipment to see

18  about Mobil purchasing Island Equipment's LPG assets.

19       Q.   So you got to know Gumataotao through that?

20       A.   I got to know him through that.

21       Q.   So he came up and told you that Frank and -- not

22  Frank -- but Brian Suhr and Michael Hahm had made these

23  comments about overweight people?

24       A.   Yes; specifically me.

25       Q.   Before when you described the conversation, you

1                          CERTIFICATE OF WITNESS

2

3          I, James B. McDonald, Jr., the deponent herein, do hereby

4     certify that I have read, or had read to me, the foregoing

5     typewritten pages 1 through 216, inclusive. My changes thereof,

6     if any, have been noted on a separate sheet of paper, which I

7     have signed, and which I understand will be appended to and made

8     a part of this deposition. I certify that the same is now a true

9     and correct transcript of my testimony.

10

11                                    _____

12                                    James B. McDonald, Jr.

13                                    (Dated)_____

14

15

16

17

18

19

20

21

22

23

24

25

James B. McDonald, Jr.: March 25, 2004

1         REPORTER'S CERTIFICATE

2

3      I, Cecilia F. Flores, Stenotype Reporter, do hereby certify

4   the foregoing 216 pages to be a true and correct transcript of

5   the stenographic shorthand notes and audio recording taken by

6   me in the within-entitled and numbered case at the time and

7   place as set forth herein.

8      Dated at Hagåtña, Guam, this 20th day of April, 2004.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

James B. McDonald, Jr.: March 25, 2004

Thirty days have elapsed from date of notification; therefore, pursuant to Rule 30(e) of the Rules of Civil Procedure, the Original transcript of James McDonald has been sealed and delivered to Attorney G. Patrick Civille.

Cecilia F. Flores

August 11, 2004

# EXHIBIT B

# CIRCLE K MULTIPLE UNIT

## DEVELOPMENT AND OPERATING AGREEMENT

## FOR THE TERRITORY OF GUAM

### BY AND BETWEEN

### TMC FRANCHISE CORPORATION
1500 North Priest Drive
Tempe, Arizona 85281

**602-728-8000**

### AND

### SOUTH PACIFIC PETROLEUM CORPORATION
267 South Marine Drive
UIU Building, Suite 3A
Tamuning, Guam 96911

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 2 of 33

# TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | GRANT OF LICENSE | 3 |
| 3. | TERM | 4 |
| 4. | MARKS AND BUSINESS SYSTEM | 5 |
| 5. | DEVELOPMENT RIGHTS AND OBLIGATIONS | 7 |
| 6. | INITIAL FEE; ROYALTY FEE; AND PAYMENTS | 8 |
| 7. | ADVERTISING AND PROMOTIONS | 9 |
| 8. | QUALITY CONTROL, UNIFORMITY, AND STANDARDS REQUIRED OF LICENSEE | 10 |
| 9. | ELECTRONIC POINT OF SALE SYSTEM; REPORTS AND FINANCIAL STATEMENTS | 15 |
| 10. | CONFIDENTIAL OPERATIONS MANUAL(S) AND OTHER INFORMATION | 17 |
| 11. | SERVICES PROVIDED BY LICENSOR | 17 |
| 12. | INSURANCE | 18 |
| 13. | DEFAULT; TERMINATION RIGHTS | 21 |
| 14. | LICENSEE'S IN-TERM COVENANT NOT TO COMPETE | 24 |
| 15. | TRAINING PROGRAM | 24 |
| 16. | INDEMNIFICATION | 25 |
| 17. | ASSIGNMENT OF LICENSE AGREEMENT | 26 |
| 18. | LICENSEE'S LEASE; BUILDING DESIGN AND SPECIFICATIONS | 28 |
| 19. | DISPUTE RESOLUTION | 29 |
| 20. | ENFORCEMENT | 30 |
| 21. | NOTICES | 30 |
| 22. | MISCELLANEOUS | 31 |
| 23. | ACKNOWLEDGMENTS | 33 |

## EXHIBITS

Exhibit A     Store Addendum ............................................................................... A-1
Exhibit B     Electronic Funds Transfer Authorization .......................................... B-1
Exhibit C     Guaranty ......................................................................................... C-1

# MULTIPLE UNIT DEVELOPMENT AND OPERATING AGREEMENT

THIS MULTIPLE UNIT DEVELOPMENT AND OPERATING AGREEMENT (the "Agreement") is made and entered into this __26__ day of __March__, 2001, by and between TMC Franchise Corporation, an Arizona corporation, 1500 North Priest Drive, Tempe, Arizona 85281 ("Licensor"), and South Pacific Petroleum Corporation, a Guam corporation, located at 267 South Marine Drive, UTU Building, Suite 3A, Tamuning, Guam 96911 ("Licensee").

## RECITALS

A.     Circle K Stores, Inc., a Texas corporation, and Circle K Enterprises, Inc., a Delaware corporation, affiliates of Licensor, and their predecessors, have developed and established the "Circle K" Business System (as defined below) throughout the United States and in foreign countries, and Licensor has received from such affiliates the right to license the "Circle K" Trademark and other trademarks used in the Business System;

B.     Licensee desires to obtain the right to develop and operate directly licensed "Circle K" Stores using the Business System at authorized locations within the Territory under this Agreement with a separate Store Addendum for each authorized location; and

C.     Licensee has had a full and adequate opportunity to read and review this Agreement and to be thoroughly advised of the provisions of this Agreement, and has had sufficient time to evaluate and investigate the Business System, the financial requirements, the economics of the convenience store business and the business risks associated with operating a Circle K Store.

In consideration of the foregoing, Licensor and Licensee agree as follows:

## ARTICLE 1
## DEFINITIONS

1.     For purposes of this Agreement, the following words will have the following definitions:

1.1     "**Agreement**" means this Multiple Unit Development and Operating Agreement, and all addenda and exhibits Licensor and Licensee enter into for the Stores, including each Store Addendum.

1.2     "**Business System**" means the Methods, Proprietary Information, and Marks.

1.3     "**Circle K Store**" or "**Store**" means a Circle K full service convenience store operating under the Marks and the Business System with sufficient floor space, vehicle parking, and inventory levels to offer all of the merchandise and services of a traditional convenience store and that complies with the specifications of a "Circle K" Store as more fully described in the Operations Manual.

Case 1:02-cv-00031     Document 34-2     Filed 05/06/2005     Page 5 of 33

1.4    "**Effective Date**" means, for purposes of this Agreement, the date that Licensor executes this Agreement. The term "Effective Date" means, for purposes of any Store Addendum, the date that Licensor executes such Addendum.

1.5    "**Good Standing**" means that Licensee has paid all amounts of money due and owing to Licensor or its affiliates and that no amounts of money currently owed by Licensee to Licensor or its affiliates are subject to interest as described in Paragraph 6.4, and that Licensee is not otherwise in default hereunder or in violation of any of the material provisions described herein or in the Operations Manual(s), and this Agreement has not been terminated by Licensor or by operation of law.

1.6    "**Gross Sales**" means the dollar aggregate of the sales price on all goods, wares, merchandise, and services sold by Licensee through or in connection with an Authorized Location, whether sold for cash, for payment by check, on credit, or otherwise, without reserve or deduction for the inability or failure to collect for the same from Licensee's customer; provided that "Gross Sales" will exclude the following: (i) authorized cash or credit refunds made upon transactions that were previously included in Gross Sales, not exceeding the selling price of merchandise returned, which refunds may be deducted from Gross Sales in the month made; (ii) the amount of any stated and collected city, county, territorial or federal sales, luxury or excise tax on sales transactions, which Licensee actually pays to the taxing authorities, other than franchise or capital-stock tax or any other similar tax based upon income or profits; (iii) the amounts of any collected Guam Gross Receipts Tax which Licensee actually pays to the taxing authorities, to the extent the exact amounts of such tax paid can be determined; (iv) gasoline and diesel fuel receipts paid to Licensee under a separate fuel license agreement; and (v) amounts in excess of commissions or other fees Licensee receives from the sale of money orders, lottery tickets, postage stamps, pay phone services, automated teller machine services, products and services approved by Licensor for sale on or through the Internet or other on-line communications, or other products or services Licensor periodically may approve in writing for calculation of Gross Sales on the basis of earnings as opposed to sales proceeds.

1.7    "**Marks**" means the name "Circle K" and certain other distinctive trademarks, trade names, service marks, copyrights, interior and exterior building designs and specifications (including the unique motif, décor, and color combinations), slogans, logos and commercial symbols together with all goodwill associated therewith, as Licensor periodically may modify and improve.

1.8    "**Methods**" means the unique and distinguishing characteristics and methods for the operation of convenience stores, including exterior and interior construction designs, equipment layout, operating methods, services, advertising and promotional materials, sales techniques, signs, personnel management and control systems, and bookkeeping and accounting systems, and systems for inventory control.

1.9    "**Proprietary Information**" means all information and knowledge about the Business System and the services, standards, specifications, programs, procedures, and techniques Licensor prescribed which are not in the public domain or generally known in the convenience store business including the Operations Manual(s), trade secrets, information, know-how, ideas,

techniques, research methods, improvements, and copyrighted materials (whether published, confidential, or suitable for registration or copyright), and the goodwill associated with them, information concerning the pricing structure, advertising, and promotional discounts relating to items offered at the Circle K Store, and any other information and material which Licensor may designate as confidential.

## ARTICLE 2
## GRANT OF LICENSE

2.1     Authorized Locations. During the term of this Agreement, Licensor grants to Licensee the right and license to establish and operate Stores in the United States Territory of Guam (the "Territory") at authorized locations approved by Licensor (the "Authorized Locations") and Licensee accepts the license hereunder and agrees to operate the Stores in the Territory using the Marks and the Business System. Licensee must provide Licensor with all information Licensor requests regarding sites and potential sites for Authorized Locations before Licensee and Licensor enter into a Store Addendum. Licensee will have the right to establish and operate one Store at each Authorized Location.

2.2     Store Addendum. Subject to any rights Licensee may receive under a separate agreement with Licensor (as contemplated under Paragraph 5.3 below) to sublicense its rights under this Agreement, Licensee will execute a separate Store Addendum in the form attached hereto as Exhibit A (individually, the "Store Addendum" and collectively, the "Store Addenda") for each Store and will operate the Store thereunder for its own account pursuant to a direct license from Licensor hereunder. Licensee will send two executed copies of the Store Addendum for each Store to Licensor for its approval before commencing any construction necessary to complete the build-out of or otherwise modify the existing premises of such Store to comply with Licensor's specifications and standards for Circle K Stores. The Store Addendum will be effective as of the Effective Date. Licensee will cause each Store to commence operations within one hundred eighty (180) days following the Effective Date of the Store Addendum, unless Licensor authorizes in writing an extension of time. Thereafter, each Authorized Location must be maintained and operated under Licensee's active and continuous supervision and management and upon the standards and requirements provided herein.

2.3     Relocation. Licensee cannot relocate a Store without Licensor's prior written consent. Licensee will request such consent in writing and state the proposed location, together with the specifications for the new site of the Store. Licensor will have no less than thirty (30) days from the date Licensor receives the request to approve or deny the relocation of the Store.

2.4     Exclusive Rights. Except as described in Article 5 below, and subject to Paragraph 2.6 below, during the Development Period (as defined in Paragraph 5.1), Licensor will not establish or license a third party to establish a Store using the Marks within the Territory.

2.5     Reservation of Certain Rights. Licensee acknowledges and agrees that Licensor and its affiliates have expressly reserved certain rights to use the Business System respecting: (i) their own convenience store and retailing operations outside the Territory, (ii) the licensing of same or similar products or services utilizing the same or similar Marks, or any other Marks

Case 1:02-cv-00031     Document 34-2     Filed 05/06/2005     Page 7 of 33

which may hereafter be designated as part of the Business System through other channels of distribution, (iii) the manufacture and sale of products at wholesale, (iv) the offer or sale of products or services under the Marks on or through the Internet or other on-line communications, (v) the licensing of different products, services or businesses under the same or similar Marks in the Territory, (vi) the operation of convenience stores in the Territory under trademarks and service marks other than the Marks, and (vii) granting rights identified in subparagraphs 2.5(i) through 2.5(vi) above to others pursuant to a license or franchise agreement. Subject to any rights Licensee may receive under a separate agreement (as contemplated in Paragraph 5.3 below), Licensee has no rights under this Agreement to license or sublicense to itself or any third party the right to operate a Circle K Store in the Territory.

## ARTICLE 3
## TERM

3.1    Term. The term (the "Term") of this Agreement will be for ten (10) years, unless terminated as provided in Article 13 below. The Term will commence upon the Effective Date. Each Store Addendum executed during the Term will continue in effect, unless earlier terminated, until the expiration of this Agreement. As further described in Paragraph 5.1 below, Licensee will have the right to develop Stores in the Territory only during the Development Period.

3.2    Renewal. Licensee will have the right to renew this Agreement for an additional term of ten (10) years, provided Licensee is in Good Standing and has complied with all of the following conditions:

(A)    Licensee has given Licensor written notice of its request to renew at least six (6) months before the expiration of the Term. Licensor will not unreasonably withhold its approval of such request for renewal, provided the conditions stated in this Paragraph 3.2 have been satisfied;

(B)    Licensee has, at its expense, incurred reasonable expenses or made reasonable capital expenditures specified by Licensor to upgrade and renovate each Authorized Location to conform to the current standards and image required of then-new licensees, including upgrading of signs, equipment, furnishings, fixtures and décor;

(C)    Licensee and Licensor execute a mutual release of all claims relating to this Agreement subject to any incomplete performance or continuing obligations, unless such releases are prohibited by applicable law. Licensee will execute a general release in form satisfactory to Licensor, of any and all claims it may have against Licensor and its affiliates, individual capacities, including all claims arising under any federal, state, territorial, or local law, rule or ordinance;

(D)    Licensee executes Licensor's then-current standard multiple unit development and operating agreement for the renewal term as specified above, which may contain provisions substantially different from those stated in this Store Addendum, including Licensor's right, at its discretion, to formulate, and require

Case 1:02-cv-00031     Document 34-2     Filed 05/06/2005     Page 8 of 33

Licensee to comply with, a development schedule for the development of additional Stores in the Territory. No Initial Fee will be charged for the renewal term; and

(E) Licensee and each Store manager will complete any new, refresher, or additional training and educational programs that Licensor may require for new licensees upon renewal or execution of a new Store Addendum.

