CIVILLE & TANG, PLLC
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891/472-8868
FACSIMILE: (671) 472-2601/477-2511

*Attorneys for Defendants*
*South Pacific Petroleum*
*Corporation*



FILED
DISTRICT COURT OF GUAM

MAY - 6 2005

MARY L.M. MORAN
CLERK OF COURT



## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| JAMES B. McDONALD, JR., | CIVIL ACTION NO. 02-00031 |
| Plaintiff, | |
| vs. | DECLARATION OF BRIAN Y. SUHR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| SOUTH PACIFIC PETROLEUM CORPORATION, a Guam Corporation, | |
| Defendants. | |

I, BRIAN Y. SUHR, hereby declare as follows:

1. I am the President/CEO of South Pacific Petroleum Corporation ("SPPC").

2. This Declaration is based upon matters within my knowledge, and if called as a witness at a hearing hereon I would testify as set forth in this Declaration.

### SOUTH PACIFIC PETROLEUM COMPANY

3. SPPC is a Guam corporation incorporated on June 29, 2000. The incorporators of SPPC were Sang Yeon Hahn, Paul Kim, Michael Hahm and me. SPPC operates gasoline service stations, convenience stores ("c-stores"), fuel terminal facilities and liquid propane gas ("LPG") facilities in Guam. In 2000, as part of the merger between Exxon and Mobil Oil, Exxon was required to divest itself of its assets on Guam. SPPC was formed for the purpose of buying the Exxon assets. In order to be able to market its products under major brand names, SPPC entered

into an agreement with TMC Franchise Corporation, a division of Tosco, Inc., whereby SPPC was licensed to sell 76 brand gasoline, and it was granted a franchise to operate Circle K convenience stores at its service station locations.

4. During the period of James B. McDonald's ("McDonald") employment with SPPC, the controlling shareholder of SPPC was Mr. Hahn (85%). The other shareholders were Paul Kim (5%), Brian Suhr (5%) and Michael Hahm (5%).

### HIRING OF JAMES McDONALD

5. In early 2000, Exxon was trying to sell its Guam assets. I learned that the top bidder was a joint venture between the FPX, LLC and David Pangelinan ("FPX JV"), which was represented by McDonald, but that FPXJV needed help. In March 2000, I contacted McDonald at his home in California to find out what type of help the FPX JV was looking for. McDonald said FPX JV needed financing. McDonald faxed me some preliminary financial projections and gave me a brief history of the Exxon asset divestment.

6. I put together a group to participate with the FPX JV, but we were unable to make a deal with Exxon. The FPX JV did not come up with the needed money and withdrew from the bidding.

7. In May, 2002, I contacted Exxon and expressed continued interest on behalf of the Hanom/Calihahn group which I represented to buy Exxon's assets. McDonald had no involvement with us at that time and provided us with no assistance.

8. After Hanom/Calihahn made its purchase bid in June 2000, I telephoned Mr. McDonald and asked him if he would be willing to join the Hanom/Calihahn team in pursuing the Exxon assets. He said that he was representing another bidder (an investment banking firm based in California, separate from FPX) and that he would stick with his client. I told him that I admired his loyalty and I asked him if he would be interested in working for Hanom/Calihahn if it was the successful buyer. McDonald said he would not participate with Hanom/Calihahn because he represented an entity competing for the same assets, but he asked me to give him a call if we were successful.

2

9. The negotiations between Hanom/Calihahn was successful and the principals of Hanom/Calihahn, Mr. Hahn, Mr. Hahm, Paul Kim and I formed SPPC. Then on June 29, 2000, SPPC signed a purchase agreement contract for the Exxon assets. That same night, I called McDonald and told him that SPPC had a signed contract and I asked him if he wanted to work for SPPC. McDonald said that he was prepared to start immediately.

10. SPPC paid for a ticket to fly McDonald to Guam.

11. Mr. McDonald was retained in early July, 2000 as a consultant. There was no written contract. He was initially retained as a consultant at the rate of $7,500 per month. On December 1, 2000 he was hired as a full time SPPC "at will" employee at a salary of $144,000 per year with full company benefits, in the position of General Manager.

## MCDONALD'S PERFORMANCE

12. I knew at the time I hired McDonald that he had extensive experience in the petroleum industry, including executive level experience with Exxon and Mobil on Guam. I believed that he would make an excellent General Manager. Additionally, McDonald was recommended to me by my step-father, Dr. Shin Kyung Kim, who was a professor at the University of Guam. My step-father had a very high opinion of McDonald, and I placed a great deal of faith on his recommendation.

