CIVILLE & TANG, PLLC
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Defendant*
*South Pacific Petroleum Corporation*



FILED
DISTRICT COURT OF GUAM

MAY - 6 2005

MARY L.M. MORAN
CLERK OF COURT



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF GUAM

| | | |
|---|---|---|
| JAMES B. McDONALD, JR., | ) | CIVIL ACTION NO. 02-00031 |
| Plaintiff, | ) | |
| vs. | ) | **DECLARATION OF MICHAEL HAHM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| SOUTH PACIFIC PETROLEUM CORPORATION, a Guam Corporation, | ) | |
| Defendant. | ) | |

I, MICHAEL HAHM, hereby declare as follows:

1. I am Executive Vice President and Chief Operating Officer for South Pacific Petroleum Corporations ("SPPC"). I am also a member of SPPC's board of directors. This declaration is based on my personal knowledge, and if called upon as a witness, I would testify as set forth herein.

2. In June and July 2000, I participated in the decision to hire James McDonald ("McDonald") as the vice-president and general manager for SPPC. As general manager, McDonald held the third highest position in the company. He had management oversight responsibilities for all divisions of the company. He reported directly to me on some matters, and to the company's president, Brian Suhr, on others.

ORIGINAL

3. McDonald had extensive experience in the petroleum industry and we believed that he would make an excellent general manager.

4. McDonald was hired in July 2000, before the sale between Exxon and SPPC had closed. The Exxon sale did not close until November 30, 2000. During the closing period, McDonald served as a consultant to SPPC at a consulting fee of $7,500 per month. Following the closing, he became the general manager at a salary of $12,000 per month.

5. Between December 2000 and September 2001, SPPC was in a transition period in which it was required to convert Exxon gas stations and Exxon c-stores to SPPC stations and stores. This turned out to be a very tight time frame in which to accomplish the needed tasks, and SPPC was under tremendous pressure during this period.

6. By early January 2001, it became apparent to me that we were falling behind schedule and that many tasks were not being completed in a timely manner. I also began to receive complaints from lower level managers that they had asked McDonald for directions on various matters but that McDonald was not responding promptly to their questions or e-mails and that this was slowing down needed work. I concluded from this that important matters were being log-jammed on McDonald's desk. I discussed these concerns with Suhr, and we decided to try and work with McDonald to fix the problem. I spoke to McDonald numerous times about this problem, and he always had some reason why things had not gotten done. Eventually Suhr and I ended up just doing some of McDonald's work ourselves to avoid dealing with the problem.

7. In early January 2001, Suhr and I became concerned about the status of the leases on the property where our service stations were located. Most of those leases had options to extend which would enable SPPC to extend the leases on favorable terms. McDonald was instructed to have a matrix of critical lease dates prepared. He resisted this and said that the Carlsmith law firm had been taking care of this task and that it had a tickler file. Suhr said that he did not want to just rely on Carlsmith and he asked McDonald, and had me ask McDonald, to prepare a matrix showing option dates. Despite these very clear instructions, McDonald did not prepare the requested matrix

2

and about two months later the option period on our Agat station expired without our being aware of it. As a result of this, SPPC was eventually forced to agree to lease payments of about $7,000 per month in order to keep the lease, as opposed to the $700 it would have cost had the option been extended.

8. McDonald apologized for this oversight and told Suhr, in my presence, that he had "dropped the ball." This was a serious failure in that it cost SPPC more than $75,000 per year.

9. Suhr and I are both experienced businessmen. However, since McDonald had much more experience than we did in the petroleum industry, we tended to defer to him on many operational matters. We believed it was important to let McDonald assign workers to the jobs where they would be most useful. Despite our inclination to defer to McDonald on these personnel matters, he began making assignments that made little sense, and just plain wrong. In particular, he moved the terminal manager, Glen Leon Guerrero, to the retail manager position, which is in charge of retail gas station and convenience store operations. Mr. Leon Guerrero had been doing a good job at the terminal (a position he held at Exxon), but he did not have a strong background in convenience store operations. This was a poor move, and it soon became apparent that Leon Guerrero was overwhelmed not happy, and that our franchisor, Circle K, was not satisified with lackluster performance and results. I discussed our concerns, and particularly Circle K's concerns, with McDonald but he insisted that Leon Guerrero stay in place. McDonald also moved Robert Koeppen from commercial manager to terminal manager, where he had no prior experience and he moved Mike Fleming from retail manager to commercial manager, where he did not have experience. This meery-go-round of shifting managers away from areas of proven expertise to areas where they were inexperienced made little sense and was upsetting to the managers involved and created a uncertainty throughout the company.

10. A very serious problem with respect to McDonald arose in late spring 2001. Circle K had sent an expert, Klaus Kokott, to Guam for six months to oversee the c-store conversion. Under our franchise agreement with Circle K we were required to set up and operate the c-stores

3

strictly according to Circle K guidelines. McDonald had apparently set up c-stores for Exxon about 10 years earlier on Guam and he had very strong opinions about how a c-store should be set up and operated. It quickly became apparent that McDonald's views on c-stores were quite different from Circle K's views. Both Suhr and I had meetings with McDonald in which we stressed the need to do things the Circle K way – that it was our responsibility and duty as franchisees to follow Circle K. McDonald was highly resistant to this; he genuinely believed he knew what was best and he wanted to do things his way.