## ARTICLE 4
## MARKS AND BUSINESS SYSTEM

4.1 Ownership and Right to License. Licensor represents and warrants that it has the right to license the Marks and the Business System to Licensee. Any and all improvements Licensee makes relating to the Business System, including the Marks, will be the exclusive property of Licensor or its affiliates, who will have the sole and exclusive right to register and protect all such improvements under any applicable federal and state law. Licensee agrees not to assert any rights in or to the Business System, including the Marks, other than as specifically granted in this Agreement. Licensee will operate each Store under the name "Circle K" (the "Licensed Name") and will not use any names, trademarks, trade names, service marks, logo types, trade styles, designs, signs, symbols, or slogans other than the Marks in connection with the Stores. Licensee must obtain Licensor's written consent before using additional words with the Marks or translating English words in the Marks to another language. All Methods and Proprietary Information have been revealed to Licensee in trust and confidence and constitute trade secrets and/or proprietary property of Licensor. All information regarding the Business System, including all Methods and Proprietary Information, provided or revealed to Licensee, together with the goodwill associated therewith, is, and will remain, the exclusive property of Licensor. Any unauthorized use of the Business System, including the Marks, by Licensee will constitute an infringement of Licensor's rights and will constitute a material default under this Agreement.

4.2 Licensee's Business Name. Licensee will not use any of the Marks or anything similar thereto, in or as part of its corporate, sole proprietorship or partnership name. Licensee will at all times hold itself out to the public as an independent contractor operating its business pursuant to a license from Licensor. Whenever practical, Licensee will clearly indicate on its business checks, stationery, purchase orders, business cards, invoices, receipts, advertising and promotional materials, and other written materials that Licensee is a Circle K licensee. If directed by Licensor, Licensee will display signs at each Store which are clearly visible to the general public indicating that the Store is independently owned and operated as a licensed Circle K Store.

4.3 Substitution of Marks. Licensor reserves the right, in its sole discretion, to modify the Marks or to substitute different trade names, service marks, trademarks, logos, designs, and commercial symbols as the Marks used to identify a Store. In that event, Licensee will, at its expense and as soon as reasonably practical but no later than one hundred twenty (120) days from receipt of notice from Licensor, make all modifications to the Marks displayed at any Authorized Location Licensor specifies in the written notice. If Licensor substitutes for those then-existing Marks containing the name "Circle K" a new brand that does not include the name "Circle K,"

Licensor will reimburse Licensee for all reasonable expenses Licensee incurs in complying with Licensor's directive under this Paragraph 4.3.

4.4    Adverse Claims to Marks. If any third party claims that its rights to any of the Marks are superior to Licensee's rights, and if Licensor determines that such claim is legally meritorious, then upon receiving written notice from Licensor, Licensee will, at its expense, immediately make all changes and amendments to the Marks as Licensor may require. Licensee will not make any changes or amendments to the Marks or otherwise to the Business System unless Licensor specifies in writing.

4.5    Defense or Enforcement of Right to Marks. Licensee will not, without Licensor's prior written consent, defend or enforce any rights respecting the Marks. Licensee will promptly inform Licensor of all claims or litigation arising out of Licensee's use of the Marks or the Business System and will, at its expense, cooperate with Licensor or its affiliates in any lawsuit or other proceedings involving the Marks or the Business System. Licensor will have the exclusive right to control and conduct any litigation involving the Business System (including the Marks), and Licensor or its affiliates will pay the expense of all litigation Licensor or its affiliates incur, including attorneys' fees, specifically relating to the Marks or the Business System.

4.6    Tender of Defense. If Licensee is named as a party in any action solely because the plaintiff or claimant is alleging that Licensee does not have the right to use the Marks at the Authorized Locations, Licensee may tender the defense of the action to Licensor, and Licensor will, at its expense, defend Licensee in the action provided that Licensee has tendered the action to Licensor within ten (10) days after receiving service of the pleadings or the Summons and Complaint involving the action. Licensor will indemnify and hold Licensee harmless from and against all losses, damages and expenses, including reasonable attorneys' fees, incurred by Licensee in any actions resulting solely from Licensee's authorized use of the Marks and the Business System at the Authorized Locations if Licensee has timely tendered the action to Licensor consistent with the above-mentioned requirements.

4.7    Registrations. To the extent Licensor determines, in its opinion, that it is desirable to further protect Licensor's right, title and interest in the Marks, Licensor may, at its expense, make such registration as will establish Licensor's or its affiliate's ownership of the Marks and the goodwill associated therewith. Licensee will execute such documents as Licensor may request to accomplish this purpose. Licensee may, at its expense, and with Licensor's prior written approval, file any other registrations required to permit Licensee's use of the Marks, including registered user or trademark and service mark license agreements. If Licensor requests, Licensee will execute any assignment or other documents Licensor deems necessary to transfer any interest or purported interest of Licensee in the Marks to Licensor, except those rights of use granted by this Agreement.

4.8    Non-English Translation Marks. Licensee disclaims any and all interest in any non-English translation or other phonetic or conceptual equivalent or approximation of any of the Marks, and both parties agree that Licensor owns all right, title and interest in any such translation, equivalent or approximation.

# ARTICLE 5
## DEVELOPMENT RIGHTS AND OBLIGATIONS

The following provisions will control Licensee's development rights and obligations in the Territory:

5.1    Development Period.  Subject to Paragraph 5.2 and Article 13 below, Licensee's development rights, as described in Article 2 above, will continue during the Term of this Agreement (the "Development Period").  At the end of the Development Period, Licensee's right and license to establish and operate additional Stores in the Territory will automatically revert to Licensor, and Licensor will be free to develop Stores within the Territory on its own or by or with a third party.  If the Development Period terminates early because Licensee fails to meet its development obligations under Paragraph 5.2 below (but this Agreement does not terminate at such time), Licensee will retain the right at the end of the Development Period, to continue to operate its then-existing Stores for the remaining Term of this Agreement.

5.2    Development Obligations.  The parties acknowledge and agree that Licensee's rights to establish and operate Circle K Stores, as described in Article 2 above, are expressly conditioned upon Licensee's active development and operation of Stores within the Territory. During the Development Period, Licensee will develop and continually operate for its own account (or manage the operation of) not less than ten (10) Stores in the Territory; provided that Licensee will not be obligated to meet such development requirements during the first one hundred eighty (180) day period following the Effective Date.

Notwithstanding the Development Period described Stores above, if at any time Licensee fails to develop and directly operate a minimum of ten (10) Stores in the Territory, Licensee will be in default of this Agreement and Licensor will have the right to terminate this Agreement, as described in Article 13 below.  Licensor will not terminate this Agreement for such default, however, provided: (i) Licensee desires to continue to operate its then-existing Stores for the remaining Term of this Agreement; and (ii) Licensee is not in default of any other provision of this Agreement, or any Store Addenda entered into hereunder, or any amendment hereof or successor hereto, or any other agreement between Licensor and Licensee.  In such event, Licensee's right and license to develop and operate additional Stores in the Territory and Licensee's exclusive rights within the Territory to develop, for its own account or through third parties, additional Circle K Stores will revert to Licensor, and Licensor thereafter may develop Stores within the Territory on its own or through a third party.

5.3    Licensee's Rights to Sublicense.  At such time as Licensee has developed and continuously operated ten (10) Stores in the Territory for its own account pursuant to direct licenses from Licensor for a period of twelve (12) consecutive months, Licensor and Licensee agree to negotiate in good faith an agreement in form reasonably acceptable to Licensor which would describe:  (i) the terms and conditions governing Licensee's right to sublicense others under Licensee's direct supervision to establish Stores in the Territory; and (ii) Licensee's obligations as a subfranchisor; and (iii) the form of sublicense agreement required by Licensor; provided that Licensor will be required to negotiate in good faith respecting such an agreement only if Licensee complies with the following:

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 11 of 33

(A) Provide Licensor with written notice of its desire to sublicense and a written business plan at least ninety (90) days before the date Licensee would begin to sublicense. Such business plan must be acceptable to Licensor and describe: (i) the additional development potential of the Territory; and (ii) Licensee's franchise support services that it would offer to its sublicensees, including sublicensee training, Store site selection, regular Store evaluations, management or sponsorship of approved sales promotion programs, operational counseling, employee training, and sublicensee meetings or seminars. All franchise support services Licensee would offer to its sublicensees must conform to any standards or specifications that Licensor prescribes periodically or as may be appropriate to the needs and circumstances of Licensee and of each sublicensee;

(B) Be in Good Standing under this Agreement, each Store Addendum and any other agreements between Licensor (or its affiliates) and Licensee; and

(C) Attend and successfully complete any training programs Licensor prescribes for territory operators, which may include a mandatory training program relating to subfranchising.

## ARTICLE 6
## INITIAL FEE; ROYALTY FEE; AND PAYMENTS

6.1    Initial Fee. Licensee will pay Licensor a non-refundable Initial Fee of One Hundred Forty Thousand U.S. Dollars (U.S. $140,000), all of which will be due and payable on the later of: (1) the tenth (10th) day following the date Licensor executes this Agreement; or (ii) January 3, 2001.

6.2    Royalty Fees. During the Term of this Agreement, Licensee will pay to Licensor a monthly Royalty Fee equal to one percent (1.0%) of Licensee's monthly Gross Sales; provided, however, to the extent all Royalty Fees due under this Agreement during any calendar year are less than Forty-Eight Thousand Dollars ($48,000) (the "Minimum Royalty"), Licensee will pay to Licensor within thirty (30) days after the calendar year end an additional amount equal to the Minimum Royalty less the amount of Royalty Fees actually paid to Licensor during the preceding calendar year.

6.3    Method of Payment. All monthly payments required to be paid to Licensor under this Agreement will be paid in U.S. Dollars by electronic funds transfer via the Automated Clearing House ("ACH") or wire transfer to Licensor by the fifteenth (15th) day of each month for the preceding calendar month's business activity. If the fifteenth (15th) day of the month is a Saturday or Sunday, or a legal holiday, such fees will be paid on the Monday following the fifteenth (15th) day of the month. Simultaneously, any reports required under Paragraph 9 2 of this Agreement will be submitted to Licensor electronically or, with Licensor's consent, in writing by mail. Any payment not actually received by Licensor on or before the due date, or any report not received within ten (10) days of the due date, will be deemed overdue, and Licensee will be in default under this Agreement. Licensee agrees to make arrangements with its local bank to allow Licensor to draw on Licensee's bank account on a continuing basis by ACH or wire transfer for

Case 1:02-cv-00031     Document 34-2     Filed 05/06/2005     Page 12 of 33

the amount of all fees and payments due Licensor as provided herein and agrees to execute the Electronic Funds Transfer Authorization described in Exhibit B attached hereto.

   6.4    Interest on Unpaid Fees. If Licensee fails to pay the monthly Royalty Fees when due, the unpaid and past due fees will bear interest at the rate of one and one-half percent (1 1/2%) per month or the legal rate allowed by applicable law, whichever is lower. Licensee's obligation to pay Licensor the monthly fees under the terms of this Agreement will remain in full force and effect until the Term of this Agreement has expired or until this Agreement has been terminated under the provisions of this Agreement and applicable law.

ARTICLE 7
ADVERTISING AND PROMOTIONS

   7.1    Market Entry Campaign. Before opening its first Store, Licensee will, at its expense, prepare and implement a local market entry advertising campaign within the Territory that is acceptable to Licensor. Licensee understands and agrees that the market entry advertising campaign is in addition to the other sales promotion programs described in this Article 7.

   7.2    Local Advertising Expenditures. In addition to Licensee's obligations under Paragraph 7.1 above, Licensee will be obligated to spend each calendar quarter, at a minimum, an amount equal to one and one-half percent (1½%) of Licensee's Gross Sales for such quarter on advertising and promotional activities in the Territory. Licensee's local advertising expenditures will include advertising, merchandising, sales promotion and other forms of advertising at the local level. Within fifteen (15) days following the end of each calendar quarter, Licensee will provide Licensor with an accounting of the monies that it has spent for local advertising for the preceding calendar quarter.

   7.3    Advertising Programs. Licensor periodically may initiate sales and marketing programs intended to promote and enhance the business of all Circle K Stores, and Licensee will participate fully therein under the terms of the programs Licensor establishes, unless Licensor determines, in its reasonable discretion, that a particular program will not promote or enhance Licensee's Stores in the Territory. In addition, Licensor periodically may develop advertisements or promotions for the use in radio or television medium. Licensor may make such advertisements or promotions available to Licensee upon Licensee's request, provided that Licensee will be solely responsible for placing and paying for media costs and other costs to identify the location of Licensee's Stores.