13. In SPPC the period July 2000 to November 2000 is generally referred to as the "closing period", i.e. the period between when the contract of sale with Exxon was signed and when the deal closed and SPPC took over control of Exxon's assets.

14. During the closing period, McDonald worked for SPPC as a consultant at a pay of $7,500 per month. During this time he and I shared an office and worked side by side. The closing period was a extremely busy and stressful; there were countless details which needed to be addressed in order for SPPC to be ready for closing. I was pleased with McDonald's performance during the closing period.

15. After the closing on November 30, 2000 things became even busier as we were under a very tight schedule to have to covert Exxon's assets to SPPC's assets. Even though McDonald and

3

I continued to share a large office with Michael Hahm, I did not work as closely with McDonald and he was expected to function more independently.

16. The period December 2000 to June 2001 is generally referred to as the transition period, i.e. the period during which SPPC was required to transfer all assets to a new brand and stop using any reference to Exxon (during the transition period SPPC was permitted to operate with Exxon's colors and sold many Exxon branded goods). This was a period of even more intense activity than the closing period.

17. During the transition period, SPPC's management (which included McDonald) held weekly meetings during which we set goals and established task lists for the upcoming week. As General Manager, McDonald was expected to convey these goals and tasks to his subordinates and follow up to make certain the goals and tasks were being fulfilled.

18. Early in the transition period I became aware that goals and tasks being given to McDonald were not being carried out. On a number of occasions I asked McDonald about matters which had not been completed. He always responded that he would check into the matter and see that it was taken care of. Despite these assurances, tasks were often not completed and we fell behind on our goals for being ready to be fully de-linked from Exxon by the end of the transition period.

19. I talked to other employees in SPPC about why tasks were not being completed and learned that lower level managers had been submitting task related plans, documents and proposals to McDonald for approval but that McDonald had not acted on the submissions. I determined from this that we were falling behind schedule due to matters being bottlenecked on McDonald's desk. I spoke to McDonald about the need for him to process materials and make decisions more quickly, which he agreed to do, but the problem did not improve very much. I eventually dealt with the problem by simply directing that lower level staff submit matters needing approval directly to me, thereby bypassing McDonald. While this enabled us to start getting back on schedule for our transition, it meant that I was forced to do work we had hired McDonald to do, and it meant that SPPC was not getting the benefit of what we presumed to be McDonald's valuable experience.

20. A second problem related to McDonald's failure to follow instructions relating to SPPC leases of service station property. At the time, SPPC operated 11 retail service stations. Most of SPPC's service stations were located on leasehold property, on which Exxon was the original lessee. Exxon had prudently inserted options clauses in most of its lease agreements. The option clauses allowed Exxon (and SPPC as its successor in interest) to extend the lease for the same lease payment (or a slightly higher amount) by giving notice to the landowner a specified number of days in advance of the expiration of the current lease. In January 2001, I became concerned that SPPC did not have a clear picture of the due dates for exercising options on its various leasehold properties. I instructed McDonald to take what steps were needed to review the leases and prepare a matrix outlining important dates, and most importantly the option renewal dates. McDonald strongly resisted this, saying that Exxon's law firm B the Carlsmith law firm-- had handled this matter for Exxon, and that he was certain such a matrix already existed and that everything was in order. I told McDonald that we should not rely on what Carlsmith had or had not done, and I pressed him to do an independent review. He said that he would. Unfortunately, McDonald did not follow through on these directions and, as a result, the option date on our service station in the village of Agat passed without SPPC exercising its option to renew. We immediately approached the owners for the Agat property, but were told that Shell Oil was interested in the site and that the owners were considering all options. Eventually SPPC was able to retain the site, but only by agreeing to an increase in lease payments from about $700 to $7,000 per month.

21. I asked the Carlsmith, which was also doing work for SPPC, why it had not reminded us about the deadline for renewing the option and was told that no one at SPPC had requested this service from Carlsmith, and that Exxon had always done the calculation as a backup.