11. In late spring or early summer 2001, John Patton, a vice president for Circle K International, who was in charge of coordinating the conversion on Circle K's behalf, complained to Suhr and to me that the conversion on the c-stores was behind schedule and that there was a real risk the stores would not be ready by the conversion deadline. Patton expressed his concern that McDonald was not supporting Klaus Kokott's work, and that McDonald was in some instances countermanding Kokott's instructions. Patton reminded us that the stores had to be set up and operated according to Circle K standards, and he added that this would ensure the value SPPC was paying to achieve. Patton was polite in his concerns, but he made it quite clear that Circle K expected SPPC to comply with its contractual obligations as a franchisee.

12. Suhr and I again talked to McDonald and told him that Kokott had to be supported. McDonald continued to insist that Circle K was not making the best decisions, but he did not appear to be interfering with Kokott and the store conversion was completed on schedule.

13. I believed that McDonald had finally come to the realization that the c-stores were a franchise operation and that neither he nor SPPC would have as much autonomy as McDonald had in his days with Exxon. Unfortunately, this was an incorrect assumption on my part. About a week before the grand opening of the Circle K stores on Guam, Shur went to Saipan for a one or two-day trip. While he was gone, McDonald approached me and told me not to worry, that Kokott was leaving soon and that he (McDonald) "would change everything and make it right once Kokott

4

leaves." This was very disturbing and it indicated how out of step McDonald had become with the wishes of the Board.

14. I discussed McDonald's comments with Suhr and the rest of the Board. There was a unanimous agreement that, when all factors of McDonald's performance were considered, and especially given his inability to grasp the Board's very strong need and desire to have a good relationship with Circle K and do things in the manner Circle K required, that McDonald should be terminated from his position as vice-president and general manager. Suhr was authorized to deliver the news to McDonald and to offer him a six-month severance package, with an automobile to keep, couched in terms of a consulting contract. The consulting contract was intended as a face saving measure to cushion McDonald from the embarrassment of being publicly terminated. It was not expected that McDonald would provide consulting services to SPPC under this agreement and he didn't.

15. SPPC has lived up to its side of the bargain with McDonald and has not made any public criticism of him. McDonald on the other hand, has attacked SPPC, Suhr, Chairman Hahn and me in many forums and accused us of being racists.

16. In his complaint to EEOC, McDonald claims that I "was uncomfortable with the local people (Chamorros)." EEOC Charge, Civille Decl. Ex. E. This is completely untrue. Much closer to the truth was McDonald's deposition testimony in which he said that he, Kokott and I were talking and that Kokott mentioned that he had gone back to Germany or Austria and for the first time really felt that he belonged somewhere. I responded that I grew up in the United States, but that when I went back to Korea for the first time, which is the homeland of the Korean people, I felt for the first time that I truly belonged. These comments were not intended to reflect ill feelings on the people of Guam, and no reasonable person hearing those comments would construe my words as a suggestion that I did not like Chamorros.

17. In his EEOC charge, McDonald claims that I said that Chamorros's "work was not as good as the people form the US mainland." This also is not true. *Ibid.* In his deposition,

5

McDonald claimed that I also said that I did not want to hire "locals" because I could get better workers cheaper on the mainland. McD Depo. 165:3-166:1-3; Civille Decl. Ex. A. These are also untrue statements. SPPC has a non-discrimination policy which I take very seriously. Further, SPPC always tries to hire on island before it looks off island. The only comment which I may have made which remotely resembles McDonald's allegations is a discussion we had in which I said we might not be able to find a person with convenience store expertise on island, and if we didn't we would have to recruit off island. There was no racial motive to this comment. It was simply an expression that the skill sets we were looking for were not that common, and we might not find anyone with c-store expertise in the Guam market.

18. McDonald claims that he was replaced by two white males, Kokott and Michael Fleming. This is not accurate. After McDonald was fired, the Board decided to abolish the position of general manager. The reason for this is that we felt that separating the marketing and operations into two divisions, with a vice-president in charge of each division, would help eliminate the bottleneck problems we had experienced with McDonald. Instead, the duties of the general manager were divided into two positions: vice president of marketing and vice president of operations. The first vice president of marketing was Klaus Kokott, who is white. He was hired because he had done an excellent job in the conversion of the c-stores, and because he was throughly versed in, and fully supported, Circle K's method of operation. He was an excellent trainer, something that McDonald did not seem interested in, and he had the confidence of our Board and of Circle K.

19. The vice president of operations, Michael Fleming, is also a white male and highly qualified. Although McDonald seems to claim that only Chamorros can be considered "locals", we considered Fleming to be a local hire. He had been living and working on Guam for about 9 years when we promoted him, and he was one of the Guam employees of Exxon who transferred over to SPPC at the time of the conversion. Fleming was an excellent worker, and had been second in command at Exxon. He was a logical and very good choice for the position.

20. McDonald also claims that he was discriminated against because he was fat. Again, this is completely untrue. McDonald is clearly overweight. So am I. I am 5'10" tall and weigh 250 pounds. Brain Suhr is 5' 7" tall and weighs about 160 pounds. At the time McDonald worked for SPPC, Suhr and I also were smokers (I still smoke, Suhr has since quit). The chairman of our Board, Mr. Hahn, is now 71 years old and had a stroke three years ago which has left him disabled. Before his stroke he was a fitness buff. At one meeting with Suhr, McDonald and me, the chairman said that he was worried about us and that we needed to lose weight, and stop smoking. The chairman, who speaks only limited English, said in broken English that he wanted us to have long careers with the company and we needed to take care of our health. He did not single McDonald out. At no time was losing weight a condition of employment of anyone in SPPC. McDonald was never told that he must lose weight or resign.

I declare under penalty of perjury under the laws of Guam and the United States of America that the foregoing is true and correct.

Executed on May 6, 2005, in Hagåtña, Guam.

_____
MICHAEL HAHN