   7.4    Licensee's Advertising. All advertising Licensee conducts will be subject to Licensor's prior written approval respecting form and content (other than pricing) as further described in this Paragraph 7.4. Licensee will obtain Licensor's written approval as follows: Licensee will submit to Licensor for approval, at least sixty (60) days before the beginning of each fiscal year (of Licensee), Licensee's proposed advertising plan for its Circle K Stores for the upcoming fiscal year. In addition, Licensee will, on a quarterly basis, submit to Licensor for approval any modifications to the annual plan. Licensor will have thirty (30) days after receiving the proposed plan or plan modifications to approve or disapprove of the plan or plan modifications. Licensee will revise the proposed plan or plan modifications and resubmit them to

Licensor, and Licensor will have ten (10) additional business days to approve or disapprove of such revised plan or plan modifications. Licensor's failure to respond within the designated period will be deemed approval; provided, however, that Licensor's approval of an advertising plan (affirmatively or by failure to object) will not preclude Licensor from subsequently disapproving the same or a similar plan or any advertisement or promotion arising out of such plan. To the extent Licensor determines, in its sole discretion, that any of Licensee's advertisements or promotions do not comply with Licensor's standards or otherwise may impair the value of the Marks, Licensor will, upon notice from Licensor, immediately discontinue using such advertisement or promotion. Licensor may enter any Store and unilaterally seize or remove any unauthorized advertising materials bearing the Marks.

## ARTICLE 8
### QUALITY CONTROL, UNIFORMITY, AND STANDARDS REQUIRED OF LICENSEE

Licensee acknowledges and agrees that Licensor and its affiliates have expended large sums of money to popularize the Business System, including the Marks, licensed to Licensee so that the same represents very valuable goodwill distinctive of Licensor and Circle K Stores Inc. and their respective business reputations. Licensee further acknowledges and agrees that Licensor periodically will develop, establish, modify, implement, and enforce uniform standards of quality and service regarding the business operations of Licensee's Stores. To insure that all licensees will maintain the uniformity requirements and quality standards for the foods, products, merchandise, and services associated with Licensor, other Circle K Stores, and the Business System, Licensee agrees to maintain the uniformity and quality standards Licensor establishes for all foods, products, merchandise, and services associated with the Business System, and agrees to the following minimum provisions to assure the public that all Circle K Stores will be uniform in nature and will sell and dispense quality foods, products, merchandise, and services to the public.

8.1    Authorized Services and Products. Licensee will diligently and continuously offer for sale only those products, merchandise, and services (including product mix) as Licensor periodically specifies in the mandatory provisions of the Operations Manual(s) or otherwise, which will generally consist of those products and services offered by Licensor, and its affiliates, at its Circle K Stores. Licensee will not sell or offer for sale any other products, merchandise, or services at its Stores; provided that, with Licensor's prior written approval, Licensee may sell at the Stores certain additional products or merchandise which, due to local custom or market conditions, Store customers would reasonably expect to be offered. Licensee may not sell any products, merchandise, or services relating to the Marks or purchased through Circle K's negotiated purchasing arrangements with suppliers at any location other than the Authorized Locations without Licensor's prior written consent, which may be withheld in Licensor's sole discretion. Licensor will not be liable for any claim by Licensee in the event of loss or interruption in the supply of any or all such products. Licensee may also purchase and offer for sale gasoline and related products manufactured and/or supplied by an affiliate of Licensor under a separate agreement.

8.2    Purchases. Licensor may require that Licensee periodically purchase from Licensor, or its affiliates, or from a sole source vendor or service provider, certain proprietary

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 14 of 33

items, including food products and merchandise, provided that Licensee will not be required to purchase from Licensor, or its affiliates, or any sole source vendor or service provider, any items not generally used or offered for sale by Licensor or its affiliates in its Circle K Stores.

8.3    Initial Inventory.    Licensee will maintain sufficient minimum inventories of products and merchandise in each Store at all times as Licensor periodically specifies in the mandatory provisions of the Operations Manual(s) or otherwise.

8.4    Compliance With Standards and Specifications.    The building and premises for each of the Stores will conform precisely to the approved building plans and specifications, exterior and interior decorating designs and color schemes for Circle K Stores. Licensee will not make any architectural, structural, design or decorating changes to the interior or exterior of the building or the premises without Licensor's prior written approval (unless such change is specifically required under federal, state or local law). The furniture, fixtures, and equipment used in each of the Stores will be installed and located according to the floor plans and specifications Licensor approves for each Store, and will conform to the quality standards and uniformity requirements Licensor periodically establishes for all Stores. All replacements for the furniture, fixtures, and equipment must conform to the quality standards for Circle K Stores, any applicable laws, ordinances, and regulations, and must be approved by Licensor in writing.

8.5    Remodeling and Redecoration of Stores.    Licensee will make the reasonable capital expenditures necessary to remodel, modernize and redecorate each Store, and to replace and modernize the furniture, fixtures, supplies, and equipment so that each Store will reflect the then-current image Licensor intends to portrayed.    All remodeling, modernization and redecoration must comply with the standards and specifications prescribed by Licensor in and any applicable laws, ordinances, and regulations. Licensee will commence remodeling, modernizing and redecorating each Store within six (6) months from the date Licensee receives written notice from Licensor specifying the required remodeling, modernization and redecoration for such Store, and will diligently complete such remodeling, modernization and redecoration within a reasonable time after its commencement. Except as provided for in this Agreement, Licensee will not be required to extensively remodel, modernize and redecorate a Store or to replace and modernize its furniture, fixtures, supplies, and equipment more than once every five (5) years during the term of the Store Addendum for the Store; provided, however, that if Licensor determines in good faith that an item or items of furniture, fixtures, or equipment, such as countertops, displays, and fascia, have become so worn in the ordinary course of business that repairs cannot be reasonably made so as to conform the Authorized Location with Licensor's then-current image standards, Licensee will replace such furniture, fixtures, or equipment sooner than once every five (5) years.

8.6    Maintenance and Repair.    Except as otherwise stated in any applicable lease agreement, Store maintenance and repair will be Licensee's sole responsibility. Licensee will at all times maintain the interior and exterior of each Store and all fixtures, furnishings, signs, and equipment located at each Store and surrounding area in the highest degree of cleanliness, orderliness, safety, and sanitation as stated in the mandatory provisions of the Operations Manual(s).    Licensee will also make such additions, alterations, repairs, and replacements necessary to conform with Licensor's requirements.

8.7    Signs. Licensee will display at the Store approved signs, advertising, slogans, and symbols as Licensor periodically may prescribe, subject to lease and local zoning restrictions. Any signage containing or portraying the Marks will be deemed proprietary property of Licensor and may not be otherwise used by Licensee during the Term hereof, or following any termination or expiration of this Agreement, without Licensor's prior written consent.

8.8    Operational Requirements. Licensee will operate the Stores in strict conformity with such uniform methods, standards, and specifications as Licensor periodically may prescribe (including such methods, standards, and specifications stated in the mandatory provisions of the Operations Manual(s)) to ensure that the highest degree of quality and service is uniformly maintained. During the Term of this Agreement, Licensee agrees to:

(A)    use the Authorized Locations solely for the operation of its Circle K Stores and will not use or permit the use of any Authorized Location for any other purpose or activity without first obtaining Licensor's prior written consent;

(B)    keep each Store open for business and in normal operation twenty-four (24) hours a day, seven (7) days a week (including all holidays), unless Licensor otherwise agrees in writing, or unless prohibited by local laws or ordinances, or should a "Force Majeure Delay" (as defined in Paragraph 22.12 below) occur;

(C)    comply with Licensor's current and future procedures and systems, including those relating to sales, good business practices, advertising, and other obligations and restrictions described herein;

(D)    maintain sufficient supplies of (as Licensor may prescribe in the mandatory provisions of the Operations Manual(s) or otherwise in writing), and use at all times, only such approved merchandise, equipment, materials, advertising methods, formats, and supplies as conform with Licensor's standards and specifications;

(E)    secure and maintain in full force and effect in Licensee's name all required licenses, permits, and certificates relating to each Store, including registration of names, fictitious names, tax permits, and liquor and tobacco licenses, if required, and to deliver copies of any of the foregoing to Licensor within five (5) days of such request;

(F)    notify Licensor in writing within five (5) days of each of the following events: the threat of, or the actual commencement of, any action, suit, or proceeding, or the issuance of any order, writ, injunction, award, notice, or decree of any court, agency, or other governmental entity, which, in any of the above instances, may adversely affect the operation, financial condition, or goodwill of Licensee, Licensor, or the Business System;

(G)   handle all customer complaints and requests for adjustments consistent with any procedure required in the mandatory provisions of the Operations Manual(s), and always in a manner that will not detract from the name and goodwill enjoyed by Licensor;

(H)   maintain a competent, conscientious staff and employ such minimum number of employees as are necessary to service the anticipated volume of business at each Store. Licensee will be exclusively responsible for the terms of employment, compensation, and proper training of such employees;

(I)   honor credit cards and maintain relationships with such credit and debit card issuers or sponsors, check verification services, financial center services, and electronic fund transfer systems as Licensor periodically may designate in order that Licensee may accept customers' credit and debit cards and other methods of payment. Licensor reserves the right to add or delete credit card payment systems, relationships, or services, and other methods of payment at any time. Licensor separately may approve local credit card companies recommended by Licensee who demonstrate, to Licensor's reasonable satisfaction, the ability to meet Licensor's general minimum standards respecting credit card companies;

(J)   maintain adequate security at each Authorized Location, and not permit illegal activities to take place in any Store or on the premises of any Authorized Location;

(K)   ensure that each Store is staffed by personnel who can communicate effectively with customers, vendors, emergency medical personnel, fire fighters and police officers;

(L)   timely pay all utility bills and other obligations and liabilities affecting any Store or Authorized Location; and

(M)   comply with all other requirements which Licensor may prescribe herein.

8.9   Suppliers. Licensee will purchase all merchandise, supplies, equipment, and materials required to operate each Store from suppliers approved by Licensor who demonstrate, to Licensor's satisfaction, the ability to meet Licensor's standards and specifications for such items; who possess adequate capacity and facilities to supply Licensee's needs in the quantities, at the times, and with the reliability requisite to an efficient operation; and who have been approved by Licensor. Licensee will not purchase any distressed or salvaged products for resale in any Store. Licensor and/or its affiliates periodically may make available to Licensee goods, products, and/or services for use in the Stores on the sale of which Licensor and/or its affiliates may make a profit, and Licensor and/or its affiliates periodically may receive consideration from suppliers, distributors, and/or manufacturers in consideration of services provided or rights licensed to such persons. Licensee acknowledges that Licensor and/or its affiliates will be entitled to such profits and/or consideration.

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 17 of 33

8.10  <u>Store Managers</u>.  Licensee will hire "Store Managers" who will be solely responsible for the direct management and daily activities of the Stores. Each Store Manager will be solely responsible for managing no more than three (3) Stores. Each Store Manager must successfully complete Licensor's Training Program (as defined in Paragraph 15.1) before Licensee opens the Store(s) that such Store Manager will manage. Licensee may, with Licensor's prior written consent, delegate the "Store Manager" duties to a designated third party, provided Licensee otherwise complies with the provisions of this Agreement. Licensee agrees that no person who has been convicted of a felony, has otherwise committed any action involving fraud, or has engaged in any acts which could adversely affect or be detrimental to the goodwill of the Marks and the Business System will be permitted to be employed as Store Manager, provided that Licensee will not be required to conduct any such act that would violate any federal or territorial law.

8.11  <u>Uniforms</u>.  Licensee will require its employees to wear the standard attire or uniforms Licensor approves and will comply with Licensor's uniform requirements to promote the Circle K Store image and to protect and further the goodwill associated with the Marks and the Business System.

8.12  <u>Payment of Expenses</u>.  Licensee will be solely responsible for, and will pay before delinquent (unless contested in good faith): all operating expenses, taxes, and levies in connection with the operation of the Stores, including all costs related to obtaining, purchasing, leasing, maintaining, repairing, or replacing inventory, equipment, and other supplies needed to operate the Stores; all salaries and wages of employees, and all business, income, excise, sales, use, real estate, and personal property taxes, and other taxes and assessments levied or imposed upon any Store.

8.13  <u>Compliance with Laws</u>.  Licensee will at all times and at its expense, conduct and operate each Store in strict compliance with all applicable federal, territorial, and local laws, ordinances, and regulations pertaining to the purchase, construction, remodeling or operation of such Store. Licensee will, at its expense, determine the licenses and permits required by law for each Store, obtain and qualify for all construction or operation licenses and permits required by law, and comply with all applicable federal, territorial, and local laws.

8.14  <u>Payment of Taxes</u>.  Licensee will promptly pay all federal, territorial, and local taxes and assessments, including but not limited to any and all individual and corporate income taxes, sales and use taxes, excise taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, unemployment taxes, personal property taxes, real estate taxes, gasoline taxes, and all others taxes payable in connection with the operation of the Stores and sale of merchandise and services.

8.15  <u>Corporation, Partnership, or Limited Liability Licensor as Licensee</u>.  If Licensee is a corporation, Licensee will provide Licensor with a list of all shareholders (showing the number of shares owned), officers and directors of the corporation, and will keep such information current at all times. All stock certificates of a corporate Licensee will bear a legend as Licensor specifies stating that transfer of the stock is restricted and subject to the terms of this Agreement. Upon Licensor's request, each shareholder and the spouse of each shareholder will execute an

acknowledgment of restriction on the right to transfer stock of the corporation. If Licensee is a partnership or limited liability Licensor, Licensee will provide Licensor with such information as Licensor may reasonably require, including the identity of each individual owning directly or indirectly ten percent (10%) or more of the equity interest in Licensee (each a "Principal Equity Holder"), the percentage of ownership interest held by each individual, and Licensee's governing documents.

8.16 Guaranties. If Licensee is a corporation, a limited partnership whose general partner is a corporation, or a limited liability company, all Principal Equity Holders of such entity will: (i) approve this Agreement in writing; (ii) furnish any personal financial information Licensor reasonably requests; and (iii) execute a personal guaranty in substantially the same form as the Guaranty attached hereto as Exhibit C (the "Guaranty"). Principal Equity Holders who subsequently acquire or otherwise succeed to an interest in such entity will execute the Guaranty within thirty (30) days after acquisition of such interest. The spouse of Licensee, if Licensee is an individual, or the spouses of such Principal Equity Holders, if Licensee is not an individual, will also sign the Guaranty. The term "Personal Guarantors" refers to all individuals who execute a guaranty respecting this Agreement.