22. After learning of the missed deadline, I called a management meeting. Without singling out McDonald I outlined the problem and the importance of the Agat station to SPPC. I stressed that we could not afford to make these type of mistakes. After the meeting, McDonald came up to me and said: "I dropped the ball, I'm sorry." I did not take any action against him at that time, although his mistake will cost SPPC $75,6000 a year in increased rents for many years to

5

come, with a total additional charge to the company of more than $650,000.

23.     A critical component of SPPC's is our c-store operations. SPPC's two competitors, Mobil and Shell, operate c-stores and it is generally recognized in the industry that c-stores are important to attracting customers into a site and as profit centers for additional sales.

24.     SPPC operates Circle K c-stores under a franchising agreement with Tosco, Inc. As part of that agreement, SPPC agreed to set up its Circle K stores in a manner satisfactory to Circle K. To help ensure that happened, Circle K sent Klaus Kokott a Caucasian male, with over 20 years experience to Guam to assist SPPC during the transition period. Because the set up of the c-stores was a retail matter, it fell within McDonald's area of supervision, and I asked Kokott to work with McDonald on the set up of the c-stores.

25.     During the transition period John Patton, a vice-president for our Circle K franchiser, made frequent trips to Guam to inspect the Circle K c-stores and assess SPPC's progress during the transition period. After one such inspection, he met with me and gave me a very negative report. He said the transition from Exxon to Circle K c-stores was not progressing as it should, that the stores were not being set up on the Circle K plan.

26.     Following the negative report by Patton, I spoke to both McDonald and Kolkot to find out what was causing the problem. Both gentlemen seemed to agree that they had significantly different views on how the c-stores should be set up. McDonald wanted to set them up according to a model he had successfully used with Exxon about 10 years earlier. Kolkott wanted to follow the "Circle K plan" and set them up in the manner that Circle K set up its other stores on the U. S. mainland. Because of these differences, the staff was receiving contradictory instructions and work was not getting done.

6

27. McDonald's opposition to the Circle K franchise way of doing business manifested itself in many ways, including his lack of support for our training program. McDonald told me that he did not like our training program, and he saw no need for it. In this same time period, it was reported to me that McDonald fell asleep during training meetings given by Kokott. I considered this a major issue since it sent a message to the staff that SPPC management did not place much value on the training.

28. I told McDonald that Circle K was our franchiser, and it was giving SPPC a great deal of support. I stated that I felt it was important to do things the Circle K way. I then instructed McDonald to let Kolkott take charge of setting up the c-stores in the configuration desired by Circle K.

29. After this discussion I believed that McDonald had finally gotten the message about what the Board expected in terms of cooperation with Circle K. Kolkott continued to supervise the conversion of the c-stores, and I think McDoanld let him work without further hindrance. The c-stores were ready by the transition date. Mr. Patton came back to Guam for the opening of the Circle K stores and he complimented me on how well the stores had turned out.

30. Just before the grand opening, Hahm reported to me that McDonald had just told him "Don't worry, the Circle K guys will be leaving soon and I will get these stores set up the way they should be." I was shocked by this report. McDonald's comment made it clear to me that he was not in touch with my wishes or the wishes of the Board, and that he was determined to do things his way despite my instructions to the contrary. I also was very concerned that McDonald's stubbornness on this topic would imperil our relationship with Circle K.

31. The combination of McDonald's inability to make decisions on matters delegated to him, as evidenced by the bottle necking on his desk of documents and decisions needing action, his refusal to follow my clear instructions on reviewing lease documents which resulted in additional costs to SPPC of over $76,000 per year, and his complete failure to grasp that the Board and I wanted to follow and abide by the Circle K plan in the configuration of our c-stores, made it clear to me that McDonald was not someone the Board could rely on to carry out its wishes, and that he

7

was not someone I could continue to work with and have confidence in. I conveyed these thoughts to the Board and the Board gave me permission to terminate McDonald.

32. On Sunday, October 21, 2001, I met with McDonald at a Denny's restaurant, I told him that things were not working out and that the Board and I were did not believe that we could continue to work with him. I then told him that he was terminated. I stressed that SPPC did not want to make this more difficult than it had to be, and I suggested that the six-month severance pay SPPC was planning to give McDonald be termed a consultancy fee. I further suggested that the public story we release be to the effect that McDonald had completed his mission for SPPC and that was leaving to pursue a consulting business.

## WEIGHT ISSUE

33. McDonald is about 5'10" tall and weighs about 280 lbs. He is undeniably overweight and he was in this condition when he was hired. McDonald's weight was not a factor in his being hired, nor was it a factor in my evaluation of his performance or in the decision to terminate his employment.