8.17 Inspection Rights. Licensor may at all reasonable times inspect the premises of each Authorized Location and observe Licensee's operations to ensure Licensee's full and faithful compliance with the terms of this Agreement and the mandatory provisions of the Operations Manual(s). Licensor may take photographs and videotapes of the interior and exterior of any Store premises at all reasonable times, examine representative samples of foods, food items, goods and paper products sold or used at the Stores, and examine and evaluate the quality of the services Licensee provides to customers. Licensor may use all photographs and videotapes of the Stores for such purposes as Licensor deems appropriate. Licensee will not be entitled to, and expressly waives, any right that it may have to receive compensation from Licensor or its assigns for using photographs or videotapes in the manner described herein.

### ARTICLE 9
### ELECTRONIC POINT OF SALE SYSTEM;
### REPORTS AND FINANCIAL STATEMENTS

9.1 Electronic Point of Sale System. Licensee will purchase, install, maintain, and use at each Store a point of sale computer system that complies with Licensor's then-current standards and specifications. Licensee will be responsible for all costs and expenses related to the purchase and installation of any hardware and software, including any enhancements and upgrades. Licensee also is responsible for all expenses related to hardware and software service beyond the warranty provided by the manufacturer. Licensor will have the right to access information and data produced by Licensee's point of sale computer system and Licensee will fully cooperate with Licensor in providing Licensor access to such information and data. Licensee will be solely responsible for performing all recordkeeping duties and all such records will be maintained according to the mandatory provisions of the Operations Manual(s), as it periodically may be modified.

Case 1:02-cv-00031     Document 34-2     Filed 05/06/2005     Page 19 of 33

9.2    Reports. Licensor will have direct and full access to all of Licensee's data, system, and related information by such means as Licensor periodically may require, including direct access telephone, data transmission lines, or modem. Licensee will provide Licensor with sales reports which includes an itemization of merchandise sales, lottery sales, and money order sales, as applicable, made during the previous day from each Store. All other reports will contain the information Licensor periodically prescribes and as stated in the mandatory provisions of the Operations Manual(s). Licensee will also submit to Licensor, not later than the end of each of its fiscal years during the Term of this Agreement, an annual business plan for Licensee's business for the following fiscal year. Licensor will use all reasonable means to keep Licensee's business plans confidential.

9.3    Financial Statements. Licensee periodically will provide to Licensor financial statements prepared in accordance with Generally Accepted Accounting Principles or according to the federal income tax basis of accounting. Specific statements and due dates and other reporting requirements are more fully described in the Operations Manual(s).

9.4    Licensor's Audit Rights. Within five (5) days after receiving notice from Licensor, Licensee will make all of its financial records, books, ledgers, work papers, accounts, bank statements, tax returns, sales tax returns, and other financial information pertaining to any Stores ("Books and Records") available to Licensor at all reasonable times for review and audit by Licensor or its designee. Licensee will keep the Books and Records for each fiscal year in a secure place and will make them available to Licensor for audit for at least five (5) years. If an audit by Licensor results in a determination that the actual Gross Sales were understated by more than two percent (2%), Licensee will, in addition to curing any deficiency in Royalty Fees, Promotional Fees, or other amounts owed to Licensor (plus interest as provided in Paragraph 6.4), pay Licensor for all costs and expenses that it has incurred as a result of the audit. The total amount of unpaid Royalty Fees and Promotional Fees will be immediately due and payable, together with interest as provided herein.

9.5    Tax Returns. Upon Licensor's request, Licensee will provide Licensor with a true and complete copy of all federal, territorial, and local sales and income tax returns relating to each Authorized Location, and Licensee waives any privilege pertaining thereto. Licensor acknowledges that such returns may be in the form of one or more consolidated returns relating to all Authorized Locations. Licensor will use all reasonable means to keep Licensee's tax returns confidential.

9.6    Accounting Forms. Licensee will, at its own expense, use such bookkeeping and recording forms, sales slips, invoices, purchase order forms, reprints, and other miscellaneous operating forms as Licensor periodically may require.

9.7    Delinquent Reports. If Licensee fails to provide to Licensor when due any sales, financial statement, or other reports which Licensee is obligated by this Agreement to provide to Licensor, and such failure continues for a period of ten (10) days past the due date, Licensee will pay to Licensor a late fee respecting each such report in the amount of Ten Dollars ($10.00) per day beginning with the eleventh (11) day after the date due. The imposition of late reporting fees will be in addition to any other remedy available to Licensor for failure to report.

## ARTICLE 10
## CONFIDENTIAL OPERATIONS MANUAL(S)
## AND OTHER INFORMATION

10.1    Compliance with Operations Manual(s).  Licensor will provide Licensee with one copy of Licensor's Operations Manual(s) (the "Operations Manual(s)") for each Store Licensee operates, which copy must be kept at all times at such Store, and returned by Licensee to Licensor upon expiration or termination of the Store Addendum relating to such Store.  Licensee will modify the Operations Manuals to address local statutes, customs and market conditions in the Territory, which modifications will be subject to Licensor's prior written approval.  To protect Licensor's reputation and goodwill, and to maintain uniform operating standards under the Business System, Licensee will at all times during the term of this Agreement conduct business at its Stores according to the mandatory provisions of the Operations Manual(s).

10.2    Confidentiality of Operations Manual(s).  Licensee will, during the Term of this Agreement and thereafter, treat the Operations Manual(s) as secret and confidential, and Licensee will use all reasonable means to keep such information secret and confidential.  Licensee will not copy, record or reproduce any Operations Manual, or any portion thereof, or otherwise make such Manual(s) available to any unauthorized person.

10.3    Revisions to Operations Manual(s).  Licensor reserves the right to revise, combine or eliminate the Operations Manual(s) at any time during the Term of this Agreement and Licensee agrees to operate its Stores in compliance with all such revisions.  Licensee will at all times keep the Operations Manual(s) current and up-to-date, and in the event of any dispute regarding the Operations Manual(s), the terms of the master copy of the Operations Manual(s) Licensor maintains will control.

10.4    Confidentiality of Other Information.  Licensee will not, during the Term of this Agreement or thereafter, communicate, divulge or use any Proprietary Information for the benefit of any other business, person or entity.  Licensee will divulge Proprietary Information only to its employees that must have access to it to operate the Stores.  All Proprietary Information will be deemed confidential and proprietary for the purposes of this Agreement.

## ARTICLE 11
## SERVICES PROVIDED BY LICENSOR

Consistent with Licensor's uniformity requirements and quality standards, Licensor or its authorized representative may, at its sole discretion and expense:

(A)    provide Licensee with a written schedule of all furniture, fixtures, supplies and equipment necessary and required to operate the Stores, and, upon Licensee's request, provide Licensee with recommendations regarding obtaining products, securing vendors, and establishing purchasing, selling, and pricing strategies;

(B)  inspect the Stores at any time during normal business hours to determine whether the Stores are being operated in conformity with the standards described in this Agreement and the mandatory provisions of the Operations Manual(s). Licensor also reserves the right to hire independent professional shoppers to evaluate each of the Stores. Upon notice from Licensor or its representatives, Licensee will immediately take all necessary steps to correct deficiencies detected during any inspections, including immediately discontinuing use of any equipment, advertising materials, products, supplies, or methods and services that do not conform to Licensor's then-current standards and specifications. If Licensee fails to operate its Stores in conformity with this Agreement and the mandatory provisions of the Operations Manual(s) and fails to promptly remedy any non-compliance after being advised of the same by Licensor in writing, Licensor will have the right to terminate this Agreement without providing any further right to cure such non-compliance. In addition, Licensee will reimburse Licensor for any expenses Licensor incurs to remedy any deficiencies found in Licensee's operations.

(C)  protect the Marks and the Business System for the benefit of all licensees;

(D)  upon Licensee's request, assist Licensee in preparing or otherwise developing Licensee's own advertising programs;

(E)  provide advisory services pertaining to the operation of the Stores. Licensor will make available to Licensee information relating to the latest technology and accepted industry best practices that: (i) Licensor has made available to Circle K Stores in the United States; and (ii) Licensor determines, in its reasonable discretion, is relevant to Licensee's operation of the Stores of the Territory;

(F)  provide Licensee with one copy of the Operations Manual(s) for each Store; and

(G)  conduct a quarterly visit in the Territory to inspect the Stores as described in Paragraph 11(B) above and provide such other services as Licensor determines including, for example, conducting a quarterly business review, trouble-shooting and conducting Store visits.

## ARTICLE 12
## INSURANCE

12.1  General Liability.  Licensee will obtain and maintain in full force and effect, at its expense, commercial general liability coverage insuring Licensee from and against any and all loss, liability, claim or expense associated with the operation, condition, use, business or occupancy of each Store. The commercial general liability policy will cover bodily injury, personal injury, property damage, contractual liability, products liability, premises liability, advertising liability,

completed operations, and any insurance as may be required by law. This coverage will include the surrounding premises or area, the parking area, and the sidewalks of each Authorized Location. Minimum limits for these coverages will be at least Five Million Dollars ($5,000,000) per occurrence.

12.2 Business Automobile. Licensee will obtain and maintain in full force and effect, at its expense, comprehensive automobile liability coverage (if applicable) insuring Licensee from all loss, liability, claim or expense resulting from the use, operation or maintenance of any automobile or motor vehicle Licensee owns or leases or which Licensee or any of its employees or agents use in connection with Licensee's business. Minimum limits for these coverages will be at least One Million Dollars ($1,000,000) for bodily injury and property damage, including personal injury, per occurrence.

12.3 Commercial Property. Licensee will, where appropriate, also maintain "all risk", full replacement cost coverage for buildings (if applicable), machinery and equipment, including boiler coverage (if applicable), fixtures, furnishings, inventory, including spoilage and contamination, signs, and property of others in the care, custody, and control of Licensee or its agents. Business interruption insurance for a minimum of twelve (12) months and extra expense coverage must also be included.

12.4 Liquor Liability. If the Licensee sells any alcoholic beverages, Licensee will, at its expense, obtain a general commercial liability insurance policy as required under Paragraph 12.1 above with the exclusive for liquor liability coverage removed from the policy (i.e., the resulting general commercial liability policy will include liquor liability insurance coverage insuring Licensee from and against any and all loss, liability, claim or expense associated with the sale or distribution of any alcoholic beverages). Alternatively, Licensee may obtain a separate policy for this coverage. The minimum limit (whether included in a general commercial liability insurance policy or acquired through a separate policy) will be at least One Million Dollars ($1,000,000) per occurrence with an aggregate of Two Million Dollars ($2,000,000).

12.5 Umbrella Coverage. Licensee will obtain and maintain in full force and effect, at its expense, umbrella liability coverage, in form acceptable to Licensor, insuring Licensee and its employees and agents from all loss, liability, claim or expense resulting from the operation of the Authorized Locations. Minimum limits for this coverage will be at least Two Million Dollars ($2,000,000) per occurrence.

12.6 Insurance Required By Law or Otherwise. Licensee will, at its sole expense, obtain and pay for workers compensation insurance (whether or not workers compensation insurance is required by the territory or state in which the Stores are located) with Employers Liability limits of at least One Million Dollars ($1,000,000) per occurrence, and will, at its sole expense, obtain and pay for all other insurance Licensee or its agents may be required by territory or federal law to obtain to own and/or operate the Stores.

12.7 Other Insurance. Licensee will, at its sole expense, also obtain and maintain all insurance required by law or under any lease, mortgage, deed of trust, contract for deed or any other legal contract in connection with each Authorized Location. If an Authorized Location also

stores and sells gasoline, Licensor may, at its option, upon sixty (60) days notice to Licensee during the Term of this Agreement, and if State funded and managed leaking Underground Storage Tank Funds for remediation expenses are not available to Licensee or to Licensor or its affiliates, require Licensee to obtain, to the extent reasonable and commercially affordable, environmental pollution liability insurance and/or environmental impairment liability insurance which specifically covers leaks occurring from the underground tanks and piping system, whether they are sudden or gradual, with coverage extending to any and all expenses of clean-up or recovery including excavation of contaminated soil of not less than $500,000 combined single limit of liability.

12.8    Licensor's Rights.  First party policies will contain endorsements by the insurance company waiving all rights of subrogation against Licensor, its parent company, and affiliates. Licensor will be provided with copies of all notices of cancellation, nonrenewal or material coverage reduction or elimination at least thirty (30) days before the effective date of such cancellation, nonrenewal or coverage change.  Licensor may modify the minimum insurance requirements stated in this Agreement at any time during the Term of this Agreement.  Licensee acknowledges that this Article 12 describes the minimum requested insurance requirements and Licensor does not suggest or represent itself as a professional insurance advisor.

12.9    Insurance Providers; Evidence of Insurance.  All insurance companies must be creditworthy (AM Best rating of A-VIII or better) and must be licensed and be designated as an admitted carrier in the Territory of Guam, except to the extent Licensor grants a specific exemption in writing respecting such requirements.  The insurance coverage for each Store will commence as of the date Licensee executes a Store Addendum for such Authorized Location. Licensee will provide Licensor with a certificate of insurance evidencing the required insurance coverage at the same time Licensee sends an executed Store Addendum.  Licensee will provide, upon expiration, change or cancellation of any insurance coverage, new certificates of insurance to Licensor.

12.10   Defense of Claims.  All liability insurance policies Licensee obtains and maintains will require the insurance companies to provide and pay for legal fees and other expenses incurred to defend any legal actions, lawsuits or claims brought against Licensee and Licensor and its affiliates, and their respective officers, directors, employees, and agents.

12.11   Additional Insured Status.  All policies procured for this Agreement will name Licensor and its subsidiaries and affiliates and their respective officers, directors, employees and agents as additionally insured except for workers' compensation and property insurance. Licensee will forward the certificate of insurance evidencing all insurance and the additional insured status to Licensor.  All insurance policies required hereunder will include cross-liability and severability of interest clauses applicable to Licensor, providing coverage for claims by one insured against another insured and coverage to one insured regardless of the actions of the other insureds.