34. McDonald never claimed, and I never saw any evidence, that his weight affected his ability to function in any way. He was fully ambulatory and by all appearances functioned normally.

35. The Chairman of SPPC, and its principal investor, is Sang Yeon Hahn, who is 71 years old. He suffered a stroke three years ago and is now disabled. During the time of McDonald's employment, Mr. Hahn was in good health. He was an avid outdoorsman and a strong advocate of healthy living. During one meeting attended by Chairman Hahn, Michael Hahm, McDonald and me, the Chairman told us all that we were too fat and needed to lose weight, and that Hahm and I needed to stop smoking. He said that he wanted us to work for the company for a long time and that we needed to take care of our health. His comments were directed to all three of us, and he did not single out McDonald for any special comment.

36. Chairman Hahn's concerns for healthy living extended to all SPPC employees. At his direction, SPPC set up a wellness program in which it pays 75% of the fees for a any employee who wants to join a local health club.

8

37. McDonald and I were on very cordial terms throughout his employment and we sometimes passed the time talking about any number of topics. During one such conversation we talked about weight and I mentioned to McDonald that for me the perfect solution would be to go to a weight camp/golf camp/anti-smoking clinic and come out after two weeks lighter, with a better golf game and not smoking. This was the only conversation with McDonald that even remotely related to a "fat farm."

38. The only other time when McDonald's weight was ever mentioned was at a dinner of the management team in mid-2001. The dinner was a lighthearted affair, and there was a lot of joking going on. When the waiter passed out the dessert menus, Paul Kim, an off island director who had been talking with McDonald, jokingly said "he doesn't need one." McDonald laughed when this was said, and seemed to take the comment in the humorous vein it was obviously intended. Nevertheless, I thought the comment was not entirely appropriate and I directed the conversation to other topics.

39. At no time was McDonald's weight a factor in any decision relating to his employment. Further, McDonald never claimed that his weight kept him from performing any functions, and he seemed to live a full normal life even though he was quite heavy.

## RACE DISCRIMINATION

40. SPPC is a Guam corporation. The four shareholders are all Korean or Korean-Americans, and each is an investor in the corporation. McDonald is of Chamorro descent. During his employment with SPPC he was the highest ranking non-investor in the company.

41. SPPC is a committed equal opportunity employer. The company has a anti-discrimination policy which it takes quite seriously. See, EEO Policy, Civille Decl. Ex. H.

42. SPPC had 50 employees during the period of McDonald's employment, of whom 17 were Chamorros. Of the remaining workers, about 15 were Filipino, 5 were Pacific Islanders, 7 white, and 1 Hispanic-American.

9

43. Race, color, national origin or ethnic background was not in any way a factor in the decision to fire McDonald. SPPC has a richly diverse employment force, a fact about which we are proud. The reasons that McDonald was fired had to do with his uneven performance, his failure to follow instructions from the Board or me, and his inability to fully support the Circle k franchise program. I felt, and this felling was shared by the Board, that McDonald was simply to head strong to be trusted to carry out the Board's wishes.

44. For the first year of operations, SPPC did not have to hire many workers. The reason for this is that SPPC was required to retain Exxon workers for a period of 12 months following the closing. SPPC thereby inherited many Exxon workers, of many different nationalities and ethnic backgrounds, all of whom were already well trained and experienced.

45. After McDonald was terminated, SPPC decided not to fill the position of General Manager. The reason for this was that SPPC was not able to find anyone who had sufficient experience to oversee both the operations and the marketing divisions. I thought that McDonald, with his many years of experience, could do this, but I was wrong. After McDonald was terminated, we were not aware of anyone who could take over the General Manager's position.

46. Instead, SPPC abolished the GM position and created a vice-president of marketing position and a vice-president of operations position. After McDonald left, the first vice-president of marketing was Klaus Kolkott, who had been instrumental in setting up the c-stores in accordance with the Circle K plan. Kolkot is a white male. His race played no factor in SPPC's decision to hire him. Kolkott had over 20 years experience in retail marketing with respect to service stations, he had performed well in getting SPPC's Circle K stores ready by the transition deadline, and he had the confidence of our franchisor, Circle K.