12.12   Third Party Vendors.  Licensee will be responsible for any third party Vendors (as defined below) hired to help Licensee fulfill its obligations under this Agreement.  Licensee will ensure Vendors have adequate insurance.  Licensee will be responsible for the actions or inactions

of Vendors. In this paragraph, "Vendors" means any individual or entity hired by Licensee to perform any of Licensee's duties pursuant to this Agreement.

## ARTICLE 13
## DEFAULT; TERMINATION RIGHTS

13.1    Defaults.    Licensee will be in default hereunder if Licensor determines that Licensee has breached any of the terms of this Agreement, any Store Addenda or any other agreement between the parties, which, without limiting the generality of the foregoing, will include failure to develop and operate Circle K Stores as required in Article 5 above, failure to execute a Store Addendum for any Store located within the Territory, making any false report to Licensor, failure to submit any required report, intentionally understating or underreporting or failure to pay when due any amounts required to be paid to Licensor or any of its affiliates whether pursuant to this Agreement or otherwise or to any third party as required by this Agreement, conviction of Licensee or any officer or director of Licensee or any Principal Equity Holder of any felony or conduct by Licensee (or such related person) which impairs or tends to impair the goodwill of any of the Marks, failure to comply with Licensor's standards and requirements in the operation of Licensee's business, insolvency, the expiration or termination of any lease or sublease for an Authorized Location, the expiration (without renewal) or termination of that certain Trademark License Agreement between Licensee and Tosco Marketing Company dated of even date (the "Fuel Agreement"), making an assignment for the benefit of creditors or any similar voluntary or involuntary arrangement for the disposition of assets for the benefit of creditors, or failure to meet any requirements or specifications Licensor has established respecting product quality, physical property, conditions of equipment or materials used, products manufactured, menu, or use of approved products, packages or promotional materials.

13.2    Termination by Licensor.    Except to the extent Licensor may immediately terminate this Agreement or a Store Addendum as provided below, if Licensee fails to cure a default that, in Licensor's sole judgment, relates to a particular Store within thirty (30) days from the date Licensor mails or delivers a written notice of default, Licensor will have good cause to terminate the Store Addendum for such Store. In addition, if Licensee fails to cure a default that, in Licensor's sole judgment, relates to all Stores developed pursuant to this Agreement within thirty (30) days from the date Licensor mails or delivers a written notice of default, Licensor will have good cause to terminate this Agreement and all Store Addenda entered into pursuant to this Agreement; provided, however, if Licensee fails to comply with the development obligations described in Paragraph 5.2 above due solely to the closing of an existing Store, Licensee will have six (6) months from the date of notice of default to re-open the Store or open a new Store to satisfy Licensee's obligations under Paragraph 5.2 above. For example, the use of unapproved products may relate to only one of the Stores, whereas the conviction of an officer of Licensee of an offense directly related to the business conducted under this Agreement, the failure of Licensee to pay fees or the underreporting of fees by Licensee, may relate to all of the Stores. Termination will be accomplished by mailing or delivering to Licensee written notice of termination in English, which notice will state the grounds therefor and will be effective: (i) except as provided in this Paragraph 13.2 above, immediately without an opportunity to cure if Licensee fails to develop and operate the minimum required number of Stores in the Territory as stated in Paragraph 5.2 above, voluntarily abandons this Agreement or the franchised premises, is declared insolvent, makes an

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 25 of 33

assignment or enters into any similar arrangement for the benefit of creditors, or any Principal Equity Holder is convicted of an offense directly related to the business conducted hereunder, intentionally understates or underreports Gross Sales, continuing license fees, or any default which is the third similar default within any twelve (12) month consecutive period or Licensee's failure to cure within twenty four (24) hours of notice thereof any default under this Agreement which materially impairs the goodwill associated with any of the Marks, or the Fuel Agreement expires (without renewal) or terminates; or (ii) thirty (30) days after the date of such notice of termination in all other cases. In addition, Licensor may terminate this Agreement upon any other ground within this Agreement or by any shorter period of notice (but not less than thirty (30) days except as provided above) as applicable law or regulation may permit.

13.3  Notice of Breach. Except as otherwise provided herein, Licensor will not have the right to terminate this Agreement as provided in Paragraph 13.2 unless and until a written notice has been delivered to Licensee and, after receiving the written notice, Licensee fails to cure or correct the alleged breach within thirty (30) days after receipt of such written notice from Licensor, or during such other lesser period of time as Licensor may require under the circumstances, and except where such written notice states that Licensee is delinquent in the payment of any fees or other payments payable to Licensor or any affiliates, in which case Licensee will have ten (10) days after receipt of such written notice to correct the breach by making full payment, including interest. If any such default is not cured within the time period specified herein, Licensor will have the right to terminate this Agreement and all rights granted herein. Licensor's sending a notice of termination to Licensee will not constitute modification of this provision.

13.4  Extended Cure Period. If Licensee breaches any provision of this Agreement which permits a cure period, but the default by its nature cannot reasonably be cured within the cure period, Licensee will be entitled to such additional time to cure the alleged breach as Licensor, in its sole discretion, deems reasonable. Licensee will not be entitled to an extension as provided in this Paragraph 13.4 if the default or delay is caused, directly or indirectly, by Licensee's financial inability, negligence or willful misconduct. In addition, if any law applicable to this Agreement requires additional notice or a longer notice period than specified herein, this Agreement will be deemed to be automatically amended to conform to the requirements of such law.

13.5  Breach of Related Agreements. At Licensor's election, Licensee's default under this Agreement may simultaneously constitute a default by Licensee of each related agreement between Licensee and Licensor or any of its affiliates, regardless of whether Licensee may have properly and fully performed such other agreements. At Licensor's election, Licensee's default in any other agreement between Licensee and Licensor may, in Licensor's sole discretion, simultaneously constitute a default by Licensee under this Agreement, notwithstanding that at such time Licensee may be fully and promptly performing its obligations hereunder.

13.6  Termination by Licensee. Licensee may terminate this Agreement as follows:

(A)  for good cause, provided that (i) Licensee delivers to Licensor written notice identifying each breach by Licensor of a material provision of this

Case 1:02-cv-00031   Document 34-2   Filed 05/06/2005   Page 26 of 33

Agreement or any Store Addenda and the grounds for such breach, and (ii) Licensor fails to cure such breach to Licensee's reasonable satisfaction within thirty (30) days of such notice. If Licensor fails to cure a material breach that relates to a particular Store within thirty (30) days of Licensor's receipt of proper written notice of such breach (as described above), Licensee will have good cause to terminate the Store Addendum for such Store. If Licensor fails to cure a material breach of this Agreement that relates to all of the Stores developed under this Agreement within thirty (30) days of Licensor's receipt of proper written notice of such breach (as described above), Licensee will have good cause to terminate this Agreement and all Store Addenda entered into under this Agreement; and

      (B)    upon 180 days' prior written notice to Licensor, with or without cause, provided Licensee understands that the Fuel Agreement between Licensee and Tosco Marketing Company also will terminate as of the date this Agreement terminates. If Licensee terminates this Agreement pursuant to this subparagraph 13.6(B), Licensee will, within 30 days of termination, pay to Licensor: (i) all amounts remaining due under paragraph 6.2 for the calendar period in which this Agreement terminates, plus (ii) a sum equal to two years of the Minimum Royalty described in Paragraph 6.2.

     13.7   <u>Rights and Obligations upon Expiration or Termination.</u>  Upon expiration or termination of this Agreement, Licensee will:

      (A)    immediately pay all amounts owed to Licensor or its affiliates, suppliers or vendors; and

      (B)    immediately discontinue all use of the Business System, including the Marks. Licensee will, at its expense, cease displaying and using, and will return to Licensor, all copies (including translated copies) of the Operations Manual(s), other Proprietary Information, all signs, stationery, letterheads, forms, printed matter, electronically stored data, advertising, and other materials required to be returned under this Agreement, and will cease using the Marks or any name, logo, slogans, or symbols or other designations that might tend to mislead or confuse the public or give the impression that Licensee is associated with Licensor or the Business System. Licensee will make reasonable modifications to the exterior and interior of each Store to eliminate Licensee's former identification as a licensee of Licensor within a reasonable period of time, but no longer than one hundred twenty (120) days, following expiration or termination of this Agreement. Licensee will promptly execute and file an assignment of its fictitious business name and any other similar filings and take such additional actions as may be necessary to abandon use of any fictitious business name containing any of the Marks. At Licensor's request, Licensee will assign to Licensor or its nominee all telephone numbers and listings used in each Store. Licensee will, immediately upon Licensor's request, permit Licensor or its representatives to have access to

Case 1:02-cv-00031   Document 34-2   Filed 05/06/2005   Page 27 of 33

each Authorized Location to secure Licensee's compliance with such obligations hereunder.

13.8    Effect of Wrongful Termination.    If Licensee takes any action to terminate this Agreement or to convert any Store to another name or business without first complying with the provisions of this Agreement, Licensee's actions will be deemed a wrongful termination and Licensee will be obligated to continue to pay Licensor the fees payable by Licensee under this Agreement and the provisions of this Agreement will remain in full force and effect until such time as this Agreement expires or is terminated under the provisions and applicable law.

## ARTICLE 14
## LICENSEE'S IN-TERM COVENANT NOT TO COMPETE

Licensee, the Principal Equity Holders and the Personal Guarantors will not, during the Term of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director or shareholder of any other person, firm, entity, partnership or corporation, own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in, or assist any person or entity engaged in any other convenience retail business, or other related business that is in any way competitive with or similar to Circle K Stores that is located in the Territory, except: (i) with Licensor's prior written consent; or (ii) Licensee, the Principal Equity Holders and any guarantor may, cumulatively, own directly or indirectly five percent (5%) or less of the issued and outstanding shares of any class of stock of a publicly traded company.

## ARTICLE 15
## TRAINING PROGRAM

15.1    Initial Training.    Before commencing business operations, Licensee's operations manager and each of Licensee's Store Managers must successfully complete the initial training program (the "Training Program") provided by Licensor. Licensee's operations manager and the Store Managers must complete, to Licensor's satisfaction, each individual training segment before progressing to the next segment. The Training Program (in-store and classroom) will consist of up to thirty (30) days of training as Licensor determines, and will be conducted at locations in the Territory specified by Licensor and such other locations specified by Licensor, and will cover the basic operating procedures of the Business System as described in the mandatory provisions of the Operations Manual(s). Licensor will provide the Training Program for Licensee and Licensee's initial group of Store Managers at no cost to Licensee. Licensee is responsible for all salaries, fringe benefits, payroll taxes, travel costs, lodging, food, and other personal expenses Licensee and its Store Managers incur in attending the Training Program.

15.2    Train-the-Trainer Program.    Licensor also will provide training to Licensee's operations manager and/or certain Store Managers to permit Licensee to offer the Training Program to future Store Managers and operations personnel of Licensee. Licensor will provide to Licensee certain training materials necessary for Licensee to conduct future Training Program sessions. Licensee will not modify or delete any aspect of the Training Program. Licensor will have the right to approve the person(s) Licensee selects as the trainer(s) to conduct the Training

Program and each approved trainer must successful complete the Training Program at a session offered by Licensor.

15.3    Opening Assistance.    After Licensee and Licensee's Store Manager(s) have successfully completed the Training Program, Licensor will furnish a representative to the Store who will provide opening assistance and training to Licensee and its employees as deemed necessary and appropriate by Licensor including assistance with training employees, implementing the Business System, and evaluating initial business operations. Licensee will not open and commence initial business operations of any Store until Licensor has given Licensee written approval to open any Store.

15.4    Changes in Store Manager.    If Licensee hires a new or additional Store Manager, the new or additional Store Manager must successfully complete the Training Program at the next regularly scheduled Training Program offered by Licensee or be certified by Licensor to manage one or more Stores. Licensee will be responsible for all travel, lodging, food, and other personal expenses all new or additional Store Managers incur in attending the Training Program.

15.5    Additional Training.    Licensor may, at its sole option, hold refresher and/or additional training programs for Licensee and/or its Store Managers at a location or locations in the Territory that Licensee selects. Licensee must pay for the expense of, and attend, such additional training, provided Licensor will not charge a separate fee for tuition for such programs. Licensee will be responsible for travel, lodging, food, and other personal expenses of those who attend on Licensee's behalf.

15.6    Annual Convention.    Licensor may arrange for an annual licensee convention that Licensor sponsors and conducts. If Licensee and Licensee's Store Managers attend any such convention, Licensee's attendance will be at Licensee's sole expense.

## ARTICLE 16
## INDEMNIFICATION

16.1    Indemnification.    Except as otherwise expressly provided in this Agreement, Licensee will defend, protect, indemnify, and hold harmless Licensor, its affiliates, and their respective directors, employees, officers, shareholders, and agents (individually an "Indemnified Party" and collectively, the "Indemnified Parties"), from and against any and all loss, costs, expenses, damages, and liability (including attorneys' fees and court costs) which any Indemnified Party may suffer, sustain or incur arising out of or relating to Licensee's ownership of the Stores, Licensee's or its agent's (including any management company selected by Licensee). Operation of the Stores or the use of the Authorized Locations, Licensee's or any agent's performance hereunder, or the performance, acts, or omissions by any resale customer served by Licensee, or any other person. Licensee's obligations under this Paragraph 16.1 will not apply to any losses, costs, expenses, damages or liability caused by a defective product made by or furnished by Licensor or one of Licensor's affiliates. The provisions of this subparagraph will survive the termination of this Agreement. Licensee's duty to defend and protect the Indemnified Parties will include investigation and costs of defense and settlement, including reasonable attorneys' fees up through final appeal of a trial court judgment or arbitration.