47. Kolkott was paid $110,000 per year. Kolkott stayed with SPPC for a little less than 3 years and then left to take a job in the mainland United States. Following his departure, SPPC recruited heavily both on island and off island but was unable to find anyone qualified to take Kolkott's place. Accordingly, SPPC divided Kolkott's position into two, a vice-president of

10

Marketing and a vice-president of operations. The retail marketing manager is Ervano Folco, a male from south America, and the commercial Marketing Manager is Mark Sablan, a male Chamorro.

48.   Following McDonald's termination, the vice president of operations was Mike Fleming, a white male. Mr. Fleming was an engineer who had lived on Guam and been working for Exxon for about 9 years prior to the Exxon/SPPC transaction. He was paid $90,500 per year. *See* application attached hereto as Ex. A. He only stayed with SPPC for about three months and then left to take a job with Lockheed. He was replaced with Robert Koeppen, a white male with over 25 years experience in the petroleum industry. *See* application for employment and resume, Ex. B hereto. Koeppen was considered a local hire since he had been living on Guam since 1993, working for Exxon.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 6, 2005, in Hagåtña, Guam.

_____
BRIAN Y. SUHR

# EXHIBIT A

# APPLICATION FOR EMPLOYMENT - SOUTHERN PACIFIC PETROLEUM CORP.

PLEASE PRINT — EQUAL OPPORTUNITY EMPLOYERS

## PERSONAL

- **Full Name - Last:** Fleming
- **First:** Michael
- **Middle:** William
- **Social Security Number:** 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
- **Present Address - Street:** 202 So. Marine Dr., U14-3A
- **City:** Tamuning
- **State:** GU
- **Zip Code:** 96911
- **Contact Telephone No:** (671) 646-0143
- **List Previous Address for last 5 years and permanent address if different from above:** 175 Nimitz Drive, Apt B43, Piti Guam 96926

**U.S. Citizen / Permanent Resident Alien:** ☒ YES ☐ NO

Only U.S. citizens or aliens who have a legal right to work in the U.S. are eligible for employment.

Have you ever applied: ☐ YES ☐ NO
Have you ever been employed by Exxon Corporation or any affiliate? ☐ YES ☐ NO

## U.S. MIL.

(blank)

## EMPLOYMENT DESIRED

- **Type of Employment Desired:** ☒ Regular Full Time ☐ Part Time ☐ Temporary ☐ Summer
- **Can you Perform shift work?** — **Work overtime (if necessary)?** —
- **Job Preferred and No. of Years Experience in this Work:** Management

## EDUCATION / SKILLS

- **Name & Location of High School:** Cibola High School, Albuquerque NM
- **Graduation Date:** 6/76

| Name & Location of College / Trade or Business School | From (Mo/Yr) | To (Mo/Yr) | Major | Minor | Degree | Date (Mo/Yr) | Class Standing | GPA |
|---|---|---|---|---|---|---|---|---|
| University of New Mexico | 8/76 | 12/82 | Mech Engr | | BS | 12/82 | | |

## ACTIVITIES

List special academic honors and societies:
American Society of Mechanical Engineers

**Hobbies / Leisure Time Interest:** Tennis, Trivia, cooking

**SPECIAL EMPLOYMENT NOTICE TO DISABLED VETERANS, VIETNAM ERA VETERANS, AND INDIVIDUALS WITH PHYSICAL OR MENTAL HANDICAP**

As such they are subject to Section 402 of the Vietnam Era Veteran Readjustment Act of 1974, which requires the contractor to take an affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era, and Section 503 of the Rehabilitation Act of 1973, which requires government contractors to take affirmative action to employ and advance in employment qualified handicapped individuals.

If you are disabled veteran, or have a physical or mental handicap and are scheduled for a personal interview, you are invited to volunteer this information to the employment representative at the time of the interview. You may also provide information on the skills and/or procedures you use or intend to use to perform the job for which you are applying and the nature and type of accommodations which you feel an employer may need to make in order to enable you to perform the job in a proper and safe manner. This information will be treated as confidential. Failure to provide this information will not jeopardize or adversely affect any consideration you may receive for employment.