16.2    Defense of Claims. Nothing herein will limit Licensor's right to participate in its defense with counsel of its own choosing. If Licensor does so, Licensee will instruct its counsel to cooperate fully with Licensor and its counsel, including furnishing such information as Licensor or its counsel may request. Licensee will pay any costs Licensor incurs in defending any claims.

16.3    Notification of Possible Indemnity Events. Licensee will notify Licensor of any event that is or may be subject to indemnity as provided herein, and which has resulted or may result in personal injury, death, disease, or destruction of property, by telephone within twenty-four (24) hours after such event and in writing within three (3) days after such event.

## ARTICLE 17
## ASSIGNMENT OF LICENSE AGREEMENT

17.1    Assignment by Licensor. Licensor may assign or sell its interests, rights, and/or obligations under this Agreement, in whole or in part, directly or indirectly, without notice to or the consent of Licensee.

17.2    Assignment by Licensee. Licensor entered into this Agreement in reliance upon the personal skills, and managerial and financial qualifications of Licensee's officers, directors and Principal Equity Holders. Consequently, except as otherwise provided in this Article 17, Licensee may not assign or sell the Stores or Licensee's rights and privileges under this Agreement without Licensor's prior written consent. Consent to an assignment upon specified terms and conditions will not be deemed consent to an assignment upon any other terms or conditions, nor to any other or subsequent assignment. Licensor's consent will be conditioned upon Licensee's compliance with the following conditions:

(A)    Good Standing.    Licensee is in Good Standing under this Agreement;

(B)    Qualified Assignee.    Licensee and the proposed assignee demonstrate to Licensor's reasonable satisfaction that the proposed assignee, and the directors, officers, and principal shareholders and partners of the assignee, meet(s) all of the then-current qualifications for new licensees, possess the requisite business experience, and possess the financial resources to fulfill all obligations under this Agreement respecting the Stores;

(C)    Execution of License Agreement. The proposed assignee executes a written agreement in a form satisfactory to Licensor assuming and agreeing to discharge all of Licensee's obligations and covenants under this Agreement for the remainder of the Term or, at Licensor's option, executes Licensor's then-current form of multiple unit development and operating agreement and required related agreements which may contain materially different terms and conditions, including differences in the Royalty Fee, territorial protection, and other material provisions;

(D)    Other Obligations. The proposed assignee assumes in writing all of Licensee's obligations and executes all agreements with Licensor or its affiliates as

required of Licensee (including the Guaranty), and assumes all other agreements pertaining to the Stores;

(E) <u>Training</u>. The proposed assignee and each Store Manager successfully complete the Training Program as provided in Article 15 above;

(F) <u>Transfer Fee</u>. Subject to the following, Licensee pays Licensor a nonrefundable transfer fee equal to Twenty-Five Thousand Dollars ($25,000) plus one-half of one percent ($\frac{1}{2}$%) of Licensee's Gross Sales for the twelve (12) month period ending with the last day of the calendar month preceding the closing date of the transaction between Licensee and the prospective buyer. Licensee will not be obligated to pay such transfer fee if the assignment involves a transfer, resulting from the death of a Principal Equity Holder, of fifty percent (50%) or less of the stock, membership or partnership interests in the Licensee and does not, directly or indirectly, result in a change in the effective control of Licensee.

(G) <u>Upgrading</u>. The Stores will be upgraded and/or renovated to conform to the current standards and image then required of new Circle K® licensees;

(H) <u>Releases and Subordination</u>. Licensee and Licensor will have executed a mutual release of all claims related to this Agreement in a form acceptable to Licensor, and Licensee will have subordinated its rights to all payments from the assignee to all obligations of the assignee to Licensor;

(I) <u>Agreements</u>. Upon Licensor's request, Licensee will provide Licensor with a complete copy of all contracts and agreements and related documentation between Licensee and the assignee relating to the sale or transfer of the license and this Agreement; and

(J) <u>Landlord Consent</u>. To the extent the terms of the lease for an Authorized Location require consent of the Landlord, the proposed assignee is accepted by the landlord(s) in writing as a substitute tenant at each Authorized Location. Licensor may refuse to consent to the transfer of this Agreement to any assignee who is not acceptable to all relevant landlords as a direct tenant (to the extent landlord consent is required).

17.3 <u>Change of Ownership</u>. If Licensee is a corporation, limited liability company or partnership, Licensee will notify Licensor of any assignment of corporate stock or membership or partnership interests, including any assignment of the legal, beneficial, or voting rights therein. Any such assignment which, together with all prior assignments constitutes an assignment of thirty-three and one-third percent ($33\frac{1}{3}$%) or more of the stock, membership, or partnership interests in Licensee since the Effective Date of this Agreement, and any other action, either directly or indirectly, which results in a change in the effective control of Licensee by those persons having effective voting control of Licensee as of the Effective Date of this Agreement, will constitute an assignment subject to the conditions of Paragraph 17.2. Separately, if a

Principal Equity Holder assigns or sells all of his/her interest in Licensee (including any assignment or sale contemplated by Paragraph 17.4 below) or an amount representing ten percent (10%) or more of the stock, membership or partnership interests in Licensee in one or more transactions, the proposed assignee (thereafter designated a "Principal Equity Holder") will execute a Guaranty in the form attached as Exhibit C.

17.4 <u>Shareholder Control Agreement</u>. Each of the Principal Equity Holders will enter into an agreement in form reasonably acceptable to Licensor which provides for the orderly transition of ownership and management duties relating to Licensee's business in the event of the death or permanent incapacity of a Principal Equity Holder or any other proposed sale of a Principal Equity Holder's interest in Licensee. Licensee will, upon Licensor's request, provide to Licensor a copy of such agreement.

ARTICLE 18
<u>LICENSEE'S LEASE; BUILDING DESIGN AND SPECIFICATIONS</u>

18.1 <u>Third Party Lease</u>. Licensor must approve any lease Licensee enters into after the Effective Date with a third party lessor relating to an Authorized Location, such approval will not be unreasonably withheld. Licensor's approval of such lease will be conditioned upon Licensee using reasonable efforts to obtain Landlord's agreement to the following:

      (A)    The term (alone or with renewal terms) must be for the balance of the Term of this Agreement;

      (B)    The premises will only be used for the operation of a Store;

      (C)    The lessor consents to Licensee's use of the Marks and signs as required for a Circle K Store;

      (D)    The third party landlord must notify Licensor upon Licensee's default under the lease thirty (30) days before terminating the lease;

      (E)    Licensor may enter the premises to make any modifications necessary to protect the Marks;

      (F)    Upon Licensor's written request, the landlord will supply Licensor with a current copy of the lease, Licensee's account information, sales reports, and other related information; and

      (G)    The lease will not be amended, assigned, or sublet without Licensor's prior written approval.

18.2 <u>Leasehold Improvements, Fixtures, and Equipment</u>. Licensee will effect leasehold improvements and will install such fixtures and equipment at each Store as Licensor requires under its current specifications as stated in the mandatory provisions of the Operations Manual(s), and Licensee will provide Licensor with an architectural schedule before making any renovations

to such Store. Licensor must approve all plans and specifications before Licensee commences construction.

18.3 Floor Plan Layout. Licensor will provide Licensee with a typical floor plan layout and Licensor's standard construction and equipment specifications, and Licensee will take all actions necessary to bring each Store into compliance with the then-current layout and equipment specifications before Licensee commences operations at each such Store. At such time as Licensor revises its general floor plan layout, Licensee will reconfigure the floor plan layout for each of its Stores to comply with Licensor's then-current specifications; provided, however, if Licensor determines in its reasonable discretion that the proposed reconfiguration is not suitable for Licensee's Stores, Licensor and Licensee will mutually agree upon revisions to the floor plan layout for each of Licensee's Stores. All architectural, engineering, construction, and design services for the Stores will be Licensee's sole cost and responsibility, although Licensor will, at Licensee's request, consult with Licensee regarding the design and layout of the Stores.

18.4 Changes in Plans and Specifications: Inspections. Licensor must approve in writing any and all changes to any Store plans before Licensee implements such changes. Licensor may make a final inspection of any completed Store and may require such corrections and modifications as it deems necessary to bring such Store into compliance with the plans and specifications that Licensor previously approved. If Licensee fails to correct any unauthorized variance from the approved plans and specifications within thirty (30) days of receipt of notice of such default, Licensor will be entitled to immediately terminate this Agreement. Licensee will reimburse Licensor for all expenses incurred in connection with any changes to plans or inspections made to correct changes.

### ARTICLE 19
### DISPUTE RESOLUTION

19.1 Mediation. Except as expressly provided herein, the parties will attempt to settle disputes arising out of or relating to this Agreement or the breach thereof through non-binding mediation before filing any demand for arbitration. The designated representatives of Licensor and Licensee will meet within ten (10) days after a request by either of the parties to the other party asking for the same. If such dispute cannot be settled at this meeting, the parties will designate a mediator, or if the parties are unable to agree upon a mediator, each party will choose a mediator and the two mediators will choose a third person to mediate the dispute. If the parties cannot agree upon the rules for this mediation, the Center for Public Resources Model Procedure for Mediation of Business Disputes will govern, and such mediation will take place within forty-five (45) days after a mediator is selected in Maricopa County, Arizona.

19.2 Arbitration. Except for disputes or controversies involving the Marks or as otherwise expressly provided herein, all disputes, claims and controversies between the parties arising under or in connection with this Agreement or the making, performance or interpretation thereof (including claims of fraud in the inducement and other claims of fraud and the arbitrability of any manner) will be settled, upon demand of written notice of either party, by arbitration by a sole arbitrator under the current rules of the Center for Public Resources Rules Non-Administered · Arbitration of Business Disputes. Judgment upon the award of the arbitrator may be entered in

Case 1:02-cv-00031    Document 34-2    Filed 05/06/2005    Page 33 of 33

any court having jurisdiction thereof. Such arbitration will be conducted in Maricopa County, Arizona, and will be conducted solely in the English language. Except as otherwise specifically provided for herein, each party will bear its own costs and attorneys' fees. The procedures specified herein will be the sole and exclusive procedures for the resolution of disputes between the parties arising out of or relating to this Agreement; provided, however, that a party may seek a preliminary injunction or other preliminary judicial relief if in its judgment such action is necessary to avoid irreparable damages. During any pending arbitration proceeding, Licensee and Licensor will fully perform their respective obligations under this Agreement.

## ARTICLE 20
## ENFORCEMENT

20.1    Injunctive Relief.  Licensor will be entitled to seek the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (A) the Marks and the Business System; (B) obligations upon termination or expiration of this Agreement; (C) the assignment of this Agreement, Licensee's business licensed hereunder, and ownership interests in Licensee; (D) the covenants not to compete; (E) confidentiality; or (F) any act or omission by Licensee, any Store or employees of such Store that, (i) constitutes a violation of any applicable law, ordinance or regulation, (ii) is dishonest or misleading to customers or prospective customers of the Store or other Circle K Stores, (iii) constitutes a danger to employees or customers of any Store or to the public, or (iv) may impair the goodwill associated with the Business System, including the Marks. Licensor will be entitled to seek injunctive relief against Licensee without the posting of any bond or security, unless required by applicable law.

20.2    Payments to Licensor.  Licensee will not, for any reason, withhold payment of any Royalty Fees or any other fees or payments due Licensor under this Agreement or any other agreement.  Licensee will not have the right to "offset" any liquidated or unliquidated amounts allegedly due to Licensee from Licensor against the Royalty Fees or any other payments due to Licensor under this Agreement or any other agreement.

20.3    Cumulative Rights.  Licensor's rights hereunder are cumulative and no exercise or enforcement by Licensor of any right or remedy hereunder will preclude Licensor's exercise or enforcement of any other right or remedy hereunder or which Licensor is entitled by law to enforce.

## ARTICLE 21
## NOTICES

All notices to Licensor hereunder will be in writing and will be made by overnight courier service, personal service upon an officer, or sent by prepaid registered or certified United States mail to any officer of Licensor, and will be deemed to have been given 72 hours after being sent by overnight courier service or ten (10) days after being deposited in the United States mail for certified or registered delivery, addressed to Licensor at 1500 North Priest Drive, Tempe, Arizona 85281, Attention: Worldwide Franchising Group. All notices to Licensee hereunder will be made by overnight courier service, personal service upon an officer or director of Licensee or sent by

Case 1:02-cv-00031    Document 34-3    Filed 05/06/2005    Page 1 of 27

prepaid registered or certified United States mail to any officer or director of Licensee, and will be deemed to have been given 72 hours after being sent by overnight courier service or ten (10) days after being deposited in the United States mail for certified or registered delivery, addressed to Licensee at _____, or such other address in the Territory as Licensee may designate in writing. Notice delivered by a delivery service that requires a written receipt signed by the addressee will be deemed to have been personally served under this Agreement.

## ARTICLE 22
## MISCELLANEOUS

22.1    Relationship of Parties: Independent Contractor.    Licensee is an independent contractor and is the independent owner of its business, in full control thereof to conduct such business in accordance with Licensee's own judgment and discretion, subject only to the provisions of this Agreement and such other agreements as may be entered into by these same parties. Licensor will neither regulate nor be responsible for the hiring or firing of Licensee's agents or employees or for Licensee's contracts. Neither party is the agent, legal representative, partner, joint venturer or employee of the other. Neither Licensor nor Licensee has the right to bind or obligate the other to any obligations or debts. This Agreement does not reflect or create a fiduciary relationship or a relationship of special trust or confidence.

22.2    Approval.    In all cases where Licensor's prior approval is required and no other method or times for obtaining such approval is described, Licensee will request such approval in writing, and Licensor will notify Licensee in writing of its decision within ten (10) business days after receiving Licensee's written request and all supporting documentation.

22.3    Successors/Assigns.    Subject to any restrictions regarding sale, transfer or assignment stated herein, this Agreement will be binding upon and benefit the permitted successors, assigns, heirs, and personal representatives of the parties.