## EMPLOYMENT

Give employment record over last 10 years, starting with your present or last employer. Include summer employment. (If space is insufficient, list on separate page or attach resume.) For any unemployed or self-employed periods, show dates and locations.

| DATE – FROM & TO | EMPLOYER'S NAME & ADDRESS – CITY & STATE | POSITION – SALARY | GIVE SPECIFIC REASON FOR LEAVING |
|---|---|---|---|
| FR 1 / 92  TO 12 / 00 | NAME: ExxonMobil International Holdings Inc  ADDRESS: 267 S. Merina Dr, U14-3A Tamuning, GU 96911  SUPERVISOR: Gary H. Johnson (671) 649-5620 | Retail Business Supervisor | Exxon Mobil Merger |
| FR 2 / 82  TO 10 / 91 | NAME: General Dynamics - Convair Division  ADDRESS: San Diego CA  SUPERVISOR: Mike Duhl | Senior Design Engner | Relocate to Guam |
| FR  TO | | | |
| FR  TO | | | |

## REFERENCES

Give names of three persons to whom you are not related and by whom you have not been employed. These people should have known you for several years.

| NAME – INITIALS | LAST NAME | ADDRESS – STREET CITY, STATE, ZIP CODE | OCCUPATION | YEARS OF ACQUAINT |
|---|---|---|---|---|
| A | | | | |
| B | | | | |
| C | | | | |

Give names of any relatives, including those by marriage, in the employ of Exxon.

| NAME | TYPE OF WORK | LOCATION | RELATIONSHIP |
|---|---|---|---|
| A | | | |
| B | | | |

Names of our employees you know best.

| NAME | LOCATION | NAME | LOCATION |
|---|---|---|---|
| A | | B | |

## ADD'L INFORMATION

Have you been convicted under any criminal law within the past 5 years (excluding minor traffic violations)? ☒ NO  ☐ YES – Give details

May we call your present employer? NOW ☒ YES ☐ NO  LATER ☐ YES ☐ NO

Are you under technical contract or restriction with a former employer? ☒ NO  ☐ YES – WHOM?

I authorize investigation of all statements contained in this application for employment. I understand that misrepresentation or omission of facts called for hereon will be sufficient cause for cancellation of consideration for employment or dismissal from the Company's service if I have been employed. I understand that employment is subject to a physical examination in which my health is found to be satisfactory to the Company. I understand that if I am employed, evidence of U.S. citizenship or U.S. resident status and a birth certificate or other evidence of date of birth will be required. I understand that in the absence of a written agreement to the contrary, my employment status is that of an employee-at-will with no contractual right, express or limited, to remain in the Company's employ. In consideration of my employment, I specifically agree that my employment may be terminated—with or without cause—at any time, at my option or at the option of the Company. I understand that no unauthorized representative may enter into any agreement for employment or make any agreement contrary to the foregoing.

SIGNATURE: X *Michael Flemin[g]*  DATE SIGNED: 11/28/00

This is to inform you that as part of our procedure for processing your employment application it is understood that an investigative report may be made whereby information is obtained through personal interviews with third parties. This inquiry includes information as to your character, general reputation, personal characteristics, and mode of living, whichever may be applicable. You have the right to make a written request within a reasonable period of time for a complete and accurate disclosure of additional information concerning the nature and scope of the investigation.

# EXHIBIT B

# APPLICATION FOR EMPLOYMENT - SOUTHERN PACIFIC PETROLEUM CORP.

PLEASE PRINT — EQUAL OPPORTUNITY EMPLOYER

## PERSONAL

- **FULL NAME - LAST:** KOEPPEN JR  **FIRST:** ROBERT  **MIDDLE:** E
- **SOCIAL SECURITY NUMBER:** 061 48 4922
- **PRESENT ADDRESS - STREET:** 104 TUN RAMON CT.  **CITY:** YONA  **STATE:** GU  **ZIP CODE:** 96931
- **CONTACT TELEPHONE NO.:** (671) 649-5620
- **NO. OF DAYS LOST FROM WORK OR SCHOOL DURING THE PAST 12 MONTHS:** 2

ONLY U.S. CITIZENS OR ALIENS WHO HAVE A LEGAL RIGHT TO WORK IN THE U.S. ARE ELIGIBLE FOR EMPLOYMENT.