22.4    Governing Law.    Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 et seq.), and the Federal Arbitration Act (9 U.S.C. § 1, et seq.) this Agreement and the relationship between Licensor and Licensee will be governed by the laws of the State of Arizona. Licensee waives, to the fullest extent permitted by law, the rights and protections that may be provided through the law of any jurisdiction relating to franchises or business opportunities, other than those in the jurisdiction stated above.

22.5    Counterparts.    This Agreement may be executed in one or more counterparts, all of which will constitute one agreement and will not be binding on Licensor unless and until it has been accepted and signed by an authorized officer of Licensor.

22.6    Severability    All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable. If any applicable law or rule of any jurisdiction requires a greater prior notice than is required hereunder or the taking of some action not required hereunder, or if under any applicable and binding law of any jurisdiction, any provision of this Agreement or any

specification, standard or operating procedure Licensor prescribes is invalid or unenforceable, the prior notice or other action required by such law or rule will be substituted for the notice requirements hereof, or such invalid or unenforceable provision, specification, standard or operation procedure will be modified to the extent required to be valid and enforceable. Such modifications to this Agreement will be effective only in such jurisdiction and will be enforced as originally made and entered into in all other jurisdictions.

22.7    Waiver. Licensor and Licensee may by written instrument signed by both parties, waive any obligation of or restriction upon the other under this Agreement. Neither Licensor's acceptance of any payment by Licensee nor Licensor's failure, refusal or neglect to exercise any right under this Agreement or to insist upon Licensee's full compliance of its obligations hereunder, will constitute a waiver by Licensor of any provision of this Agreement. Licensor may have the right to waive obligations or restrictions for other licensees under their License Agreements without waiving those obligations or restrictions for Licensee, and, except to the extent prohibited by law, Licensor may negotiate provisions, grant concessions, and waive obligations for other licensees without granting those same rights to Licensee and without incurring any liability to Licensee.

22.8    Entire Agreement. The preambles are a part of this Agreement, which, together with all Store Addenda and exhibits, represent the entire agreement of the parties.    This Agreement supersedes and terminates all prior agreements, either oral or in writing, between the parties involving the franchise relationship and, therefore, representations, inducements, promises or agreements between the parties not contained in this Agreement or not in writing signed by Licensor and Licensee will not be enforceable.

22.9    No Oral Modifications. No modifications, rescissions, releases or waivers of this Agreement and no approval, consent or authorization required by any provision of this Agreement may be made except by a written agreement signed by an authorized officer of Licensee and the president or an authorized officer of Licensor.

22.10   References. If Licensee consists of more than one individual, the liability of all such individuals under this Agreement will be deemed to be joint and several.    The term "Licensee" as used herein is applicable to one or more persons, a corporation, a partnership or other entity, as the case may be. References to "Licensee", "assignee", and "transferee" which are applicable to an individual or individuals will mean the principal owner or owners of the equity or operating control of Licensee or any such assignee or transferee if Licensee or such assignee or transferee is a corporation or partnership.

22.11   Venue and Jurisdiction. Unless otherwise prescribed by applicable law, and subject to the provisions of Article 19 regarding mediation and arbitration, all litigation, lawsuits, court hearings, proceedings or other actions initiated by either party against the other party will be venued in Maricopa County, Arizona. Consequently, Licensee, each of its officers, directors and Principal Equity Holders agree to submit to personal jurisdiction in Maricopa County, Arizona, for the purpose of any action or dispute arising out of this Agreement, the Authorized Locations or any Store, and agree and stipulate that any such proceedings will be exclusively venued in Maricopa County, Arizona.

Case 1:02-cv-00031    Document 34-3    Filed 05/06/2005    Page 3 of 27

22.12 Force Majeure. Either party shall be excused for delays and failures to perform for a period equal to the length of any Force Majeure Delay; provided, that a Force Majeure Delay shall delay a party's performance if it fails to use all reasonable efforts and diligence to cause the cessation of the Force Majeure Delay. "Force Majeure Delay" shall mean delay to the extent caused by acts of God; acts of a public enemy; fire; civil disturbances; mudslides; landslides, fire or other casualty; strikes, work stoppages, unavailability of or delay in receiving labor or materials, defaults by contractors or subcontractors, weather conditions, and moratoriums, governmental delays and other such factors which are beyond the reasonable control of either party (financial inability excepted). Notwithstanding the foregoing, however, a Force Majeure Delay shall not be deemed to have commenced until the date upon which notice of the occurrence of such event is given by the party claiming the delay to the other party.

22.13 English Language. Except to the extent the parties otherwise agree in writing, the language of this Agreement, and all performance hereunder, including the Training Program and all written materials, will be in the English language and English versions will be deemed the original and controlling versions of all documents.

## ARTICLE 23
## ACKNOWLEDGMENTS

23.1 Business Risk; Legal Counsel; No Financial Projections. Licensee acknowledges that it has conducted an independent investigation of the business contemplated by this Agreement and recognizes that an investment in a franchise involves business and economic risks, and that making a success of the venture is largely dependent upon Licensee's own business abilities and efforts. Licensee acknowledges that Licensor has strongly recommended that Licensee should retain legal counsel to review this Agreement and Licensor's Uniform Franchise Offering Circular and to advise Licensee as to the provisions of this Agreement and the potential economic benefits and risks of loss relating to this Agreement and the Store. Licensor expressly disclaims the making of, and Licensee acknowledges that it has not received nor relied upon, any representation, warranty, or guaranty, expressed or implied, as to the potential volume, income, earnings, expenses, profits, or financial or business success of the business venture contemplated by this Agreement except as may have been expressly stated in the Offering Circular provided to Licensee.

23.2 Other Licensees. Licensee acknowledges that other licensees of Licensor have or will be granted licenses at different times and in different situations, and further acknowledges that the provisions of such licenses may vary substantially in form and in substance from those contained in this Agreement.

23.3 Receipt of Offering Circular and License Agreement. Licensee acknowledges that it received from Licensor a copy of this Agreement with all material blanks fully completed at least five (5) business days before the date Licensee executed this Agreement. Licensee further acknowledges that it received a copy of Licensor's Offering Circular, together with a copy of all proposed agreements relating to the sale of the franchise, at least ten (10) business days before Licensee executed this Agreement or paid any consideration to Licensor in connection with the sale or proposed sale of the franchise granted hereby.

23.4 <u>Offer of License</u>. Licensee acknowledges that all solicitations and discussions relating to the offer or sale of this license occurred in, or were directed only to individuals located in, the State of Arizona or the Territory of Guam.

23.5 <u>Exemption from Guam Deceptive Trade Practices-Consumer Protection Act</u>. Licensee and Licensor acknowledge and agree that this Agreement and the parties' related activities represent acts or practices subject to and authorized under the Federal Trade Commission's Franchise Disclosure Rule (16 C.F.R. § 436 <u>et seq.</u>). Consequently, Licensee and Licensor acknowledge and agree that the provisions of the Guam Deceptive Trade Practices-Consumer Protection Act will not apply to this Agreement or the parties' activities arising out of or related to this Agreement.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the date first above written.

"LICENSOR"

TMC FRANCHISE CORPORATION, an Arizona corporation

By: _____

Its: _____

"LICENSEE"

SOUTH PACIFIC PETROLEUM CORPORATION, a Guam corporation

By: _____

Its: _____

Case 1:02-cv-00031    Document 34-3    Filed 05/06/2005    Page 5 of 27

# EXHIBIT C

# SOUTH PACIFIC PETROLEUM CORPORATION
## CONFIDENTIALITY AGREEMENT

_James McDonald_ ("Employee") wishes to be employed by the Company. Employee understands that during the course of his/her employment with the Company, he/she may be entrusted with access to confidential, restricted, or information relating to the business, operational and/or financial affairs of the Company; and that the Company has significant and legitimate business reasons for protecting such information. Therefore, in consideration of Employee's employment by the Company, Employee agrees as follows:

1.    Ownership of Confidential Information. All Confidential Information obtained, created or developed by Employee, alone or with others, or which comes into the possession of the Employee in the course of Employee's work, shall be and remain the exclusive property of the Company, and shall not be the subject of any publication or use by Employee without the express prior written consent of the Company, whether during or after the term of Employee's employment with the Company. Employee shall promptly disclose to the Company all Confidential Information created or otherwise developed by Employee, alone or with others.

   For purposes of this Agreement, "Confidential Information" means information (including information created or otherwise developed by Employee alone, or with others), in whatever form, which is not generally known about the Company or its business, including without limitation, its products, services, projects, designs, trends, patterns, compositions, artwork, developmental or experimental work, computer programs, databases, know-how, processes, formulas, existing or prospective customers, suppliers, reports, recommendations or conclusions, present or future business plans for rendering additional products or services for further expansion or development, marketing plans and strategies, finances, employment policies and plans, any legal affairs, or any other information of a restricted or confidential nature relating to the business, operations or financial affairs of the Company, and information obtained from third parties under confidentiality or non-disclosure agreements.

2.    No Disclosure of Confidential Information. Employee shall, during the term of his or her employment, and for such time as the Company is operating, keep secret and retain in the strictest confidence all Confidential Information, and shall not disclose such information to anyone inside and outside of the Company, except as may be necessary and to the extent reasonably required in the course of Employee's work for the Company, or with the express prior written consent of the President and/or Board of Directors of the Company. Employee shall not use, copy or cause to be copied, make notes of, print out or cause to be printed out, divulge to anyone outside the Company, any Confidential Information for the

Case 1:02-cv-00031    Document 34-3    Filed 05/06/2005    Page 7 of 27

Employee's or another's benefit, either during or after Employee's period of employment with the Company. Notwithstanding the foregoing, Employee shall not be bound by the foregoing restrictions to the extent that (a) such Confidential Information has previously become publicly known in a manner other than through a breach of this Agreement by Employee; or (b) disclosure of such Confidential Information is required by applicable law or regulation or is compelled by a court of other tribunal of competent jurisdiction.

3.      Return of Company Documents and Tangible Property.  It is understood and agreed that Employee shall not be entitled to retain any of the files, records or tangible property of the Company at any time.  Upon demand by the President and/or the Board of Directors of the Company, and, in any event, upon termination of employment, Employee shall promptly surrender and deliver to the Company (and shall not keep in Employee's possession or deliver to anyone else) all keys, equipment, books, records, files, programs, work papers, journal entry notes, notes taken during company meetings or company-related meetings, reports, drawings, blueprints, manuals, documents, photographs, computer disks and files and the like (including, but not limited to, all negatives, originals and copies, whether in document form, on computer discs or otherwise) and any and all other property in Employee's possession, custody, or control which relate in any way to the business of the Company or any of its affiliated entities, whether created or otherwise developed by Employee or by others.

4.      Solicitation of Confidential Information.  During Employee's employment and for a period of one (1) year after his or her separation from the Company, Employee shall not attempt, directly or indirectly, to contact the Company's confidential sources on matters relating to the Company, or to contact, discuss or negotiate with any confidential sources, or to make any use of any Confidential Information of the Company, without the prior written consent of the Company (or any successors or assigns).  At the request of the President and/or the Board of Directors of the Company, Employee shall promptly surrender to the Company any such information.  Notwithstanding the foregoing, Employee shall not be bound by the foregoing restrictions to the extent that (a) such Confidential Information has previously become publicly known in a manner other than through a breach of this Agreement by Employee; or (b) disclosure of such Confidential Information is required by applicable law or regulation or is compelled by a court of other tribunal of competent jurisdiction.

5.      Confidential Information of Third Parties.  During employment with the Company, Employee may receive, under non-disclosure agreements agreed-to by authorized representatives of the Company, information claimed by third parties to be Confidential Information.  Employee shall strictly respect such agreements and shall not disclose such information to any person or organization, except as is necessary in carrying out Employee's work for the Company consistent with the Company's agreement with such third parties.

6.   Breach or Threatened Breach of Agreement.  Should Employee breach this Agreement during his or her employment by the Company, Employee will be subject to disciplinary action, including possible discharge.  In the event of a breach or threatened breach of any of the provisions hereof (other than those providing directly for the performance by the Employee of his or her services hereunder), the Company shall, in addition to all other remedies, be entitled to a temporary or permanent injunction and/or a decree for specific performance, in accordance with the provisions hereof, without showing any actual damages or that monetary damages would not provide an adequate remedy.  The Company shall have the right to obtain immediate injunctive relief or, in the alternative, monetary damages from Employee in any court of competent jurisdiction in Guam.

7.   At Will Status Maintained.  Employee acknowledges and agrees that this Agreement does not modify or alter Employee's employment relationship with the Company, which is at will, and thus may be terminated by Employee or by the Company for any reason, with or without cause, and with or without notice, at any time.


UNDERSTOOD AND AGREED:


_James M M Donald_
Employee's Signature

_8/15/01_
Date


_JAMES B. McDonald_
Print Name

# EXHIBIT D

# CONSULTANT AGREEMENT

THIS AGREEMENT made this _26th_ day of _October_ , 2001, between

South Pacific Petroleum Corporation (hereinafter "SPPC"), whose business address is 816 North

Marine Drive, EVA Building, 2nd Floor, Tamuning, Guam, 96911, and James B. McDonald

(hereinafter "Consultant"), whose mailing address is _PO Box 21761 GMF GU 96921_ .

## WITNESSETH:

WHEREAS, SPPC is engaged in the Petroleum business and desires to utilize the

expertise of Consultant on special projects; and

WHEREAS, Consultant is an independent contractor and is currently registered with the

Government of Guam under Business License Number _____ ; and

WHEREAS, Consultant agrees to perform these services for SPPC as an independent

contractor under the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein, the

parties agree as follows:

1. **DURATION**

The term of this Agreement shall be from _November 1, 2001 to April 30, 2002, unless

sooner terminated by either party pursuant to Section 10 below.