- **U.S. CITIZEN / PERMANENT RESIDENT ALIEN:** [X] YES [ ] NO
- **Have you ever applied:** [ ] YES [X] NO
- **Have you ever been employed by Exxon Corporation or any affiliate?** [ ] YES [X] NO

## EDUCATION / SKILLS

SEE ATTACHED RESUME

## ACTIVITIES

SEE ATTACHED

SPECIAL EMPLOYMENT NOTICE TO DISABLED VETERANS, VIETNAM ERA VETERANS, AND INDIVIDUALS WITH PHYSICAL OR MENTAL HANDICAP

As such they are subject to Section 402 of the Vietnam Era Veteran Readjustment Act of 1974, which requires the contractor to take an affirmative action to employ and advance in employment qualified disabled veterans and veterans of the Vietnam Era, and Section 503 of the Rehabilitation Act of 1973, which requires government contractors to take affirmative action to employ and advance in employment qualified handicapped individuals.

If you are disabled veteran, or have a physical or mental handicap and are scheduled for a personal interview, you are invited to volunteer the information to the employment representative at the time of the interview. You may also provide information on the skills and/or procedures you use or intend to use to perform the job for which you are applying and the nature and type of accomodations which you feel an employer may need to make in order to enable you to perform the job in a proper and safe manner. This information will be treated as confidential. Failure to provide the information will not jeopardize or adversely affect any consideration you may receive for employment.

## EMPLOYMENT

Give employment record over last 10 years, starting with your present or last employer. Include summer employment. (If space is insufficient, list on separate page or attach resume.) For any unemployed or self-employed periods, show dates and locations.

| DATE - FROM & TO | EMPLOYER'S NAME & ADDRESS - CITY & STATE | POSITION - SALARY | GIVE SPECIFIC REASON FOR LEAVING |
|---|---|---|---|
| FR / TO (MONTH/YEAR) | NAME - PRESENT OR LAST EMPLOYER / ADDRESS & TELEPHONE NUMBER / NAME OF SUPERVISOR | SEE RESUME | |
| FR / TO | NAME / ADDRESS & TELEPHONE NUMBER / NAME OF SUPERVISOR | | |
| FR / TO | NAME / ADDRESS & TELEPHONE NUMBER / NAME OF SUPERVISOR | | |
| FR / TO | NAME / ADDRESS & TELEPHONE NUMBER / NAME OF SUPERVISOR | | |

## REFERENCES

Give names of three persons to whom you are not related and by whom you have not been employed. These people should have known you for several years.

| NAME - INITIALS | LAST NAME | ADDRESS - STREET, CITY, STATE, ZIP CODE | OCCUPATION | YEARS OF ACQUAINT |
|---|---|---|---|---|
| A | | | | |
| B | | | | |
| C | | | | |

Give names of any relatives, including those by marriage, in the employ of Ennco.

| NAME | TYPE OF WORK | LOCATION | RELATIONSHIP |
|---|---|---|---|
| A | | | |
| B | | | |

Names of our employees you know best.

| NAME | LOCATION | NAME | LOCATION |
|---|---|---|---|
| A. RON CUMMINGS | UIU | B. VICTOR TORRES | CMT |

## ADD'L. INFORMATION

Have you been convicted under any criminal law within the past 5 years (excluding minor traffic violations)? ☐ NO  ☐ YES - Give details

May we call your present employer? NOW ☐ YES ☐ NO  LATER ☐ YES ☐ NO

Are you under technical contract or restriction with a former employer? ☐ NO  ☐ YES - WHOM?

I authorize investigation of all statements contained in this application for employment. I understand that misrepresentation or omission of facts called for hereon will be sufficient cause for cancellation of consideration for employment or dismissal from the Company's service if I have been employed. I understand that employment is subject to a physical examination in which my health is found to be satisfactory to the Company. I understand that if I am employed, evidence of U.S. citizenship or U.S. resident status and a birth certificate or other evidence of date of birth will be required. I understand that in the absence of a written agreement to the contrary, my employment status is that of an employee-at-will with no contractual right, express or limited, to remain in the Company's employ. In consideration of my employment, I specifically agree that my employment may be terminated—with or without cause—at any time, at my option or at the option of the Company. I understand that no unauthorized representative may enter into any agreement for employment or make any agreement contrary to the foregoing.

SIGNATURE: X R E Kolpien

DATE SIGNED: 11/28/00

This is to inform you that as part of our procedure for processing your employment application it is understood that an investigative report may be made whereby information is obtained through personal interviews with third parties. This inquiry includes information as to your character, general reputation, personal characteristics, and mode of living, whichever may be applicable. You have the right to make a written request within a reasonable period of time for a complete and accurate disclosure of additional information concerning the nature and scope of the investigation.