2. **SERVICES TO BE PROVIDED BY CONSULTANT**

    a. The services to be performed by Consultant for SPPC include the following

_____ or any other projects that may be assigned to

Consultant by Brian Y. Suhr or his designee.


    b. SPPC may, during the term of this Agreement, engage other independent

1

contractors to perform similar work that Consultant performs hereunder.

      c.     Consultant may perform services for any other entity or person, or otherwise conduct business, during the term of this Agreement so long as such service: (1) does not conflict with Consultant's obligations hereunder; or (2) is not performed for a major oil company that is a direct competitor with SPPC.

    3.     <u>PAYMENT FOR SERVICES</u>

      a.   <u>Monthly Fee.</u> SPPC will pay Consultant the total sum of Twelve Thousand Dollars ($_12,000.00) per month for the services provided under this Agreement.

      b.   <u>Company Car.</u> SPPC shall provide Consultant with a company car. It is understood and agreed by and between the parties that Consultant shall be solely responsible for any taxes associated with his receipt of the company car.

      c.   <u>Reimbursement for Expenses.</u> SPPC will reimburse Consultant for reasonable Expenses incurred by Consultant on SPPC's behalf and/or at SPPC's request; provided, however, such expenses have been pre-approved by SPPC.

      d.   <u>Monthly Invoices.</u> Consultant will bill SPPC for all services rendered on the fifth (5th) of each month. All service fees are subject to Guam Gross Receipts Tax which Consultant shall be responsible for paying. Consultant shall also submit monthly requests for reimbursement of reasonable business expenses, along with the appropriate documentation and/or receipts for such expenses. Invoices and requests for reimbursement must be submitted to SPPC's accounting department. Payments and reimbursements shall be made to Consultant within three (3) days after submission of such invoices and reimbursements requests.

    4.     <u>REFERENCES TO OTHER CLIENTS</u>

2

SPPC wishes to assist Consultant in the start of his consulting business. Accordingly, SPPC will provide Consultant with references for his potential clients.

5.    RELATIONSHIP OF PARTIES

      a.    It is expressly agreed by the parties hereto that Consultant is not hereunder an agent or employee of SPPC for any purpose whatsoever, but is an independent contractor. Furthermore, no relationship of joint venture or partnership of any form is created by this Agreement.

      b.  SPPC neither reserves, nor will it exercise, any control or direction over the method or manner by which Consultant provides his services, including whether an on what terms Consultant hires his employees, agents, or subordinates, nor will SPPC exercise any control over Consultant as to how Consultant provides his services so as to best achieve the objectives of this Agreement.

      c.  Consultant agrees that he will not hold out to the general public, customers, clients, or others that Consultant is an agent, officer, or employee of SPPC. Consultant further agrees and understands that he has no authority to bind or obligate SPPC, with respect to third parties, in any way whatsoever. In the event Consultant does bind or obligate SPPC, with respect to third parties, in some way, Consultant shall be solely liable for performance and payment of such commitments and for any costs and damages to SPPC in connection therewith.

      d.  SPPC agrees that it will not hold out to the general public, customers, clients, or others that Consultant is an agent, officer, or employee of SPPC.  SPPC further agrees and understands that SPPC has no authority to bind or obligate Consultant, with respect to third parties, in any way whatsoever.  In the event SPPC does bind or obligate Consultant, with

3

respect to third parties, in some way, SPPC shall be solely liable for performance and payment of such commitments and for any costs and damages to Consultant in connection therewith.

## 6. RESPONSIBILITY FOR EMPLOYEES AND AGENTS

a. No agent, employee or servant of Consultant, if any, shall be or deemed to be the employee, agent or servant of SPPC. None of the benefits provided by SPPC to its employees including, but not limited to, medical benefits, disability compensation insurance, and retirement benefits, are available from SPPC to the employees, agents or servants of Consultant.

b. Consultant represents and warrants that he provides all benefits and insurance to his employees as required by Guam and federal laws. Consultant agrees that all Guam taxes, fees, assessment or contributions, or insurance payments covering Consultant and his employees, if any, shall be the sole responsibility of Consultant including, but not limited to, Guam withholding taxes, social security taxes, workers' compensation insurance, gross receipts taxes and self-employment taxes.

## 7. LAWSUITS: INDEMNIFICATION

a. Lawsuits. If a lawsuit, administrative complaint or other similar action is filed by a third party against Consultant and/or SPPC directly arising from any services provided hereunder, both parties agree to cooperate with one another in the investigation and defense of the suit, administrative complaint or other action.

b. Indemnification By Consultant. Consultant shall protect, defend, indemnify, and hold harmless SPPC, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out

4

of Consultant's conduct being the proximate cause of negligence, gross negligence, intentional misfeasance willful misconduct, violation of any law or breach of this Agreement.

      c.  <u>Indemnification by SPPC.</u> SPPC shall protect, defend, indemnify and save harmless Consultant, its agents and employees against and from all claims, damages, losses and expenses, including but not limited to attorneys' fees and costs, by reason of any suit, claim, demand, judgment or cause of action initiated by any person, arising or alleged to have arisen out of SPPC's negligence, gross negligence, intentional misfeasance, willful misconduct, violation of any law or breach of this Agreement.

## 8.     RIGHT OF INSPECTION

     In the performance of the services hereunder, Consultant is an independent contractor with the authority to direct the performance of the details of the work, SPPC being interested only in the results obtained. However, the services provided hereunder must meet the approval of SPPC and shall be subject to SPPC's general right of inspection to secure the satisfactory completion thereof.

## 9.     CONFIDENTIALITY OF INFORMATION

      a.     All information of any nature that is made available by SPPC or that becomes available to Consultant by virtue of this Agreement or the relationship created by this Agreement, other than public information, shall be held in strict confidence by Consultant. Such confidential disclosures made available by SPPC to Consultant are made in reliance of this promise. All information of any nature that is made available by Consultant or that becomes available to SPPC by virtue of this Agreement or the relationship created by this Agreement, other than public information, shall be held in strict confidence by SPPC and may not be used without the express written consent of Consultant. Compensation for such confidential

5

information provided by Consultant is not contemplated within the scope of this Agreement unless disclosure is necessary for rendering of services under this Agreement.

      b.     All parties hereto acknowledge and recognize that Consultant will have access to and shall acquire knowledge of material confidential information and that in the event of the breach of terms and conditions of this Agreement, then SPPC shall be entitled to, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or equity, to obtain damages for any breach of this Agreement, and/or to enjoin Consultant from disclosing such material confidential information, but nothing herein contained shall be construed or interpreted to prevent such remedy in the courts, in the case of any willful breach of this Agreement by Consultant, as SPPC may elect to invoke.

     10.     <u>TERMINATION OF AGREEMENT</u>

      a.  It is the intent of the parties to create an enforceable six-month agreement for consulting services. However, either party may terminate this Agreement for cause upon ninety (90) days written notice to the other party.

     11.     <u>TRIAL BY JURY</u>

      a.  Suit for damages or other relief shall be brought to the Superior Court of Guam. Either Consultant or SPPC shall be entitled to a trial by jury. Should termination of this agreement be brought in bad faith, the parties agree that treble damages are appropriate.

     12.     <u>MISCELLANEOUS</u>

      a.  <u>Entire Agreement.</u> This Agreement embodies the entire agreement of the parties and supersedes any other agreements or understandings, oral or written, with respect thereto that may ever have existed between the parties hereto.

      b.  <u>Amendment.</u> This Amendment may be amended only by an instrument in

6

writing signed by both parties.

    c.  <u>Waiver.</u> The failure of any party to enforce, at any time, any provision of this Agreement shall not constitute a waiver of the right thereafter to enforce the same or any other provision of this Agreement.

    d.  <u>Assignment.</u> This Agreement may not be assigned, in whole or part, by either party without the other party's prior written consent.

    e.  <u>Severability.</u> If any provision of this Agreement or the application thereof to any person or circumstance is invalid or unenforceable to any extent, the remainder of this Agreement and the application thereof to other persons or circumstances shall not be affected thereby.

    f.  <u>Applicable Law.</u> This agreement shall be governed by the laws of Guam both as to interpretation and performance.

    g.  <u>Notices.</u> All notices, requests, demands, consents and other communications which are required to be given in writing shall be given by registered or certified mail, return receipt requested, postage prepaid, addressed to Brian Y. Suhr, President of SPPC or Consultant, as the case may be, at the address set forth above or at such other post office address as either may from time to time designate by writing or by personally delivering such notice to the other party. Any such notice, request, demand, consent or other communication shall be deemed to have been given on the date of such mailing or personal delivery.

7

IN WITNESS WHEREOF, the parties have signed this Agreement on the day and year first written above.

SOUTH PACIFIC PETROLEUM
CORPORATION

JAMES B. MCDONALD

By

BRIAN Y. SUHR

President

8




www.spoccrp.com

# SOUTH PACIFIC PETROLEUM



## DEDUCTION AUTHORIZATION FORM

I, <u>James B McDonald</u>, hereby authorize South Pacific Petroleum Corporation (the "Company") to make the following deductions to my Management Consulting Fee each month:

** The amount of <u>$ 1 .400</u> will be deducted from my monthly management consulting fee commencing on November 2001 through March 2002.

** The amount of <u>$ 1.500</u> will be the final deduction made from my monthly management consulting fee in the month of April 2002.

*LAST PAYMENT*

_____          _____
James B McDonald                                  Date
                                                  10/26/01

Witness: _____   _____
Cher Marie A Davis                                Date
Human Resource Administrator                      10/26/01

Effective Date:   _Nov 2001_

**816 North Marine Drive, EVA BLDG., 2ⁿᵈ Floor, Tamuning, GU. 96913 TEL: 649-5620 FAX: 649-5615**

# EXHIBIT E

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE... |
|---|---|
| ☐ FEPA | 378-A2-00208 |
| ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., etc.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. James S. McDonald | (671) 477-0227 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| P.O. Box 21761 G M F, Barrigada, GU 96921 | | 06/21/1951 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| South Pacific Petroleum Corporation | Cat B (101-200) | (671) 649-5620 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 616 N. Marine Drive, 2nd Fl., Eva Bldg, Tamuning, GU 96911 | | 010 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 10/22/2001 | 10/31/2001 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s))*:

In July 2000, I began work with South Pacific Petroleum Corporation as its Vice President and General Manager.

In August 2001 and September 2001, I was subjected to ethnically derogatory remarks by Michael Hahm (Korean), Executive Vice President. Hahm told me that he was uncomfortable with the local people (Chamorros) and that their work was not as good as the people from the US Mainland.

On October 22, 2001, I was informed by Respondent that I would be discharged without a reasonable explanation.

On October 31, 2001, I was terminated by Respondent. I was then replaced by Klaus Kokott (White) and Michael Fleming (White).

I believe I have been discriminated against because of my national origin, Chamorro.

RECEIVED
APR 18 2002
EEOC HLO

I want this charge filed with both the EEOC and the State or Local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

4/19/02
*Date*

*Charging Party (Signature)* James McDonald

NOTARY - *(When necessary for State and Local Requirements)*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)*

EEOC FORM 5 *(Rev. 07/99)*

# EXHIBIT F

South Pacific Petroleum Corporation is an affirmative action employer. In the compliance with government regulations we are required to track down the number of employees by gender, race/ethnicity, and positions held.

SPPC asks you to indicate your gender and race/ethnicity below. This information will be kept separately from your application and will be used only in accordance with federal and state regulations.

**GENDER    RACE/ETHNIC GROUP**

**Male**

**White**
(Not of Hispanic origin) – All persons having origins in any of the original peoples of Europe, North Africa, or Middle East.

**Female**

**Black**
(Not of Hispanic origin) – All persons having origins in any of the black racial groups of Africa.

**Hispanic**
All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.

**Asian or Pacific Islander**
All persons having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, Guam or the Pacific Islands. This area includes, for example, China, India, Japan, Korea, the Philippine Islands, and Samoa.

**American Indian or Alaskan Native**
All persons having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliation or community recognition.

**Other**
Please specify _____

Name: _____  Date of Hire: _____

Position Applied for: _____ Position Hired for: _____

# EXHIBIT G

| NAME | ANNUAL | COMMENTS |
|------|--------|----------|
| JAMES MCDONALD | $144,000.00 | |
| ROBERT KOEPPEN | $ 80,000.00 | Assigned 1/02 |
| MICHAEL FLEMING | $ 90,540.00 | Resigned 12/01 |
| KLAUS KOKOTT | $110,000.00 | |

SPPC S&W 10-01CURRENT PAY SCHEDULE (2)

# EXHIBIT H

| POLICY and PROCEDURES | Policy No.: 021 |
|---|---|
| South Pacific Petroleum Corporation | Date: |
| **Affirmative Action/Equal Employment Opportunity** | Page 1 of 1 |



I.  **PURPOSE**

To preserve an employment environment free from illegal discrimination.

II.  **SCOPE**

This policy applies to all employees of South Pacific Petroleum Corporation.

III.  **POLICY**

South Pacific Petroleum Corporation (SPPC) is an equal employment opportunity employer. SPPC is committed to exercising affirmative action to employ and advance all individuals without regard to race, color, gender, age, religion, national origin, disability, veteran status, or any other characteristic protected by federal and/or local laws.

To ensure full implementation of this policy, we will make every effort to attract and engage the most qualified and suitable personnel for present and future needs. This is accomplished by:

- Treating every employee with dignity and respect.

- Recruiting, selecting, placing, training, transferring and promoting people in all job classifications without regard to race, color, sex, age, religion, national origin, disability, veteran status or any other characteristic protected by federal and/or local laws.

- Basing recruitment, selection, training and promotional decisions solely on an individual's job-related qualifications.

- Making reasonable accommodations for the needs of individuals with disabilities.

- Ensuring that all other personnel considerations and actions (such as compensation, benefits, leave of absence, layoff, return from layoff) are in accordance with this policy, and the operational affairs and financial capabilities of the Company.