# Robert E. Koeppen, Jr.
104 Tun Ramon Court, Yona
P.O. Box 9301  Tamuning, GU. 96911
Phone: (671) 789-0179 (home)  (671) 649-5620 x107 (work)

**Career Objective:**
Seeking employment / management opportunities in an organization that has both growth and advancement potential. Desire to be part of a functional business team, and utilize my diverse business skills and knowledge.

**Experience:**

| | |
|---|---|
| March 1997 To Present | Esso Eastern Inc. - Guam Branch<br>Tamuning, Guam<br>**Commercial Business Supervisor** - Manage the Commercial Business Team, responsible for Marketing, Sales, Service, and receivables for the LPG, Bulk Fuels, FleetCard, Aviation & Marine fuels business lines. Responsible for Commercial business strategies and work plans. Responsible for forecasting and tracking Capex, OpEx, and profit and loss statements for each business line. |
| January 1996 To March 1997 | Esso Eastern Inc. - Guam Branch<br>Tamuning, Guam<br>**Industrial & Wholesale Territorial Manager** - Sales responsibility for the I.&W. business, including the LPG, Bulk Fuels, Aviation, & Marine fuels business lines. Responsible for Government & Military bid business. Supervise installations and upgrades of facilities at Customer sites. Ensure environmental compliance for the bulk fuels business. |
| January 1993 To December 1995 | Esso Eastern Inc. - Guam Branch<br>Tamuning, Guam<br>**LPG Territorial Manager** - Manage the LPG direct marketing business on Guam, Saipan, Palau, and Rota. Responsible for marketing, sales, contracts, promotions, design, construction, service, and receivables for the LPG business line. Direct Supervision of LPG technicians. |
| March 1988 To August 1992 | Chevron Research and Technology Company<br>San Ramon, California<br>**Cost Estimating & Scheduling Consultant** - Develop, estimate, and/or analyze cost data for projects, and review project budgets. Evaluate and recommend cost estimating and scheduling software, consult on use with project controls. |
| April 1990 To October 1991 | Chevron Corporation<br>San Francisco, California<br>**Career Enrichment Team Member** - Part of a special project undertaken by Chevron to develop a career process worldwide. Designed, developed, and implemented a computer based on-line job resume for all employees. |
| April 1984 To February 1988 | Chevron Pipeline Company<br>Santa Barbara, California<br>**Point Arguello Project Engineer** - Supervised design, construction, and operations of the City of Lompoc water loading facilities. Public relations liaison between Hollister Ranch and Project Management. Administered various lump sum and time & materials contracts. Cost reporting for all project activities, forecasted and trended expenditures for the environmental cost centers. Consulted on erosion control plans. Coordinated and supervised the pipeline joint tracking system. |

| | |
|---|---|
| December 1981<br>To<br>March 1984 | Chevron U.S.A.<br>Concord, California<br>Geological Technician - Prepared stratigraphic sections, contour maps, and plotted & updated well logs, to assist in the oil exploration of the Santa Barbara Channel. |
| October 1979<br>To<br>November 1981 | Chevron Overseas Petroleum Incorporated<br>San Francisco, California<br>Geological Technician - Prepared presentation material for approval of exploratory wells in the Australia-Southeast Asian region. Cataloged seismic sections of overseas exploration sites. |
| October 1977<br>To<br>May 1978 | Amfac Corporation / Fred Harvey<br>Grand Canyon, Arizona (South Rim)<br>Waiter - Worked in the Food & Beverage Department at the Grand Canyon National Park. |
| June 1972<br>To<br>September 1977 | Debmar Creative Carpentry / Spiderman Paint Company<br>Buffalo, New York<br>Carpenter, Painter - Worked in home construction business, roughing in new homes. Owned & operated a house painting business. Worked summers to pay college tuition. |
| August 1972<br>To<br>May 1977 | Saturn Club<br>Buffalo, New York<br>Athletic Department Assistant - Maintained Athletic Facilities at a private club. |

## Education:

Bachelor of Arts Degree in Geosciences -1977
    State University College at Buffalo, Buffalo, New York

Partial Masters of Science Degree in Environmental Studies - completed 12 hours of program before
    relocating to Guam in 1992
    San Jose State University, San Jose, California

Continuing Education - Completed a wide variety of personal development and business related
    classes with Chevron & Exxon.

## References:
Upon request.

## Personal:
Hobbies include running, lifting weights, woodworking and remodeling.